**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: PET FOOD PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1850 (All Cases)<br><br>Civil Action No. 07-2867 (NLH)<br><br>**OPINION** |

### I.   <u>INTRODUCTION</u>

The Pet Food Products Liability Litigation involves litigation brought on behalf of consumers in the United States and Canada who purchased, or whose pets consumed, pet food and/or treat products that were recalled (the "Recall") because they allegedly contained contaminated wheat gluten and/or rice protein concentrate ("Recalled Pet Food Products"). The parties entered into a settlement agreement ("Settlement") that was preliminarily approved by this Court on May 30, 2008. On October 14, 2008, the Court held a fairness hearing and heard argument on plaintiffs' motion to approve the Settlement and co-lead plaintiffs' counsels' motion for attorneys' fees. The Court also heard argument on a motion to intervene in the Settlement and a separate motion for attorneys' fees filed by Newman, Creed & Associates. For the reasons expressed below, the motion for Settlement and for attorneys' fees is granted, the motion to intervene is denied, and co-lead counsels' motion to strike the separate motion for attorneys' fees filed by Newman, Creed & Associates is granted.

II.   __FACTUAL AND PROCEDURAL BACKGROUND__

As described in the motion for Settlement, in March 2007, Menu Foods announced a recall of more than 50 brands of dog food and over 40 brands of cat food manufactured between November 8, 2006 and March 6, 2007.  Shortly thereafter, Hill's Pet Nutrition, Del Monte Pet Products, Nestlé Purina PetCare Co. and Sunshine Mills, Inc. also initiated recalls of their own pet food and treat products that may have been contaminated.  The Recall expanded and eventually covered approximately 180 brands of pet food and pet treats produced by twelve different manufacturers that were distributed, marketed and sold by dozens of retailers. The cause of the Recall was that wheat gluten and rice protein concentrate imported from China and supplied to multiple pet food manufacturers by ChemNutra, Inc. and Wilbur Ellis, appeared to have been contaminated.  It was discovered that these pet food ingredients were adulterated with both melamine and cyanuric acid, the combination of which can lead to acute renal failure in small animals if ingested.  The two Chinese supply companies — Xuzhou Anying Biologic Technology Development Co., Ltd. ("XAC") and Binzhou Futian Biological Technology — inserted melamine into wheat gluten and rice protein to boost their protein content to meet the protein levels required under industry standards.

On February 6, 2008, two Chinese companies — XAC and Suzhou Textiles, Silk, Light Industrial Products, Arts and Crafts — were indicted on "charges of intentionally defrauding and misleading American manufacturers about poisonous ingredients

2

used in pet foods." According to the indictment against XAC and its owner, "[w]hen the XAC-manufactured wheat gluten was exported to the United States it was deliberately labeled and coded so that the product would not be subject to" compulsory and mandatory inspection by Chinese food authorities. Altogether, defendants recalled over 60 million containers of pet food products.

Pet owners commenced over 100 class actions against pet food manufacturers, ingredient suppliers, distributors, repackagers and retailers. Plaintiffs brought claims on behalf of all persons who purchased, used or obtained, or whose pets consumed, any cat or dog food or treats that allegedly contained contaminated wheat gluten and/or rice protein concentrate. Each complaint alleged violations of state consumer protection and deceptive trade practice statutes, product liability, warranty and negligence claims. These class action cases were consolidated by the Judicial Panel on Multidistrict Litigation (the "Panel") and transferred to this Court.

Counsel then engaged in motion practice regarding communications with potential class members and also began negotiations on preserving evidence and spoilage issues, including consultation with and deposition of experts regarding the contaminated pet food. In September 2007, the parties commenced settlement negotiations, both independently and with Professor Eric D. Green of the dispute resolution firm Resolutions, LLC. Settlement negotiations continued for seven

months involving cross-country and cross-border negotiations
between the parties, including Canadian plaintiffs and their
counsel.  Negotiations included more than ten days of formal
mediation facilitated by Professor Green and many additional
hours of in-person and telephonic negotiations with
representatives of plaintiffs and over twenty defendants.

### A.    The Proposed Settlement

As stated in the motion to approve the Settlement, the
Settlement provides for a $24 million cash fund in addition to
the approximately $8 million in payments already paid to pet
owners by certain defendants or their insurers as a result of
reimbursement claims programs ("Historic Payments").  The
proposed Settlement provides reimbursement for reasonable
economic damages incurred.  The determination of what costs will
be reimbursed will be decided by a claims administrator who shall
consider various documentation to determine reimbursement
amounts.[1]  The Settlement contemplates economic damages that
could potentially be covered such as necropsy/autopsy,
euthanasia, cremation, burial/specialty services, costs of new

---

[1]  The Settlement provides examples of acceptable documents
such as veterinarian bills, veterinary records, cancelled checks,
receipts, credit card receipts, and/or credit card statements,
statements from veterinarians, AKC registrations or Cat Fancier's
Association Certificates, copies of product labels or other forms
of proof of purchase.

pets,[2] and healthy pet screenings.[3]  For economic expense claims
that are unsupported by documentation, class members remain
eligible for payment up to a maximum of $900 for the undocumented
part of the claim.  Plaintiffs' co-lead counsel maintain that
some of the potentially recoverable claims under the Settlement
may not have been recoverable had this case gone to trial.

The payments described above will be subject to pro
rata reduction if the total amount of valid claims exceeds the
Settlement Fund, which sets aside certain amounts for product
reimbursements and health screenings.  Of the $24 million,
$250,000 is available for reimbursement of product purchases, and
$400,000 is available for health screenings.  If the total value
of claims for all other types of economic damages exceeds the
amount of the Settlement Fund, the claims will be pro-rated based
on the ratio of the claim to the total amount of claims for these
other damages.  Also, a charitable distribution comprised of any
funds remaining after the administration of the Settlement and
payment of all valid claims will be timely made to animal
welfare-related organizations in both the United States and
Canada.

The Settlement also includes an agreement for the

---

[2]  Pet owners may be reimbursed for the fair market value of
a deceased pet, including pets that were specially trained as
service animals.

[3]  The Settlement allows claims on behalf of healthy pets
that received veterinary attention and testing to ensure they
were not harmed by Recalled Pet Food Products.

further testing of pet food ingredients.  Defendants that
manufactured the Recalled Pet Food Products agreed to continue to
administer their internal quality assurance programs to regularly
test shipments of raw wheat gluten and rice protein concentrate
imported from China for the presence of melamine and cyanuric
acid until May 30, 2009.

   **B.** **Notice of Settlement**

   After joint motion by the parties and after hearing on
the motion on May 22, 2008, the Court preliminarily approved the
Settlement by Order entered May 30, 2008.  The Court found that
the "proposed settlement is fair, reasonable and adequate and
that the proposed Settlement Class meets all of the applicable
requirements under Rule 23(a) and 23(b)(3) of the Federal Rules
of Civil Procedure."  The Order also approved the Notice Plan for
publishing class notice.  As stated in the motion for settlement,
notice was published extensively in newspapers, magazines and
periodicals throughout the United States and Canada.  Pet owners
who were paid as part of the Historic Payment programs received
direct individual notice, and long form notice was sent to the
American Veterinarian Medical Association.  As of September 30,
2008, a total of 28,955 notices were directly mailed to potential
class members, the Settlement website had received over 38,039
visits, and over 8,150 calls were placed to the toll-free
telephone number, of which over 4,607 callers received live
assistance.  In addition, the Settlement has been reported
nationally in print, television and internet media.

The class members are now before the Court and move to have the class certified for purposes of settlement and to have the settlement approved.  We first address whether the plaintiffs have met their burden under Rule 23 for class certification. Finding that class certification for settlement purposes is proper in this case, we then address the motion to intervene and the various objections to the settlement by class members. Concluding that the grounds for intervention and for objection lack merit, we then address whether the settlement should be approved by the Court pursuant to Rule 23(e).  Approving the settlement, we then turn to the motions to approve attorneys' fees and determine that plaintiffs' co-lead counsels' motion will be granted and the separate motion for attorney fees' filed by Newman, Creed & Associates will be stricken.

### III.   **CLASS CERTIFICATION**

Federal Rule of Civil Procedure 23 governs the certification of class actions.  A party seeking class certification bears the burden of proving that each of the requirements under Rule 23 has been met. See, e.g., Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).  The legal requisites for class certification are: (1) under Rule 23(a), to satisfy all four requisites of numerosity, commonality, typicality, and appropriateness of class relief; (2) to fulfill at least one part of Rule 23(b); and (3) provide the Court with adequate information so that it can enter an Order defining the class and listing the claims, issues, or defenses subject to class

treatment pursuant to Rule 23(c)(1)(B).[4]  Id.; Watchel v.
Guardian Life Ins. Co., 453 F.3d 179, 184 (3d Cir. 2005).  Class
actions certified for the purposes of settlement are well
recognized under Rule 23.  See In re Prudential Ins. Co. of Am.
Sales Practices Litig., 962 F. Supp. 450, 508 (D.N.J. 1997)
(stating that Rule 23 allows Court to certify class for
settlement purposes only) (citing In re General Motors Corp.
Pick-Up Truck Fuel Tank, 55 F.3d 768, 778 (3d Cir. 1995).  "A
settlement class is 'a device whereby the court postpones the
formal certification procedure until the parties have
successfully negotiated a settlement, thus allowing a defendant
to explore settlement without conceding any of its arguments
against certification.'"  Id. (finding that a settlement class to
be "an 'extremely valuable' device to dispose of major and
complex class actions.").

        The parties filed their joint motion for approval of
the Settlement on May 22, 2008, and the Settlement was
preliminarily approved by this Court by Order entered May 30,
2008.  This Court preliminarily certified the following class for
settlement purposes pursuant to Rules 23(a) and 23(b)(3)
("Settlement Class"):

                All persons and entities who
                purchased, used or obtained, or

_____

    [4]  Rule 23(c)(1)(B) is easily satisfied in this matter as
the class is certified for settlement purposes only and counsel
have provided the Court with adequate information to define the
class and list the claims, issues and defenses as discussed
infra.

> whose pets used or consumed
> Recalled Pet Foods Product(s), and
> excluding Defendants, Released
> Entities and the Lum Class.

The Settlement Class excludes those members who properly opted out of the Settlement Class. To determine whether this Class should be certified for settlement purposes, we address whether each element under Rule 23(a) and the requirements under Rule 23(b)(3) have been met.

### A. **Rule 23(a)**

Under Rule 23(a), one or more of the plaintiffs may sue on behalf of all the members of the proposed class only if: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Baby Neal, 43 F.3d at 55.

### 1. **Numerosity**

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable. The Third Circuit has ruled that the numerosity requirement is satisfied where the proposed class consists of "more than 90 geographically dispersed plaintiffs." Eisenberg v. Gagnon, 766 F.2d 770, 785-86 (3d Cir. 1985); see also Welch v. Bd. of Dirs. of Wildwood Golf Club, 146 F.R.D. 131, 135 (W.D. Pa. 1993) (finding numerosity met where proposed class exceeds 100 members).

Here, the proposed Settlement Class includes thousands of consumers that are geographically dispersed throughout the United States and Canada.  As of the end of September 2008, approximately 9,357 class members have submitted claim forms to the Claims Administrator in this case.  Thus, a class of this size makes joinder of all members impracticable and Rule 23(a)(1) is met.

### 2. <u>Commonality</u>

The commonality prong of Rule 23(a) requires "questions of law or fact common to the class."  Fed.R.Civ.P. 23(a)(2). This requirement is met if plaintiffs share "at least one question of fact or law with the grievances of the prospective class."  <u>Baby Neal</u>, 43 F.3d at 56.  This commonality requirement has been recognized as one that is easily met.  <u>Id.</u>  Also, class members can assert such a single common complaint if they demonstrate that all class members are subject to the same harm. <u>Id.</u> (citing to <u>Hassine v. Jeffes</u>, 846 F.2d 169, 177-78 (3d Cir. 1988)).  The commonality prerequisite does not require that all members of the prospective class share identical claims. <u>Hassine</u>, 846 F.2d at 176-77 (relying on <u>Eisenberg</u>, 766 F.2d at 786).  It requires only that the harm complained of be common to the class, not that plaintiffs are affected by the harm in the same way. <u>Id.</u> at 177; <u>Baby Neal</u>, 43 F.3d at 56 (rejecting the argument that the commonality requirement cannot be met because of individualized circumstances).

The particular questions of law and fact common to the

Class are:

> (i)   Whether defendants intentionally, recklessly or negligently authorized injurious pet food to enter the market;
>
> (ii)   Whether defendants failed to properly test their "cuts and gravy" style dog and cat food before market entry of such food;
>
> (iii)   Whether defendants intentionally, recklessly or negligently delayed instituting a recall of its "cuts and gravy" style dog and cat food;
>
> (iv)   Whether defendants' recall was adequate and properly notified potentially affected consumers;
>
> (v)   Whether defendants' conduct constituted unlawful, unfair, or fraudulent business practices in violation of state consumer protection laws;
>
> (vi)   Whether defendants have been unjustly enriched as a result of their conduct;
>
> (vii)   Whether members of the Class have sustained damages as a result of defendants' conduct, and, if so, the appropriate measure of damages; and
>
> (viii)   Whether the contaminated pet food injured dogs and cats.

Based on the above claims which arise from the same nucleus of operative facts and involve the same legal theories, the Court finds that the commonality prong under Rule 23(a)(2) is met.

### 3.   **Typicality**

It has been recognized that the requirements for commonality and typicality are broadly defined and tend to merge. See Baby Neal, 43 F.3d at 56.  Nevertheless, they are distinct requirements and we scrutinize them individually.  "The typicality inquiry is intended to assess whether the action can

be efficiently maintained as a class and whether the named
plaintiffs have incentives that align with those of absent class
members so as to assure that the absentees' interests will be
fairly represented." Id.  "Commentators have noted that cases
challenging the same unlawful conduct which affects both the
named plaintiffs and the putative class usually satisfy the
typicality requirement irrespective of the varying fact patterns
underlying the individual claims." Id.  Factual differences do
not defeat typicality if "... the claim arises from the same
event or practice or course of conduct that gives rise to the
claims of the class members, and if it is based on the same legal
theory." Id., at 58.

     In this case, the claims of the class representatives are
aligned with those of the class members since the claims of the
representatives arise out of the same conduct and core facts
surrounding the Recall.  As such, the action can be efficiently
maintained as a class and the named plaintiffs have incentives
that align with those of absent class members so as to assure
that the absentees' interests will be fairly represented.
Therefore, the plaintiffs' claims are typical of the Class's
claims and Rule 23(b)(3) is met.

          4.    **Adequacy of Representation**

     The final prerequisite under Rule 23(a) is a
determination whether "the putative named plaintiff has the
ability and the incentive to represent the claims of the class
vigorously, that he or she has obtained adequate counsel, and

that there is no conflict between the individual's claims and those asserted on behalf of the class." Hassine, 846 F.2d 169 at 179 (citations omitted).  The two purposes for making such inquiry are: (1) the adequacy of representation inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent," Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997); and (2) the adequacy of representation inquiry "tests the qualifications of the counsel to represent the class." In re General Motors Corp. Pick-Up Truck Fuel Tank, 55 F.3d 768, 800 (3d Cir. 1995).

Here, the representative plaintiffs were damaged as a result of defendants' allegedly unlawful conduct, and the plaintiffs would have had to prove the same wrongdoing as the absent Class members to establish defendants' liability.  Thus, the representative plaintiffs' interests are directly aligned with those of other members of the Class.  In addition, plaintiffs have retained attorneys who are highly qualified, experienced and able to conduct this litigation.[5]  Thus, the Court finds that the requirements under Rule 23(a) have been met.

**B.**  **Rule 23(b)(3)**

Plaintiffs state that they meet the requirements under Rule 23(b)(3) for class certification.  Under Rule 23(b)(3), the

---

[5] Co-Lead counsel consists of Wexler Wallace LLP, Berger & Montague, P.C., Hagens Berman Sobol Shapiro LLP, Coughlin Stoia Geller Rudman & Robbins LLP, Audet & Partners LLP, and KamberEdelson, LLC.  Each of these firms have extensive histories of experience in complex class action litigation, and are well-respected law firms in the plaintiffs' class action bar.

Court must determine whether questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is the superior method of adjudication. <u>See</u> Rule 23(b)(3); <u>Prudential</u>, 962 F. Supp. at 510-11.  To make this determination, the following factors are addressed:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Rule 23(b)(3); <u>see also</u> <u>In re Mercedes Benz Antitrust Litig.</u>, 213 F.R.D 180, 186 (D.N.J. 2003) (stating that "[t]he Rule sets forth a non-exhaustive list of factors to be weighed.").  Where, as in this case, the class certification is for purposes of settlement, "... the Court need not inquire into whether a class action would be manageable at trial."  <u>In re AremisSoft Corp. Sec. Litig.</u>, 210 F.R.D. 109, 122 (D.N.J. 2002) (citing <u>In re Ikon Office Solutions, Inc., Sec. Litig.</u>, 194 F.R.D. 166, 178 n.14 (E.D.Pa. 2000); <u>Amchem Prods.</u>, 521 U.S. at 620.

For the purpose of certification of the Class for settlement, the same set of core operative facts and theory of proximate cause apply to each member of the class.  The actions

in this litigation concern consumers who purchased, used or
obtained, or whose pets used or consumed, Recalled Pet Food
Products.  If plaintiffs and potential class members were to
bring individual actions, they would each be required to prove
the same wrongdoing by defendants in order to establish
liability.  Thus, common questions of law and fact predominate.

Also, a class action in this MDL is superior to other
available methods for the fair and efficient adjudication of this
litigation because absent class action certification, the Court
may be faced with litigating over 100 individual lawsuits all of
which would arise out of the same set of operative facts.  By
proceeding in a class action, the resolution of common issues
alleged in one action will result in more efficient use of
judicial resources and bring about a single outcome that is
binding on all Class Members.  Also, a class action might allow
certain individuals to participate who would otherwise be
prevented from pursuing their claims because of the expense of
maintaining individual actions.  See Phillips Petroleum Co. v.
Shutts, 472 U.S. 797, 809 (1985) (concluding that it may be
uneconomical to litigate class action plaintiffs' claims
individually).

With regard to the four actors under Rule 23(b)(3), for
those potential class members who were interested in individually
controlling the prosecution or defense in a separate actions,
they had the option to opt-out of this litigation and pursue
their own claims individually.  With regard to the extent and

nature of any litigation concerning the controversy already begun
by or against class members, cases involving allegations of
contaminated pet food or recalled pet food merchandise were
transferred as quickly as possible to this MDL last year before
any substantive proceedings had occurred.  It is desirable to
concentrate the litigation in this MDL and to have the plaintiffs
operate as a class because of the common set of facts and claims
that dominate this litigation for purposes of settlement.  And,
finally, it would be administratively difficult to manage this
litigation as individual claims rather than a class action due to
the enormous number of plaintiffs.

Thus, the Court finds that Rule 23(b)(3) is satisfied in
this action because questions of law or fact common to the class
members predominate over any questions affecting only individual
Class members, and a class action is superior to other available
methods for the fair and efficient adjudication of this
controversy.  See In re Honeywell Intl Inc. Sec. Litig., 211 F.
R. D. 255, 267 (D.N.J. 2002) (finding that class action to be
fairest and most efficient means of resolving dispute given the
size and geographical dispersion of the proposed class and
likelihood that many purchasers sustained comparatively small
losses and individual adjudication class members would place
unnecessary burden on parties and courts).

**IV. MOTION TO INTERVENE/OBJECT**

Margaret Picus and Daniel Kaffer (collectively

16

"Proposed Intervenors")[6] filed a motion seeking leave to intervene on the ground that their interests were not adequately represented by the existing plaintiffs.  Proposed Intervenors allege that they purchased pet food that was falsely labeled as "Made in the United States" and have brought separate actions based on such mislabeling in California and Nevada state court. Proposed Intervenors' claims involve the mislabeling of pet food that was not contaminated and which was not recalled by defendants.  Proposed Intervenors argue that the Settlement is overly broad and purports to release their claims.  Proposed Intervenors also criticize the Settlement because only $250,000 out of the $24 million to be paid is allocated to pay product purchase claims.  Proposed Intervenors seek intervention to limit the scope of the Release to only the contaminated pet food products for which settlement consideration is being paid or, alternatively, to modify the settlement to include appropriate consideration for the release of the mislabeling claims for both the contaminated and non-contaminated pet food products.

---

[6]  Margaret Picus is the named plaintiff in a putative class action pending in the United States District Court for the District of Nevada.  Picus v. Wal-Mart Stores, et al., Case No. 2:07-CV-00682-PMP-LRL.  The Picus has been stayed pending the Court's determination of class certification.  Daniel Kaffer states that he is a former member of a putative class in a case currently under appeal.  Kennedy v. Natural Balance, Case No. 07-CV-1082 (S.D. Cal.).  In both of these actions, the plaintiffs alleged various causes of action against pet food manufacturers based on their alleged mislabeling of certain of pet food products containing imported ingredients as being "Made in the USA."

As was discussed with counsel at the fairness hearing
held on October 14, 2008, the Release is not as broad as Proposed
Intervenors suggest.  The Release applies only to claims by any
"Settlement Class Member" that relate to "matters referenced in
any claim raised . . . in the Pet Food Recall Litigation."
Settlement Class Members are "all persons and entities who
purchased, used or obtained, or whose pets used or consumed
Recalled Pet Food Product(s)" who have not opted out.  "Recalled
Pet Food Product(s)," are defined as:

> Any pet food product and/or treat
> products or any ingredient thereof
> that were recalled by any Released
> Entity between March 16, 2007, and
> the present because of allegedly
> contaminated wheat gluten and/or
> rice protein concentrate, and
> purchased, obtained or used by, or
> were made available to, or intended
> to be purchased or obtained by
> Class Members in the United States
> or Canada, and are the subject of
> the Pet Food Recall Litigation.

The list of Recalled Pet Food is attached to the
Court's Order approving the Settlement and lists all the
manufacturers and products recalled.  Consequently, persons that
did not purchase or whose pets did not consume Recalled Pet Food
Products are not Settlement Class Members, and their claims are
outside the scope of the Settlement Agreement.

Picus's and Kaffer's claims are based on their alleged
purchase of mislabeled products over a period of more than four
years, beginning in April 2003 through 2007 or 2008, and their

lawsuits assert "Made in the USA" claims for various pet food
products and varieties that were outside the scope of the pet
food recalls (i.e., all Ol' Roy products labeled "Made in USA,"
including unrecalled varieties).  To the extent these claims
relate to products other than the Recalled Pet Food Products,
they are not the subject of this Pet Food Recall MDL.  Therefore,
the Proposed Intervenors' claims in the state actions are not
released by the Settlement and their motion to intervene will be
denied.

     The Proposed Intevenors also object to the Settlement
on the ground that their interests as "mere purchasers," are not
adequately represented by the Class representatives.  The Class
representatives in this case were purchasers of pet food whose
pets consumed the contaminated pet food.  Co-lead counsel asserts
that they were designated to represent the entire Settlement
Class, including "mere purchasers."  The Court does not find any
conflict between the interests of the Proposed Intervenors and
the Class representatives who purchased the Recalled Pet Food
Products, as their interests in maximizing recovery of such
damages for the purchase of such products are aligned with the
interests of "mere purchasers" in maximizing recovery for such
product purchase claims.

     Finally, the Proposed Intervenors object to the
Settlement on the ground that the allocation of $250,000 for
purchases Recalled Pet Food Products is inadequate.  The Recall
involves a defined number of products manufactured over only a

few months.  The Settlement Agreement applies only to products
recalled in or after March 2007.  More importantly, it was
represented to the Court during the fairness hearing by co-lead
counsel and defense counsel - and it makes common sense - that
manufacturers and retailers have already provided compensation to
purchasers of recalled products through the Historical Payments
or through point of sale refunds or a result of the Recall.
Therefore, many purchasers of Recalled Pet Food Products have
already compensated outside of the Settlement.  Therefore, the
$250,000 amount allocated is adequate for payment for "Consumer
Food Purchase Claims" defined as "claims solely for reimbursement
of the costs associated with the purchase of a Recalled Pet Food
Product by a Settlement Class Member who has not been reimbursed
for such costs to date, including through return or exchange of
the Recalled Pet Food Products."[7]

## V.   **BLASZKOWSKI OBJECTORS**

The Blaszkowksi Objectors were named plaintiffs in a
putative class action in the United States District Court for the
Southern District of Florida, <u>Blaszkowski, et al. v. Mars Inc.,
et al.</u>, Case No. 1:07-cv-21221-CMA, filed on May 9, 2007.  The
<u>Blaszkowski</u> case was not consolidated with this Pet Food Recall
MDL.

_____

[7]  During the fairness hearing, counsel for objectors Jim
Jones and Dustin Turner appeared and also argued for removal of
the $250,000 cap for reimbursement claims for owners whose pets
suffered no injury.  For the reasons already discussed, the
$250,000 is adequate and this objection is overruled.

In the _Blaszkowski_ action, plaintiffs alleged that the
defendants' marketing of their pet food products as healthy,
premium or human grade was false and misleading because such pet
food products allegedly contained "nonedible garbage, by-products
and waste that is unfit for human consumption."

The proposed class in _Blaszkowski_ is defined as
follows:

> All persons in the United States
> who have purchased pet food
> produced, manufactured, advertised,
> marketed, distributed and/or sold
> by any of the Defendants that (a)
> was marketed as having certain
> ingredients or benefits to cats and
> dogs when the pet food either
> contained ingredients and/or
> additives and/or contaminants
> and/or other matter that were not
> represented in the Defendants'
> marketing and/or (b) fails to
> contain the promised benefits based
> upon scientific valid research
> studies.

The Blaszkowski Objectors contend that the Release in
this MDL impermissibly encompasses all claims asserted in the
_Blaszkowski_ action.[8]   The Court is satisfied that the Release in

---

[8]   The Blaszowksi Objectors also made this argument in a
motion to stay filed in the Florida action on the grounds that
the Settlement in this MDL would release all claims asserted in
the _Blaszkowski_ action, including those plaintiffs' claims
relating to non-Recalled Pet Food Products. The District Court
in Florida denied the stay motion on July 21, 2008.  The
Blaszkowski plaintiffs filed a renewed motion for stay making the
same arguments and the Florida Court denied the renewed stay
motion on July 31, 2008.  Following this denial, many of the
Blaszkowski plaintiffs voluntarily dismissed their claims with
prejudice against all but one defendant (Natura, a manufacturer
that did not produce any Recalled Pet Food Products and is not a

this MDL does not encompass all claims brought in the Blaszkowski
action.  As discussed above regarding the motion to intervene,
the Release only pertains to "Recalled Pet Food Product(s)."[9]

        The Blaszkowski Objectors also object to the Settlement
on the ground that they are unable to ascertain whether they are
"Settlement Class Members" that purchased "Recalled Pet Food
Products" from "Released Entities."  The List of Recalled Pet
Food Products attached to this Court's Order approving the
Settlement sets forth the manufacturer, product name and variety
type and other information about the products in order for them
to make such a determination.  It also appears that the remaining
defendant in the Blaszowski action, pet food manufacturer Natura,
did not produce Recalled Pet Food Products and was not "Released
Entity."[10]  The objections raised by the Blaszowksi Objectors are
overruled.[11]

### VI.   OBJECTIONS TO THE SETTLEMENT

        To date, over 9,357 pet owners have submitted claim

---

defendant in the Pet Food Recall MDL before this Court).

        [9]  The Blaszowski Objectors did not appear and argue their
position before the Court during the fairness hearing.

        [10]  The Blaszkowski plaintiffs also had the option of opting
out of the Settlement but choose not to do so.

        [11]  To be clear, to the extent that any claims brought in
the Pincus, Kennedy, or Blaszkowski actions do overlap with the
Release of claims in this MDL, the Release governs and those
claims cannot be brought in a separate action.  As explained
supra, however, it does not appear that the Release in this MDL
encompasses the claims in those actions, except to the extent
they extend to the Recalled Pet Food Products.

forms to the claims administrator.  Of those 9,357 Settlement
Class Members participating in the Settlement, 114 have opted-
out, and 28 have objected ("Objectors").  The Court has read each
letter filed on the docket by those objecting to, or in support
of, the settlement and notes the understandable expressions of
immense grief over the injury to or loss of their pets.  Rather
than discuss each individually, the objections are grouped into
the following categories.

### 1.   Criminal and Punitive Sanctions

Some of the Objectors contest the fact that the
Settlement does not provide for criminal penalties or is not
punitive enough, and that stricter testing and screening measures
should be implemented throughout the pet food industry.  While
the Court notes their desire to have certain wrongdoers held
criminally liable, this particular litigation involves a civil
class action lawsuit.  This Court does not have the jurisdiction
or the power to initiate criminal investigations or to impose
criminal penalties in this case.  As explained earlier in this
Opinion, indictments were handed down against certain
manufacturers by the United States Department of Justice ("DOJ").
Those criminal matters are being pursued by the DOJ in a separate
legal action and are not part of this litigation.

As for punitive measures, plaintiffs' co-lead counsel
negotiated with the intention of providing the greatest relief
possible to Class Members against a backdrop in which the
financial viability of Menu Foods, a major defendant in the

litigation, was uncertain.  Counsel felt that the upper limits of
damages were unclear and pursuing punitive damages without
compromise could very well have jeopardized the relief the
putative class could have obtained.  To put it another way, an
award of punitive damages would be a hollow victory against a
bankrupt defendant.  Balancing such risks is part of any
litigation and as we note elsewhere, the Settlement appears to
have been carefully thought out, negotiated at arm's-length, and
achieved a fair result despite the risks attendant to litigation.
This objection is overruled.

### 2.   Testing of Pet Food and Enforcement of Regulations

Several Objectors voiced displeasure because the
Settlement does not impose indefinite testing of pet foods or
stronger enforcement of safety regulations.  As part of the
Settlement, defendants that manufactured the Recalled Pet Food
Products have agreed to regularly test shipments of raw wheat
gluten and rice protein concentrate imported from China for the
presence of melamine and cyanuric acid and will continue such
testing until May 30, 2009.  This Court, however, does not have
the jurisdiction or power in this particular litigation to impose
stricter statutes and regulations governing the pet food
industry.  Rather, such regulations are primarily under the
purview of Congress and the FDA, which are not parties to the
litigation.  The power to have stricter enforcement and tougher
statutes lies with the Legislative and Executive branches of
government.  See Northwest Airlines, Inc. v. Transport Workers

24

Union, 451 U.S. 77, 94 (1981) (stating, "... we consistently have emphasized that the federal lawmaking power is vested in the legislative, not the judicial, branch of government;").  For those Objectors who feel that stronger statutes or enforcement should be in place, their voice can be heard by contacting their respective legislators.  While the Court certainly sympathizes with the Objectors, this Court cannot make new laws; its purpose is to interpret the laws as written.  This objection is overruled.

### 3.    Emotional Damages

Some Objectors criticized the Settlement because it does not provide damages for emotional distress.  Although the complaints filed in this case generally sought emotional damages, in almost every state in the Union, the current state of the law is that emotional damages are not recognized as a recoverable damage for pets.  See Konaurov v. Kerdasha, 629 S.E.2d 181, 186-87 (Va. 2006) (stating that the law in most states regard dogs and cats as personal property and emotional distress damages are generally not recoverable for personal property).[12]  Courts that have addressed the issue of emotional distress damages for the injury or death of a pet found that it is a subject properly left to legislature. Id.[13]

---

[12]  Illinois and Tennessee appear to be the only states allowing such lawsuits in limited circumstances.  Id.

[13]  Plaintiffs' co-lead counsel states that they researched A.B. 4217, a bill introduced in the New Jersey State Legislature that would, in part, provide noneconomic damages for the loss of

The Court takes particular notice of the Objectors' emotional distress over the loss of their pets and understands their request to be compensated for their loss in this way.  The current law in most states, however, rarely provides relief for such damages.  Plaintiffs' co-lead counsel felt they were somewhat constrained by existing statutes and case law from advocating for noneconomic damages on behalf of pet owners and felt that the amount of recovery would still be adequate even if such damages were more widely recognized.  Given the backdrop of the current state of the law regarding emotional damages for injuries to pets, and co-lead counsels' consideration of the current law in negotiating settlement, this objection is overruled.

### 4.    Future Expenses

Future expenses beyond November 24, 2008 are excluded from the Settlement.  The reasons provided by counsel for excluding future expenses are that such expenses would be highly speculative, incapable of reasonable determination absent expert actuarial analysis, and potentially require prolonged involvement by the claims administrator and the Court.  For example, reimbursement for future expenses would require estimates of a pet's life expectancy, a determination of whether a pet's renal

---

a pet.  That Bill is pending in the New Jersey Assembly.  The perceived need for this legislation is additional evidence that the common law does not support recovery for emotional damages caused by the loss of a pet.

condition is improving or deteriorating and an analysis of the
costs associated with treating the pet's renal condition over the
course of the pet's life.  Counsel states that it would also be
difficult to limit treatment costs where a pet's existing renal
condition may be complicated or worsened by other factors, such
as compounding diseases or other health issues.  They argue that
the claims administrator cannot make these determinations and
damages based on conjecture would be difficult to contain and, if
allowed under the current Settlement, could require expert
treatment that would consume portions of the fund otherwise
allocable to concrete, determinable expenses already incurred by
pet owners.  It also noted that recovery for further expenses
could expose the claims process to potential exaggeration and
fraud.  Although co-lead counsel does not believe that fraudulent
claims would be common, they do feel that the difficulty of
verifying such claims and the inability to predict future
expenses with accuracy would make the Settlement vulnerable to
abuse.

Taking into consideration the objections filed in this
case, the Court concludes that the objections do not disturb the
preliminary findings that the Settlement is fair, reasonable and
adequate.  Some objections pertain to matters beyond the power of
this Court and scope of this litigation and other objections
either are not feasible or could jeopardize the Settlement as a
whole.  In weighing the various issue in this matter, the Court
must take into consideration not just the objections but the

entire settlement class and come to a resolution that benefits
the Class as whole.  Although the Court understands that the
Settlement cannot address every concern and provide the total
relief sought or envisioned by every class member, and
particularly sympathizes with those Objectors who suffered
through emotional distress from this ordeal, the Court is
satisfied that the Settlement provides adequate relief to the
Class as a whole.

### VII. <u>SETTLEMENT</u>

Settlement of class actions is governed by Rule 23(e)
which provides that "[t]he claims, issues, or defenses of a
certified class may be settled, voluntarily dismissed, or
compromised only with the court's approval."  The Court finds
that requirements of Rule 23(e) have been met.

### A. Notice

As stated above, after the Settlement was preliminarily
approved, notice was published in newspapers, magazines and
periodicals in the United States and Canada.  Some pet owners
received direct individual notice, and notice was sent to the
American Veterinarian Medical Association.  As of September 30,
2008, a total of 28,955 notices were directly mailed to potential
class members, the Settlement website had received over 38,039
visits, and over 8,150 calls were placed to the toll-free
Settlement telephone number.  Also, the settlement has received
attention from the media and been reported nationally in print,
television and internet media.  Thus, notice has been provided in

28

a reasonable manner to potential class members.

### B.   Fair, Reasonable, and Adequate

The Settlement can be approved only after the Court conducts a hearing and finds that it is "fair, reasonable, and adequate."  In <u>Girsh v. Jepson</u>, 521 F.2d 153, 156-57 (3d Cir. 1975), the Third Circuit articulated nine factors to consider to evaluate whether a proposed settlement is fair, reasonable and adequate.  They are:

(1)   The complexity, expense, and likely duration of the litigation;

(2)   The reaction of the class to the settlement;

(3)   The stage of the proceedings and the amount of discovery completed;

(4)   The risks of establishing liability;

(5)   The risks of establishing damages;

(6)   The risks of maintaining the class action through the trial;

(7)   The ability of the defendants to withstand a greater judgment;

(8)   The range of reasonableness of the settlement fund in light of the best possible recovery; and

(9)   The range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of

litigation.

See id. at 157 (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974)).

> **(1)  The Complexity, Expense, and Likely Duration of the Litigation**

This litigation was initiated following the largest pet food recall in U.S. history.  Over 60 million containers of pet food were recalled and covered over 90 brands of dog food and cat food.  Approximately 115 nationwide class action lawsuits were filed on behalf of approximately 250 plaintiffs.  Similar class actions were filed in the provinces of Canada.

There are complex medical and toxicological issues in this litigation, which would have likely required undertaking a comprehensive analysis into the combined impact of melamine and cyanuric acid, the contaminants found in the wheat gluten and rice protein in the Recalled Pet Foods, on small animal renal systems.  Such an analysis would have likely required multiple experts in the fields of veterinary medicine, toxicology, and pathology with particular attention to feline and canine renal systems.  This analysis would have likely delved into somewhat new territory involving the effects of these toxins on cats and dogs.[14]  Counsel has represented that reliance on expert research in this case would be substantial and carry with it enormous cost throughout the litigation and through trial.

_____

[14]  See "FDA's Ongoing Pet Food Investigation," available at http://www.fda.gov/consumer/updates/petfoodrecallup.html

In addition, an analysis of the pet food itself may have been necessary to test the extent to which pet food products were contaminated.  Counsel has represented that were litigation to continue, additional experts would be required to perform the actual testing of many units of stored pet food located in locations across the nation.  Given the potential degeneration of pet food recalled over a year ago, such testing could be complicated, costly and time consuming.

It also appears that discovery in this litigation would be extensive and require significant resources.  Counsel has stated that the parties would have to expend substantial resources taking discovery of the over 20 defendants named in this litigation, involving international and cross-country travel.  Defendants would also likely seek to depose many of the 250 named plaintiffs in this litigation, who reside throughout the country.

Finally, although the parties have engaged in motion practice and some discovery as well as settlement negotiations, the procedural posture of this case is not beyond the discovery stage.  No motions to dismiss or motions for summary judgment have been filed.  Although the class has been certified for settlement purposes, plaintiffs have not moved for class certification for litigation or trial purposes and have not filed a consolidated complaint.  Counsel represents that pursuing these actions through pretrial motion practice, formal discovery and trial would involve potentially several additional years to this

litigation and could deprive pet owners of relief.

Thus, for the above reasons the Court finds that the complexity, expenses, and likely duration of this litigation favor the approval of the proposed Settlement.  See Warfarin, 391 F.3d at 535-36 (stating that the first Girsh factor "captures the probable costs, in both time and money, of continued litigation.") (quoting Cendant, 264 F.3d 201, 233 (3d Cir. 2001)).

### (2) Reaction of the Class to the Settlement

It has been represented to the Court that the Court-appointed settlement administrator published a summary notice of the Settlement and hearing in newspapers and periodicals throughout the U.S. and Canada; mailed Notice to all the Class Members who received Historic Payments from defendants or their insurance carriers; mailed notice to all persons who completed and returned a claim form and whose names and addresses are in a readily accessible database; and posted relevant documents on the Settlement website.  The Notice informed potential Class Members of their right to object to any aspect of the Settlement.  In response, as of the date of the fairness hearing, over 9,357 claims have been received by the settlement administrator, 89 exclusion requests from U.S. residents, and 25 from Canadian residents.  Twenty-eight objections have been received.

Given the wide distribution of notice and the small percentage of objections received, this factor weighs heavily in

favor of settlement.  See Bell Atlantic Corp. v. Bolger, 2 F.3d
1304, 1314 (3d Cir. 1993) (holding that a "small proportion of
objectors does not favor derailing settlement."); Stoetzner v.
U.S. Steel Corp., 897 F.2d 115, 118-19 (3d Cir. 1990) (holding
that a settlement where 29 out of 281 class members filed
objections satisfied the Girsh test).  Also, as explained above,
many of the objections pertain to matters outside the scope of
this litigation or jurisdiction of this Court; or, the objections
are due to an overly broad reading of the Release.  Thus, the
reaction of the large majority of the class has been positive and
satisfies the second Girsh factor.

### (3)   The Stage of The Proceedings and The Amount of Discovery Completed

Since this case was stayed, formal discovery was not
conducted except for the deposition of defendants' 
biostatistician.  Plaintiffs' co-lead counsel represents that
even though formal discovery did not occur, they still needed to
know the facts and law to be able to effectively weigh the
strengths, weaknesses and risks in this case to participate in
settlement negotiations.  They state that they conducted informal
discovery, including extensive consultation with experts, and
spent considerable time doing factual and legal research as well
as having many meetings and conversations between counsel.
Particularly, plaintiffs state that they retained and consulted a
well-respected toxicologist and pathologist specializing in small
animal renal systems at the outset of the case, and consulted

with and reviewed reports produced by numerous veterinarians,
veterinary medical associations and advocacy organizations,
including: the American Veterinary Medical Association (AVMA),
American College of Veterinary Internal Medicine (AC VIM),
American Society for the Prevention of Cruelty to Animals
(ASPCA), the American Animal Hospital Association (AAHA), the
Veterinary Information Network (VIN) and the American Association
of Veterinary Laboratory Diagnosticians (AAVLD).  Plaintiffs
state that they retained a biostatistician, Dr. Nicholas Jewell,
to assist them in reaching an agreement with defendants on a
sampling plan that would help determine what amount of evidence
in the form of stored, and rapidly deteriorating, pet food
product should be maintained to assess levels of contamination.
Plaintiffs also deposed defendants' statistician, Dr. George
McCabe, on the issue of disposal of the pet food.

     Plaintiffs further state that they performed an
extensive analysis of the legal claims available under common law
and applicable state statutes in order to analyze the
relationship of the companies in the pet food distribution chain
and determine their ability to contribute to class relief.
Plaintiffs also state that they tracked legislation in various
states to determine whether the relevant legal landscape would
change during the course of the litigation.  They further state
that they conducted damages analyses by contacting close to 50
pet hospitals throughout the nation to determine typical costs
for treatment, diagnosis and death-related expenses such as

necropsy, cremation and burial.

In assessing the third <u>Girsh</u> factor, courts look at the amount of case development that has occurred prior to settlement. <u>See</u> <u>Cendant</u>, 264 F.3d at 235 (quoting <u>GM Trucks</u>, 55 F.3d at 813) (stating that the third <u>Girsh</u> factor "captures the degree of case development that class counsel have accomplished prior to settlement."). Here, counsel has shown that adequate informal discovery was conducted as well as some formal discovery in order for counsel to gain an appreciation of the merits of the case as well as the legal theories and risks. <u>Id.</u> (finding that the district court took note of the formal and informal discovery conducted). Thus, the Court finds that the third <u>Girsh</u> factor weighs in favor of settlement. <u>Id.</u> at 236 (approving settlement even though litigation was at an early stage because of the nature of the case and because counsel had an excellent idea of the merits of its case at the time of the settlement).

### (4 & 5)    Risks of Establishing Damages and Liability

In assessing the risks under the fourth and fifth <u>Girsh</u> factors, plaintiffs state that although they are confident they would prevail at trial, they recognize that complex litigation cases such as this against large companies have inherent risks. They state that trial in this case against the pet food industry would have involved a "major battle" between the parties' respective experts and would have opened them to the risk of convincing the jury to believe their expert. Plaintiffs also felt they would likely face significant risks on the issue of

causation, damages and liability.

Plaintiffs state that research on toxicity showed that the melamine and cyanuric acid, compounds found in the adulterated wheat gluten and rice protein concentrate used to manufacture pet food, demonstrated a strong relationship to acute renal failure, and that the combination of melamine and cyanuric acid seems to be more toxic than either compound alone.[15] Plaintiffs noted, however, that relatively few studies have been conducted, and of those conducted, it is unclear precisely how many pets became ill or died as a result of eating Recalled Pet Food Products.  Plaintiffs also noted that the age and health of the pet at the time contaminated food was consumed complicates causation because oftentimes, pet death or illness could not be explicitly tied to the consumption of contaminated food; pets could have suffered from other known or undetected illnesses and/or could have been of a particularly old or young age at the time of consumption.

Plaintiffs further state that liability would be hotly contested because the adulteration of wheat gluten and rice protein concentrate with melamine was a criminal act by Chinese companies that occurred in China, and its presence was reasonably unexpected, had never been tested for nor was previously detected.  Indeed, the criminal prosecution itself and the nature of the alleged scheme suggests the contamination was calculated

---

[15]  See http://www.fda.gov/cvm/menufoodrecallfaq.htm.

as a deception designed to fool regulators and end users.
Plaintiffs further note as the product moved through the
manufacturing and distribution process that varying degrees of
liability would exist between manufacturers, private labelers and
entities that were strictly retailers.

Although plaintiffs state that they believe that
causation could be shown at trial, they admit that the issue of
causation would be a major battleground with the outcome unknown.
Plaintiffs have also admitted that they do not know definitively
how many pets became ill or died as a result of consuming
Recalled Pet Food Products which creates uncertainty as to what
damages plaintiffs could ultimately obtain on behalf of pet
owners.  Therefore, there is some risk to plaintiffs in being
able to establish causation, damages and liability if this case
were to go to trial thereby satisfying the fourth and fifth <u>Girsh</u>
factors.

### (6) Risks of Maintaining a Class through Trial

Plaintiffs argue that even if the class is certified
for litigation, there are risks of decertification.  As an
example, plaintiffs state that defendants could argue that the
science concerning the etiology of renal failure is not
susceptible to class-wide proof of plaintiffs' claims, or that
defendants will seek to establish that individual issues such as
pet breed, amount or type of food consumed, health history, and
age, among other issues, predominate.  Plaintiffs point out that
the studies found that sickness and mortality varied widely

between cats and dogs and on the size of the animal, and that
various preexisting conditions may contribute to the rates of
death and sickness in cats and dogs and smaller and larger
animals.

Even assuming that the Court would certify the class
for litigation purposes under Fed.R.Civ.P. 23(a), it has the
ability to "decertify or modify a class at any time during the
litigation if it proves to be unmanageable." Cendant, 264 F.3d
at 239 (citing lower court case, In re Cendant Corp. Sec. Litig.,
109 F.Supp.2d 235, 262 (D.N.J. 2000), quoting In re Prudential
Ins. Co. of Am. Sales Practice Litig., 148 F.3d 283, 321 (3d Cir.
1998)).  In Cendant, the Third Circuit found the potential for a
court to decertify or modify a class at any time if unmanageable
only creates a slight risk of decertification and is not enough
alone to weigh in favor of settlement.  Id.  Here, however, given
the potential differences as to the health of the pet and the
size of the pet, there exists more than a slight risk of
modification or decertification enough for this factor to weigh
in favor of settlement.

    **(7)  Defendants' Ability to Withstand Greater Judgment
and Enforceability of Judgment**

Plaintiffs' co-lead counsel states that after engaging
in settlement negotiations, they believed that defendants were
unwilling or potentially unable to settle for a greater amount.
Plaintiffs note that Menu Foods, a major defendant in this
litigation in that it manufactured a large quantity of the

recalled food for distribution by various companies under numerous brand names, spent approximately $55 million in Canadian dollars exclusive of any Historic Payments and the Settlement Fund, C$10 million more than originally anticipated.  Plaintiffs also report that Menu Foods lost approximately 80% of its contract business representing approximately 45% of Menu Foods' total volume.  Plaintiffs also state that following the Recall, it was reported that Menu Foods stock fell by 69%, and the company has reduced its workforce by reportedly 10-15%. Plaintiffs state that the financial viability of Menu Foods was uncertain during the settlement negotiations.

The Court acknowledges the fact that Menu Foods has incurred substantial cost in recalling the contaminated pet food, costs incurred outside of this litigation yet nonetheless factored into the financial viability of Menu Foods' ability to pay the settlement.  The amount of settlement, coupled with the expectation that some pet owners will be able to recover most if not all of their costs, weigh in favor of settlement.  See McCoy v. Health Net, Inc., 569 F.Supp.2d 448, 462-63 (D.N.J. 2008) (even assuming Health Net could afford to pay more than the settlement it is not a basis for rejecting the settlement and noting that "many settlements have been approved where a settling defendant has had the ability to pay greater amounts."), citing In re Remeron Direct Purchaser Antitrust Litig., No. Civ.03-0085 (FSH), 2005 WL 3008808, at *9 (D.N.J.  Nov. 9, 2005), citing In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 538 (3d Cir.

2004)).  There is also the consideration that if this case did proceed to trial, that plaintiffs would not be able to recover much more than they are able to recover through the Settlement. See Lazy Oil Co. v. Wotco Corp., 95 F.Supp.2d 290, 318 (W.D.Pa. 1997) (stating "in light of the risks that Plaintiffs would not be able to achieve any greater recovery at trial, the Court accords this factor little weight in deciding whether to approve the proposed Settlement."); Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D. 207, 239 (D.N.J. 2005) (finding that "Class Members will have the opportunity to obtain a full-recovery under this Settlement, so its not clear to what degree a greater judgment would recompense Class Members.").

> **(8 & 9)   The range of reasonableness of the settlement fund in light of the best possible recovery; and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.**

The eight and ninth Girsh factors are often analyzed together.  See Warfarin, 391 F.3d at 538 (stating that factors eight and nine "... test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." ).  In this case, plaintiffs state that the Settlement allows Class Members to have the potential to obtain up to 100% of their economic damages after submitting a valid claim while avoiding the risk of litigation.  Plaintiffs argue that since the Class Members could potentially recover up

to 100% of their economic damages, it is preferable to the very real possibility of a smaller recovery or no recovery at all. Plaintiffs also state that the proposed Settlement represents a significant recovery in light of the attendant risks of litigation of proving causation, damages and liability.

The Court finds that the range of reasonableness under the eighth and ninth <u>Girsh</u> factors weigh in favor of settlement. Although some Class Members may not be reimbursed fully for their economic damages depending upon whether the fund can support the number of claims ultimately submitted, it does have the potential to allow most Class Members to be reimbursed fully. The Court also notes that by settling, the Class Members will receive money now at present value, rather than later, assuming they would be successful in litigation. <u>See</u> <u>GM Trucks</u>, 55 F.3d at 806 (comparing "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing" with "the amount of the proposed settlement.") (quoting MANUAL FOR COMPLEX LITIGATION 2d § 30.44 at 252).

Overall, settlement of litigation is favored by the courts and particularly so in class action litigation. <u>See</u>, <u>e.g.</u>, <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516, 535 (3d Cir. 2004) (finding that there is an "overriding public interest in settling class action litigation, and it should therefore be encouraged.") (quoting <u>In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.</u>, 55 F.3d 768, 784 (3d Cir. 1995)

(stating that "the law favors settlement, particularly in class
actions and other complex cases where substantial judicial
resources can be conserved by avoiding formal litigation").
District courts exercise discretion in determining whether to
approve a proposed class action settlement.  See Warfarin, 391
F.3d at 535; Girsh, 521 F.2d at 156; Bryan v. Pittsburgh Plate
Glass Co., 494 F.2d 799, 801 (3d Cir. 1974) (holding that the
district court has discretion in determining whether a settlement
is fair and reasonable).  In this case, the Settlement meets the
requirements under Rule 23(e), and in particular is found to be
fair, reasonable and adequate under Rule 23(e)(2) pursuant to the
Girsh factors.

### VIII.    ATTORNEYS' FEES

In conjunction with their motion for settlement,
plaintiffs' co-lead counsel also move for an award of attorneys'
fees equal to 25% of the $24 million Settlement Fund, or $6
million, plus reimbursement of expenses in the amount of
$394,403.09.[16]  This percentage of recovery was included in the
Settlement preliminarily approved by the Court on May 30, 2008.
Following entry of that Order, co-lead counsel has represented
that more than 28,950 Notices of Proposed Class Action Settlement
and Final Fairness Hearing ("Notice") were mailed to Class

---

[16]  The May 22, 2008 Settlement Agreement also allowed
plaintiffs' Canadian counsel to apply for attorneys' fees in the
amount of up to 6% of the Settlement Fund, or $1,440,000.  That
application is not before this Court.  Nonetheless, if approved,
the combined applications for attorneys' fees would equal
$7,440,000, or 31% of the Settlement Fund.

members.  The Notice advised Class members that plaintiffs'
co-lead counsel planned to request an award of attorneys' fees
not to exceed 25% of the Settlement Fund, and for reimbursement
of their expenses.  Of the twenty-eight objections received, two
objected to the anticipated fee and expense request.  This is a
de minimis number as compared with the 9,357 claims filed through
September 30, 2008.  The Notice also advised Class members that
counsel for plaintiffs in the Canadian actions would seek an
award for their attorneys' fees not to exceed 6% of the
Settlement Fund and for reimbursement of expenses.

It has long been recognized that an attorney who
prosecutes an action on a contingent fee basis that results in
the creation of a fund or benefit for his or her clients may
obtain fees from that common fund.  See Boeing Co. v. Van Gemert,
444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a
common fund for the benefit of persons other than himself or his
client is entitled to a reasonable attorney's fee from the fund
as a whole.") (citations omitted); In re AremisSoft Corp. Sec.
Litig., 210 F.R.D. 109, 128 (D.N.J. 2002) ("Attorneys who
represent a class and aid in the creation of a settlement fund
are entitled to compensation for legal services offered to the
settlement fund under the common fund doctrine.") (citing In re
GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 820
n.39 (3d Cir. 1995)).  The amount of attorneys' fees to be
awarded rests within the discretion of the court.  See Gunter v.
Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000)).

          The award of counsel fees based on a percentage of the

common fund created for the benefit of a class has been

recognized as the appropriate method for determining

compensation. See, e.g., Boeing, 444 U.S. at 479 (stating

"[a]lthough the full value of the benefit to each absentee member

cannot be determined until he presents his claim, a fee awarded

against the entire judgment fund will shift the costs of the

litigation to each absentee in the exact proportion that the

value of his claim bears to the total recovery.").  This

"percentage of recovery" or percentage of the fund method of

awarding fees in common fund cases has been approved by the Third

Circuit and applied by District Courts in this Circuit.  See In

re AT&T Corp., 455 F.3d 160, 164 (3d Cir. 2006) ("In common fund

cases such as this one, the percentage-of-recovery method is

generally favored "); Cendant, 264 F.3d at 220 (Counsel fees are

generally been fixed on a percentage basis rather than the

lodestar method,[17] or hourly fee method); In re Prudential Ins.

_____

          [17]  For the lodestar method, the number of hours spent on
the case is multiplied by each attorney's reasonable hourly rate
and then adjusted (by applying a multiplier) to reflect such
factors as risk, the contingent nature of the litigation, the
result obtained, and the quality of the attorney's work.  See
Hahnemann University Hosp. v. All Shore, Inc., 514 F.3d 300, 310
(3d Cir. 2008); Lindy Bros. Builders, Inc. v. Am. Radiator &
Standard Sanitary Corp., 540 F.2d 102, 116-18 (3d Cir. 1976).
This method is disfavored and the percentage of recovery method
is commonly used.  See Third Circuit Task Force Report, Selection
of Class Counsel, 208 F.R.D. 340 (Jan. 15, 2002); Third Circuit
Task Force Report, Selection of Class Counsel, 108 F.R.D. 237,
238 (Oct. 8, 1985); MANUAL FOR COMPLEX LITIGATION §14.121 (4th
ed.).

Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 333
(3d Cir. 1998)("The percentage-of-recovery method is generally
favored in cases involving a common fund, and is designed to
allow courts to award fees from the fund 'in a manner that
rewards counsel for success and penalizes it for
failure.'")(quoting GMC Trucks, 55 F.3d at 821).

### A. **Gunter** Factors

Under Third Circuit law, plaintiffs' requested fee
enjoys a presumption of reasonableness which can be rebutted only
by a showing that it is, prima facie, clearly excessive.  See
Cendant, 264 F.3d at 283; AT&T, 455 F.3d at 167-68.  To determine
whether the fee is reasonable or "clearly excessive," the Court
is guided by seven factors listed in Gunter v. Ridgewood Energy
Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000).  See Cendant, 264
F.3d at 283.  The Gunter factors to be considered are:

    1.   The size of the fund created
and the number of persons
benefitted;

    2.   The presence or absence of
substantial objections by
members of the class to the
settlement terms and/or fees
requested by counsel;

    3.   The skill and efficiency of
the attorneys involved;

    4.   The complexity and duration of
the litigation;

    5.   The risk of nonpayment;

    6.   The amount of time devoted to
the case by plaintiffs'
counsel; and

       7.   Awards in similar cases.

      Applying each of the <u>Gunter</u> factors, the Court finds that the percentage of fee requested is reasonable.

      **(1)  The Result Achieved and the Number of Persons Benefitted by the Settlement**

      Plaintiffs' co-lead counsel maintains that the Settlement provides Class members with the opportunity to recover up to 100% of their reasonable economic damages, and up to $900 per pet for economic damages that Class members are unable to prove with documentation.  The economic damages that are designated as recoverable include healthy screening, veterinary testing and treatment, death-related expenses, pet cost reimbursement and cost of recalled pet food.  Other types of economic damages may also be recovered as long as they are "reasonable and set forth by the claimant on the Claim Form under 'Additional Expenses.'"[18]  Plaintiffs' co-lead counsel states that after much intense negotiation, they achieved a cash settlement fund that roughly equals the full amount of Menu Foods' $24 million insurance policy despite the fact that some defendants had potential claims against that policy for their portion of the $8 million of Historic Payments.  Plaintiffs' co-lead counsel also states that the Settlement was reached even though the defendants denied (and continue to deny) any liability, and had to be negotiated against a background in which

---

    [18]  Examples include travel and transportation expenses, property damage and lost wages.

a Menu Foods faced possible bankruptcy.

The Court finds that the total amount of recovery has the potential to award economic damages to all of the Class members and potentially, in some cases, the full recovery of their economic damages across a broad range of categories. Therefore, given the amount of settlement, its possibility of high recovery for the Class members, and the thoughtfulness of the settlement claim procedure in terms of the types of damages recoverable, the Court finds that the first factor has been met. See Hensley v. Eckerhart, 461 U.S. 424, 436 (1983) (stating that the "most critical factor is the degree of success obtained.").

> **(2) The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms And/or Fees Requested by Counsel**

As previously stated, copies of the Notice were sent to over 28,950 potential Class members pursuant to the Court's May 30, 2008 Preliminary Approval Order.  The Notice provided that Plaintiffs' co-lead counsel would be applying for an award of attorneys' fees in an amount of up to 25% of the Settlement Fund and for reimbursement of expenses.  The Notice also expressly advised Class members that they could object to any aspect of the Settlement and explained the procedure for doing so.  In addition, notice was published in 50 publications located throughout the United States and Canada, and many of the relevant documents were posted on the claims administrator's website.  Out of the more than 28,955 persons to whom Notice was mailed, 28 Class members objected to the Settlement and of those 28, only

47

two objected to the attorneys' fees.

Given the adequacy of the Notice provided to potential Class members compared with the number of objections to the attorneys' fees, the Court finds an absence of substantial objections to the request for fees and costs by plaintiffs' co-lead counsel.  See In re Rite Aid Sec. Litig., 396 F.3d 294, 305 (3rd Cir. 2005) (finding that district court did not abuse its discretion by finding that the absence of substantial objections by class members to fee request weighed in favor of approval.); see also In re Relafen Antitrust Liigt., 231 F.R.D. 52, 79-80, 82  (D. Mass. 2005) (approving fee request despite four objections);  In re Fleet/Norstar Securities Litig., 935 F. Supp. 99, 107 (D.R.I. 1999) ("the lack of objections to the proposed settlement must be taken into account").  Thus, the second Gunter factor has been met.

### (3) The Skill and Efficiency of the Attorneys Involved

Plaintiffs' co-lead counsel maintain that they spent numerous hours in over 10 mediation sessions and many more informal meetings, as well as numerous telephone conferences, over the course of seven straight months negotiating with numerous defense counsel.  They state that at times more than 30 defense counsel sat at the mediation table, representing more than 20 defendants who were not a homogenous group but represented different stops along the pet food supply chain with varying levels of potential liability.

Plaintiffs' co-lead counsel describe themselves as

among the most experienced lawyers in the prosecution of complex
consumer class actions and mass tort actions who have
reputations as attorneys who zealously pursue meritorious cases
through trial and appeals, as well as have the ability to
vigorously develop the evidence and prepare a case for trial.
They state that these skills and experience enabled them to
negotiate the recovery for the benefit of the Class.

   The Court is satisfied with the skill and quality of
the work performed by counsel in this litigation.  As described
more fully in the discussion on the motion for settlement,
counsel engaged in motion practice, initial discovery, including
expert discovery, and extensive settlement negotiations.  They
also orchestrated the Notice to the Class members and oversaw the
administration of claims.  Given the complexity of this case
coupled with the relatively quick resolution of this litigation
on behalf of the Class members, the Court has no reservations
regarding plaintiffs' co-lead counsels' skill and efficiency in
this matter.  See Gunter, 223 F.3d at 198 (recognizing "the
stated goal in percentage fee-award cases of ensuring that
competent counsel continue to be willing to undertake risky,
complex and novel litigation.").  In addition, plaintiffs' co-
lead counsel also points to the skill and quality of the
attorneys representing the defendants in this case as evidence
that they had to face formidable opponents in this matter while
representing their clients.  The quality of defense counsel is a
factor taken into consideration by some courts in determining

whether counsel were skillful in reaching settlement. <u>See</u> <u>In re</u> <u>WorldCom, Inc. Sec. Litig.</u>, 388 F. Supp. 2d 319, 357-58 (S.D.N.Y. 2005)(finding counsel "obtained remarkable settlements for the Class while facing formidable opposing counsel from some of the best defense firms in the country."); <u>In re Warner Comm. Sec.</u> <u>Litig.</u>, 618 F. Supp. 735, 749 (S.D.N.Y. 1985) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work.") (citations omitted), <u>affd</u>, 798 F.2d 35 (2d Cir. 1986)).  Here, we find that plaintiff's co-lead counsel faced highly skilled defense counsel in this matter which weighs in favor of finding that they were skillful and efficient in reaching settlement in this litigation.

### (4) The Complexity and Duration of the Litigation

Plaintiffs' co-lead counsel argues that this case was complex and represented many challenges.  Some the challenges included issues related to communications with putative class members, preservation of the contaminated pet food, certifying the class and organizing all of the plaintiffs' counsel in the United States and in Canada.  They also argue that the case was complex due various issues such as whether there would be any recovery for the emotional distress of owners of the pets that were affected given the current status under state law in which emotional distress damages are generally not recoverable; whether the tainted pet food was the proximate cause of the injuries to and the death of the affected pets, and the extent of injuries in each affected pet; whether all manufacturing and distribution

defendants would be liable since, aside from the intentional act
by the Chinese company that added melamine and cyanuric acid to
the wheat gluten and rice protein concentrate, the defendants
denied liability for these criminal acts and argued that they had
no obligation to test the wheat gluten for an obscure ingredient
that should not have been present; whether some the private label
and retail defendants who were several steps removed from the
manufacturing process would be liable; and whether the individual
medical history, diets and veterinary treatment of the pets would
defeat class certification.  Plaintiffs' co-lead counsel also
recounts the problems associated with certain defendants'
communications with putative Class members offering to settle
claims, and seeking releases from liability from some Class
members without providing information about ongoing litigation
related to the Recall which ultimately got resolved after
plaintiffs' co-lead counsel filed two motions to halt the
communications.

Plaintiffs' co-lead counsel also notes the problems
associated with storing the tainted pet food by defendants, some
of which had rotted and attracted vermin in storage locations.
Plaintiffs' co-lead counsel state that they worked on a discovery
and a sampling plan, traveled to several of defendants' storage
sites in Kansas and New Jersey and negotiated an agreement that
allowed defendants to destroy a vast amount of tainted pet food
since the Recall began, while retaining a statistically relevant
sampling for evidentiary purposes in this litigation.  Both sides

engaged experts and plaintiffs' co-lead counsel deposed
defendants' expert regarding his proposed evidence.

As the above list illustrates, there were many complex
issues in this litigation that were satisfactorily resolved in a
skillful and efficient manner.  The complexity of this case were
it to go to trial rather than settle weighs in favor of the
fourth <u>Gunter</u> factor.  With regard to the duration of the
litigation, this case commenced on June 22, 2007 and the parties
are seeking approval of their settlement agreement roughly
sixteen months later.  The relatively short duration of the
litigation to this point weighs in favor of settlement because
the Class members would be able to recover now rather than
possibly years later.  As plaintiffs' co-lead counsel has
described, many Class members were unexpectedly faced with
unbudgeted and sometimes extraordinary expenses to save their
pets.  Many were retired or on fixed incomes, or had to dip into
their savings or borrow the necessary funds.  For these Class
members, protracted litigation with an uncertain outcome that
could take years to resolve is not in their best interest.
Therefore, the complexity and the duration of the litigation
weigh in favor of settlement and satisfy the fourth <u>Gunter</u>
factor.

**(5)  The Risk of Non-Payment**

Plaintiffs' co-lead counsel state that they undertook
this action on an entirely contingent fee basis, assuming a
substantial risk that they would have to devote a significant

amount of time and incur substantial expenses in prosecuting this
action without any assurance of being compensated for their
efforts.  In addition to the risk of non-payment, plaintiffs'
co-lead counsel argue they faced additional risks due to
defendants denying any wrongdoing and plaintiffs' need to prove
at trial the liability of defendants, who were each various
degrees removed from the source of the contamination in China.
They also argue they faced the possibility that a jury would have
sided with defendants' experts and found that injuries or deaths
to Class members' pets were not caused by defendants' conduct, or
that the class certification could not be maintained.

    Although this litigation reached settlement, the risk
of non-payment is generally assessed when the attorneys' time is
committed to the case.  See Skelton v. Gen. Motors Corp., 860
F.2d 250, 258 (7th Cir. 1988) (stating that "[t]he point at which
plaintiffs settle with defendants (or win a judgment against
defendants) is simply not relevant to determining the risks
incurred by their counsel in agreeing to represent them.")
(citation omitted).  At the time that plaintiff's counsel
undertook representation, they faced significant hurdles and the
possibility of non-recovery.  Courts have consistently recognized
that the risk of receiving little or no recovery is a major
factor in considering an award of attorneys' fees. See In re
Warner Communications Sec. Litig., 618 F.Supp. 735, 747 (D.C.N.Y.
1985)(citations omitted).  Therefore, the fifth Gunter factor has
been met.

### (6)   The Time Devoted to This Case by Plaintiffs
###         Co-Lead Counsel Was Significant

Plaintiffs' co-lead counsel and plaintiffs' liaison counsel have reported that they worked more than 12,511 hours in this litigation.  Multiplying the number of hours by the hourly rate, the total "lodestar" is $5,113,954.15.[19]  See In re Rite Aid Corp. Securities Litigation, 396 F.3d 294, 300 (3d Cir. 2005) (finding that it is sensible for a court to cross-check its initial fee calculation with a second method of calculation). Plaintiffs' co-lead counsel state that the work performed by them and plaintiffs' liaison counsel was done without duplication of effort and in fact made tremendous efforts to eliminate duplicative work.  They state that a core group of two attorneys were assigned to attend and lead the multiple mediation sessions; another group of several attorneys handled the issues surrounding certain defendants' communications with putative class members; a separate contingency was assigned to deal with the evidence

---

[19] Counsel submitted separate affidavits detailing the number of hours worked times each attorney's or legal professional's rate.  See Rite Aid, 396 F.3d at 306 (stating that "[i]n performing the lodestar cross-check, the district courts should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter.").  This comports with the Third Circuit's instruction to apply a "blended rate" rather than just the hourly rate of the most senior attorneys with the highest billing rate.  Id. at 306 n.15 (quoting THE MANUAL FOR COMPLEX LITIGATION (Fourth) § 21.724 (2004) (stating that "a statement of the hourly rates for all attorneys and paralegals who worked on the litigation .... can serve as a 'cross-check' on the determination of the percentage of the common fund that should be awarded to counsel").

preservation issues; others were assigned to negotiate with
defendants' counsel concerning the preservation of electronic
data and records, communicate with counsel for plaintiffs in the
Canadian actions, and finalize with defendants' counsel the
substantive terms of the Settlement.

Attached to counsels' motion is an appendix of attorney
declarations containing the declarations from each of plaintiffs'
co-lead counsel and liaison counsel, computing the lodestars, at
current rates, for each attorney at their respective law firms,
(Exhibits B through H), and a summary of the lodestars (Exhibit
A).

Plaintiffs' co-lead counsel requests a lodestar
multiplier of 1.17.  See Fanning v. Acromed Corp., No. 97-381.,
2000 WL 1622741, at *8 (E.D.Pa. Oct. 23, 2000) (stating that
court may apply multiplier to the lodestar, adjusting the
lodestar either upward or downward) (citation omitted).  Counsel
argues that their request is at the low end of the range of
multipliers typically awarded in comparable cases in this Circuit
and across the United States.

Given the magnitude and complexity of the litigation as
well as the significant time and effort invested by plaintiffs'
counsel, the Court finds that the requested percentage fee of 25%
of the cash Settlement Fund, with a lodestar multiplier of less
than 1.2, is reasonable.  See Cendant 243 F.3d at 737 n.22
(citing to a list of cases where the lodestar multiplier of 1.5,
3.25, 1.2, 2, and 1.25 to 1.75, were applied respectively)

(citations omitted); In re Corel Corp. Inc. Sec. Litig., 293
F.Supp.2d 484, 497 (E.D.Pa. 2003) (finding that multiples between
lodestars and fee requests range between 1 and 4, so that the
multiple requested of 1.7 was at the lower end, a factor which
militated in favor of approval).  Thus, the sixth Gunter factosr
is satisfied.

### 7. Awards in Similar Cases

        The final factor to consider is a comparison of the
requested fee to fees awarded in similar cases.  Although there
is no rule as to what percentage of the common fund should be
awarded, the Third Circuit has noted that fee awards range from
19% to 45% of the settlement fund.  See In re General Motors, 55
F.3d at 822; Ikon, 194 F.R.D. at 194 ("Percentages awarded have
varied considerably, but most fees appear to fall in the range of
nineteen to forty five percent."); In re Computron Software,
Inc., 6 F.Supp.2d 313, 322-23 ("Awards utilizing the
percentage-of-recovery method can reasonably range from nineteen
percent to forty-five percent of a settlement fund").

        Within the Third Circuit, courts have awarded fees
greater than 25% of the cash Settlement Fund requested here, and
also greater than the maximum combined U.S. and Canadian fees of
31% of the Settlement Fund.  See In re Datatec Systems, Inc.
Securities Litigation, No. , 2007 WL 4225828, at * (D.N.J. Nov.
28, 2007)(approving requested fee award of 30% and noting that
"[c]ourts within the Third Circuit often award fees of 25% to 33
1/3% of the recovery."); In re Ravisent Techs., Inc. Sec. Litig.,

No. 00-CV-1014, 2005 WL 906361, at *15 (E.D.Pa. Apr. 18, 2005)
(awarding 33% of the $7 million settlement fund); In re Corel,
293 F.Supp.2d at 497 (observing that awards in the district
frequently range between nineteen and forty-five percent of the
common fund and finding that the 33 1/3% fee request in a complex
case to be within the reasonable range) (citing In re SmithKline
Beckman Corp. Secur. Litig., 751 F.Supp. 525, 533 (E.D.Pa.
1990).[20]

The 25% fee requested by plaintiff's co-lead counsel
is appropriate in this case given the complexity and amount of
work expended to resolve the matter.  Even adding the 6%
requested by Canadian counsel, the percentage of fee requested is
within the accepted reasonable range in this District and
satisfies the final Gunter factor.

**B.   Prudential Factors**

In In re AT&T Corporation Securities Litigation, 455
F.3d 160, 166 (3d Cir. 2006), the Third Circuit held that when
"reviewing an attorneys' fees award in a class action settlement,
a district court should consider the Gunter factors, the
Prudential factors, and any other factors that are useful and
relevant with respect to the particular facts of the case."   In
In re Prudential Ins. Co. Am. Sales Prac. Litig., 148 F.3d 283,
338-39 (3d Cir. 1998), the Third Circuit found that district

---

[20]   In their motion, counsel supplied an extensive list of
cases in which the fee awarded was greater than 30% of the
settlement or award).

courts should consider other potentially relevant and appropriate

factors, such as:

> [T]he maturity of the underlying
> substantive issues, as measured by
> the experience in adjudicating
> individual actions, the development
> of scientific knowledge, the extent
> of discovery on the merits, and
> other factors that bear on the
> ability to assess the probable
> outcome of a trial on the merits of
> liability and individual damages;
> the existence and probable outcome
> of claims by other classes and
> subclasses; the comparison between
> the results achieved by the
> settlement for individual class or
> subclass members and the results
> achieved-or likely to be
> achieved-for other claimants;
> whether class or subclass members
> are accorded the right to opt out
> of the settlement; whether any
> provisions for attorneys' fees are
> reasonable; and whether the
> procedure for processing individual
> claims under the settlement is fair
> and reasonable.

Id., at 323; see At&T, 455 F.3d at 165.  The Gunter factors and

Prudential are substantially similar to the factors provided in

Girsh.  See At&T, 455 F.3d at 165; Desantis v. Snap-On Tools Co.,

LLC, No. 06-2231 (DMC), 2006 WL 3068584, at *9 (D.N.J. Oct. 27,

2006) (to avoid redundancy court incorporated its discussion of

the Girsh factors to decide reasonableness of fee under Gunter

and Prudential).

     In assessing the Prudential factors, plaintiffs request

that the Court take into consideration the value of benefits that

accrued to the Class members through the efforts of plaintiffs'

counsel rather than the efforts of any government investigation. For instance, after Menu Foods reported illnesses and deaths in cats and dogs, the FDA investigated the claims but did not pursue litigation against Menu Foods or any of the other settling defendants.  Plaintiffs' co-lead counsel states that there was no government investigation exposing a fraud or a defective product that plaintiffs' relied on in bringing suit against the defendants.  Rather, the litigation followed the nationwide recall of the tainted food.  Plaintiffs' co-lead counsel states that FDA's low reported numbers of death from the contaminated food put them at a disadvantage and prompted them to undergo their own investigation into the number of deaths and illnesses of pets allegedly due to the contaminated pet food.

Plaintiffs' co-lead counsel also notes that the Settlement incorporated some "innovative" terms of settlement. For example, they state that claimants may receive up to $900 in economic damages without providing any supportive documentation. Also, they note that the Settlement allows for reimbursement of Healthy Screening claims, essentially check-ups to ensure the pet was not harmed by the Recalled Pet Food.  Further, where a pet has died and the claimant elects to seek a recovery for the cost of the deceased pet and not the cost of a replacement pet, the Settlement allows the claimant to recover the fair market value of the deceased pet.  And, finally, the settlement allows for the potential recovery of economic damages such as travel and transportation expenses, property damage and lost wages.

Thus, for the reasons expressed by the Court under its discussion of the <u>Girsh</u> factors, and the <u>Gunter</u> factors, as well as the additional considerations under <u>Prudential</u>, the award of attorneys' fees in this class action settlement is appropriate and plaintiffs' co-lead counsels' motion will be granted.

### C.  Reimbursement of Expenses

Plaintiffs' co-lead counsel are seeking reimbursement of costs and expenses in an aggregate amount of $394,403.09. They state that these expenses were incurred by plaintiffs' Co-Lead Counsel and other plaintiffs' counsel on an ongoing basis for such items as photocopying of documents, mediation costs, court filing fees, hearing transcripts, expert fees, on-line research, messenger service, postage, express mail and next day delivery, long distance and facsimile expenses, transportation, travel and other incidental expenses directly related to the prosecution of this case.  In support of their request, counsel included a list of expenses. <u>See</u> Appendix of Attorney Declarations (Exhibits B through H) and a summary of the expenses (Exhibit A).  The Court finds that the reimbursement of these fees reasonably incurred during the course of this litigation is appropriate.

Thus, based on the above discussion and for the reasons expressed during the fairness hearing, and defendants having no objection to the request for attorneys' fees and costs, plaintiffs' motion for attorneys' fees and reimbursement of costs is approved.

IX.   **MOTION FOR ATTORNEYS' FEES FILED BY NEWMAN, CREED & ASSOCIATES**

Newman, Creed & Associates ("NC&A") filed a separate motion for attorneys' fees on the ground that they were counsel for over 130 pet owners.  NC&A seek an award of attorneys' fees equal to $425,205.25 and reimbursement of $2,768.65 in expenses incurred in the prosecution of this litigation since March of 2007.  NC&A argues that of the early actions filed in New Jersey, the action filed by them was the only one to name Proctor & Gamble/IAMS Company as a defendant.  They argue that the naming of this defendant proved to be of tremendous value to the class as a whole because it permitted an emergency motion to be filed to limit inappropriate communications between the IAMS Company and putative class members.

NC&A also argue that they worked on issues that were not part of the stay such as issues pertaining to the preservation and destruction of evidence.  NC&A also state that they were a signatory to the mediation agreement, attended four mediation sessions and were asked by lead counsel to review motions for preservation of evidence, conduct an inspection of a facility in Watsontown, Pennsylvania, and attend a conference on issues pertaining to destruction of evidence.

NC&A states that they sent a letter to lead counsel on May 29, 2008 regarding attorneys' fees but received no direct response to their letter other than the letter sent to all counsel on June 20, 2008 announcing the Settlement and asking

that time and expense sheets be submitted to the Berger Montague firm.

Plaintiffs' co-lead counsel filed a motion to strike NC&A's motion on the ground that court-appointed lead counsel is the only plaintiffs' counsel empowered to file attorneys' fees applications in class actions on behalf of the class and all plaintiffs' class counsel.  In addition, co-lead counsel argue that not only does NC&A's motion violate the terms of the Settlement Agreement, the Court's preliminary approval Order, the Court's Order appointing co-lead counsel, and the law of this and all other Circuits, but that NC&A lacks standing to file a separate motion for attorneys' fees and costs.

After providing notice, the Court in its December 18, 2007 Order, appointed co-lead counsel to manage the plaintiffs' litigation in this MDL, including the allocation of attorneys' fees.  The December 18th Order specifically authorized co-lead counsel "to delegate specific tasks to other co-counsel or committees of counsel that interim co-lead counsel may establish as appropriate" and "to collect and monitor time and expenses incurred by other plaintiffs' counsel for the efficient management of the litigation."  NC&A did not object to this Order.

On May 30, 2008, the Court granted the parties' joint motion for preliminary approval of the Settlement and set a date to "determine whether Plaintiffs' Lead Counsel's application for attorneys' fees and reimbursement of expenses should be granted"

and instructed plaintiffs' co-lead counsel to be responsible for
the timely filing of "any application for an award of attorneys'
fees and reimbursement of costs."  Following this Order, on June
20, 2008, co-lead counsel states that they requested that all
plaintiffs' counsel submit detailed time and expense information
to Co-Lead Counsel.  They state that all plaintiffs' firms
complied with co-lead counsels' request, except for NC&A.
Instead, NC&A sent a letter, written by Mr. Newman, inquiring as
to the amount of fees and expenses from any award in the case
that would be allocated to his firm and stated that they would
file a separate application for fees and expenses unless they
were told how fees and expenses would be allocated to NC&A.

     During the fairness hearing held on October 14, 2008,
the Court also heard oral argument on NC&A's motion for
attorneys' fees.  For the reasons expressed by the Court during
that hearing, and in this Opinion, NC&A's motion for attorneys'
fees is not ripe for decision.  It is clear that by Order of this
Court, plaintiffs' co-lead counsel was given the responsibility
for filing an aggregate application for attorneys' fees on behalf
of all plaintiffs' firms in this matter.  They also have the
responsibility of reviewing the bills submitted to them and
properly and reasonably allocating the appropriate fee and
reimbursement to the specific plaintiffs' firms.  See In re Auto.
Refinishing Paint Antitrust Litig., MDL No. 1426, 2008 WL 63269,
at *20-21 (E D. Pa. Jan. 3, 2008) (stating that co-lead counsel
directed case from beginning and are best able to assess weight

and merit of each counsel's contribution and allowing counsel to
allocate fees conserves the time and resources of the courts).

NC&A has not yet responded to co-lead counsels' request
for documentation.  Thus, their objection that they anticipate
not being fairly compensated is premature.  As explained by the
Court during the hearing, it not possible at this time for the
Court to judge the relative worth that NC&A contributed to the
litigation as compared to the other 54 law firms whose efforts
also contributed to the Settlement without reviewing and
assessing all the billed time of all the firms, a task the Court
expressly ordered co-lead counsel to perform.  Although NC&A asks
the Court to award it $425,205.25 in fees and reimbursement of
$2,768.65 in expenses, there has been no rejection of their claim
by co-lead counsel who will be reviewing their claim in
combination with the claims of all the other plaintiffs' law
firms.  This matter is not appropriate before the Court at this
time because it pertains to a determination that the Court
ordered co-lead counsel to perform and is therefore not ripe.[21]
See Freeland v. Liberty Mut. Ins. Co., No. 07-6160 (MLC), 2008 WL
2625226, at *2 (D.N.J. June 27, 2008) ("A matter is not ripe for
adjudication if it "rests upon contingent future events that may
not occur as anticipated, or indeed may not occur at all.")
(quoting Texas v. U.S., 523 U.S. 296, 300 (1998)).  Thus, NC&A

---

[21]  During the hearing, Co-lead counsel assured the Court
that the allocations to the plaintiffs' firms, including NC&A,
will be done fairly and reasonably and the Court has no evidence
at this time to doubt that that will be the case.

motion for attorneys' fees is denied.

### IX.   <u>CONCLUSION</u>

The plaintiffs' class is certified for settlement purposes pursuant to Rule 23(a) and (b)(3).  The motion for approval of settlement is granted pursuant to Rule 23(e).  The motion to intervene is denied and the various objections to the settlement are overruled.  Plaintiffs' co-lead counsels' motion for attorneys' fees is granted.  The motion to strike Newman, Creed & Associates's separate motion for attorneys' fees is granted.

<div style="margin-left:40%">__s/Noel L. Hillman__</div>

At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.

Dated: November 18, 2008