JAY EDELSON (*pro hac vice*)
jedelson@edelson.com
MICHAEL J. MCMORROW
mmcmorrow@edelson.com
EDELSON MCGUIRE, LLC
350 North LaSalle, Suite 1300
Chicago, IL 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

*Interim Class Counsel for Plaintiffs*
(additional counsel on signature page)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re JIFFY LUBE INTERNATIONNAL, INC. TEXT SPAM LITIGATION<br><br>This filing relates to: ALL CASES | No. 3:11-MD-02261-JM-JMA<br><br>MDL No. 2261<br><br>Assigned to The Hon. Jeffrey T. Miller<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT HEARTLAND AUTOMOTIVE SERVICES, INC.'S MOTION TO DISMISS MASTER CONSOLIDATED COMPLAINT**<br><br>Date: December 12, 2011, 2 P.M.<br>Time: 10:00 a.m.<br>Place: Courtroom 4<br><br>Complaint Filed: September 23, 2011<br>Trial Date: None Scheduled |

## Table of Contents

I.      INTRODUCTION ................................................................................... 1

II.    THE RELEVANT FACTS AND HISTORY OF THE TCPA ................................... 1

     A.    Plaintiffs' Allegations Against Defendant Heartland ................................ 1

     B.    The Telephone Consumer Protection Act ............................................... 2

III.   THE PLAIN LANGUAGE OF THE TCPA, AS WELL AS THE NINTH CIRCUIT'S AND THE FCC'S INTERPRETATIONS OF THE DEFINITION OF "ATDS," ARE CONSTITUTIONAL ............................................................................................. 5

     A.    Content-Neutral Speech Restrictions & First Amendment Overbreadth ....... 5

     B.    Defendant Misreads the Construction and Scope of the TCPA's ATDS Prohibition .................................................................................... 7

     C.    The TCPA Serves the Substantial Government Interest in Minimizing the Invasion of Privacy and Cost to Consumers Caused by Mass Unsolicited Text Message Calls ............................................................................ 11

     D.    The TCPA is Narrowly Tailored to Protect Privacy and Costs to Consumers ..................................................................................... 13

     E.    Numerous Alternative Channels of Communication Remain Open ............. 14

IV.   THE TCPA'S STATUTORY DAMAGES COMPORT WITH DUE PROCESS ..... 15

     A.    *BMW* and its Progeny are Inapplicable to Claims for Statutory Damages ... 16

     B.    The TCPA's Statutory Damages are Not Constitutionally Excessive ........... 17

     C.    Heartland's Due Process Challenge is Premature ............................... 20

V.    PLAINTIFFS' COMPLAINT ALLEGES SUFFICENT FACTS TO MEET FEDERAL PLEADING REQUIREMENTS ................................................................. 20

     A.    Plaintiffs Have Adequately Alleged that Heartland Violated the TCPA by Participating in the Transmission of Spam Text Messages .......................... 22

            1.    The TCPA makes it unlawful for "any person" to engage in prohibited conduct, not just the "maker" of text message spam ....... 23

            2.    Plaintiffs have adequately pleaded facts establishing Heartland's liability ................................................................ 26

1

**B.** **Heartland Did Not Have Prior Express Consent to Send Text Message Ads** ......................................................................... 27

**C.** **All Plaintiffs Have Sufficiently Pleaded Use of an ATDS** ............................... 33

1. **Plaintiffs' allegations about the text message and short code use are sufficient at the pleading stage** ............................................................. 33

2. **Each Plaintiff sufficiently alleged use of an ATDS** ............................ 35

**VI.** **CONCLUSION** ....................................................................................................... 35

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
<u>**Table of Authorities**</u>

2
<u>**United States Supreme Court Cases:**</u>

3
*Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564 (2002) ........................................ 6

4
*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................ 20

5
*Bd. of Airport Com'rs of City of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569 (1987).......... 7

6
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................... 20, 21, 27

7
*Board of Trustees v. Fox*, 492 U.S. 469 (1989) .......................................................... 6

8
*BMW of North America, Inc. v. Gore*, 517 U.S. 408 (2003) ...................................... 15

9
*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557 (1980)..... 6

10
*Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)................... 31

11
*City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984).............................. 6

12
*Erickson v. Pardus*, 551 U.S. 89 (2007)................................................................... 21

13
*St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63 (1919) ............................... 17, 18

14
*United States v. Williams*, 553 U.S. 285, 293 (2008)................................................... 7

15
*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) ....................................... 7

16
*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ................ 14

17
*Ward v. Rock Against Racism,* 491 U.S. 781 (1989) ............................................. 5, 13

18
<u>**United States Circuit Court of Appeals Cases:**</u>

19
*Airborne Beepers & Video, Inc. v. AT&T Mobility* LLC, 499 F.3d 663 (7th Cir. 2007)............. 21

20
*Arista Records, LLC v. Doe 3,* 604 F.3d 110 (2d Cir. 2010) ....................................... 33

21
*Arrington v. Wong*, 237 F.3d 1066 (9th Cir. 2001)....................................................... 7

22
*Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708 (9th Cir. 2010)............................................. 18

23
*Bland v. Fessler,* 88 F.3d 729 (9th Cir. 1996)................................................... 12, 15

24
*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,

25
      --- F.3d ---, 2011WL 4336667 (9th Cir. Sept. 16, 2011) ............................ 6, 7

26
*Destination Ventures, Ltd. v. FCC*, 46 F.3d 54 (9th Cir. 1995) ................................... 4

27
*Grant v. Capital Management Services, L.P.*, 2011 WL 3874877 (9th Cir. Sept. 2, 2011) ........ 22

28

1   *Hedges v. United States*, 404 F.3d 744 (3d Cir. 2005) ................................................................. 21

2   *Jablon v. Dean Witter & Co.*, 614 F.2d 677 (9th Cir. 1980) ................................................. 21-22

3   *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116 (9th Cir. 2008) .................................. 21

4   *Maldonado v. Morales*, 556 F.3d 1037 (9th Cir. 2009) ............................................................ 15

5   *McCalden v. California Library Ass'n*, 955 F.2d 1214 (9th Cir. 1990) ...................................... 21

6   *McDonald v. Sun Oil Co.*, 548 F.3d 774 (9th Cir. 2008) ..............................................................

7   *Morley v. Walker*, 175 F.3d 756 (9th Cir. 1999) ...................................................................... 21

8   *Moser v. F.C.C.*, 46 F.3d 970 (9th Cir. 1995) ................................................... 4, 5, 6, 12, 13

9   *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946 (9th Cir. 2009) ................................. *passim*

10   *Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000) ................................................................ 7

11   *Turney v. Pugh*, 400 F.3d 1197 (9th Cir. 2005) ....................................................................... 6

12   *United States v. Citrin*, 972 F.2d 1044 (9th Cir. 1992) .............................................................. 17

13   *Wilson v. A.H. Belo Corp.*, 87 F.3d 393 (9th Cir. 1996) ..................................................... 30, 31

14   **United States District Cases:**

15   *Abbas v. Selling Source, LLC*,

16         No. 09-CV-3413, 2009 WL 4884471 (N.D. Ill. Dec. 14, 2009) ................................. *passim*

17   *Accounting Outsourcing, LLC. v. Verizon Wireless Personal Commc'ns, L.P.*,

18         329 F. Supp. 2d 789 (M.D. La. 2004) ...................................................................... *passim*

19   *Adams v. AllianceOne, Inc.*, No. 08-cv-248, 2011 WL 20666172 (S.D. Cal. May 25, 2011) ...... 22

20   *Arrez v. Kelly Servs., Inc.*, 522 F. Supp. 2d 997 (N.D. Ill. 2007) ................................................ 16

21   *Ashby v. Farmers Ins. Co. of Oregon*, 592 F. Supp. 2d 1307 (D. Or. 2008) ......................... 17, 20

22   *Capital Records, Inc. v. Thomas-Rasset*,

23         --- F. Supp. 2d ---, No. 06-1497, 2011 WL 3211362 (D. Minn. July 22, 2011) ......... 18, 19

24   *Centerline Equipment Corp. v. Banner Personnel Servs., Inc.*,

25         545 F. Supp. 2d 768,(N.D. Ill. 2008) ............................................................... 4, 18, 20

26   *Charvat v. Echostar Satellite, LLC*, 676 F. Supp. 2d 668 (S.D. Ohio 2009) .............................. 24

27   *Coupons, Inc. v. Stottlemire*, 588 F. Supp. 2d 1069 (N.D. Cal. 2008) ........................................ 21

28

1  *Destination Ventures, Ltd. v. F.C.C.*, 844 F. Supp. 632 (D. Or. 1994) ................................... 12, 14

2  *Edeh v. Midland Credit. Mgt., Inc.*, 748 F. Supp. 2d 1030 (D. Minn. 2010) ......................... 32, 33

3  *Facebook, Inc. v. Fisher*, C 09-05842 JF PSG, 2011 WL 250395 (N.D. Cal. Jan. 26, 2011) ...... 17

4  *Holtzman v. Caplice*, No. 07 C 7279, 2008 WL 2168762 (N.D. Ill. May 23, 2008) ............. 19, 20

5  *Hutchens v. Alameda County Soc. Services Agency*,

6      No. C-06-06870 SBA, 2008 WL 4193046 (N.D. Cal. Sept. 10, 2008) ............................ 33

7  *Greene v. DirecTV*, No. 10-C-117, 2010 WL 4628734 (N.D. Ill. Nov. 8, 2010) ......................... 29

8  *In re Napster Inc. Copyright Litig.*,

9      MDL 00-1369 MHP, 2005 WL 1287611 (N.D. Cal. June 1, 2005) ................................ 20

10 *Italia Foods, Inc v. Marinov Enters., Inc*.,

11     No. 07-C2494, 2007 WL 4117626 (N.D. Ill. Nov. 16, 2007) ........................................ 4, 6

12 *Kazemi v. Payless Shoesource Inc*.,

13     No. 09-cv-5142, 2010 WL 963225 (N.D. Cal. Mar. 16, 2010) ................ 21, 22, 26, 27, 34

14 *Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162 (S.D. Ind. 1997) ........................................ 4, 20

15 *Knutson v. Reply!, Inc.*, No. 10-cv-1267, 2011 WL 291076 (S.D. Cal. Jan. 27, 2011) ............... 34

16 *Kopff v. Battaglia*, 425 F. Supp. 2d 76 (D.D.C. 2006) ................................................................ 24

17 *Kramer v. Autobytel, Inc*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010) ............................. 3, 24, 26, 34

18 *Leckler v. CashCall, Inc.*, No. 07-4002-SI, 2008 WL 5000528 (N.D. Cal. Nov. 21, 2008)... 30, 32

19 *Lozano v. Twentieth Century Fox Film Corp*.,

20     No. 09-CV-6344, 2010 WL 1197884 (N.D. Ill. Mar. 23, 2010) ............................... *passim*

21 *Maryland v. Universal Elections*, 787 F. Supp. 2d 408 (D. Md. 2011) ........................................ 24

22 *Mills v. Bristol-Myers Squibb Co*.,

23     No. CV 11-00968-PHX-FJM, 2011 WL 4708850 (D. Ariz. Oct. 7, 2011) .................... 33

24 *Minnesota v. Sunbelt Commc'ns & Mktg*., 282 F. Supp. 2d 976 (D. Minn. 2002) ....................... 4

25 *Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 196 F. Supp. 2d 920 (E.D. Mo. 2002) ....... 4, 20, 24

26 *Moeller v. Taco Bell Corp*.,

27     No. C 02-5849-MJJ, 2004 WL 5669683 (N.D. Cal. Dec. 7, 2004) ........................... 16, 17

28

*Peter Strojnik, P.C. v. Singalife, Inc.,*

    No. CV-08-1116-PHX-FJM, 2009 WL 605411 (D. Ariz. Mar. 9, 2009) ........................ 27

*Phillips Randolph Enters., LLC v. Rice Fields,*

    No. 05-17114, 2007 WL 129052 (N.D. Ill. Jan. 11, 2007) .................................. 4

*Sadowski v. Med1 Online LLC*, No. 07 C 2973, 2008 WL 489360 (N.D. Ill. Feb. 20, 2008) 16, 18

*Spillman v. Dominos Pizza, LLC*, No. 10-cv-349, 2011 WL 721498 (M.D. La. Feb. 22, 2011) .. 24

*Texas v. American Blastfax, Inc.*, 121 F. Supp. 2d 1085 (W.D. Tex. 2000) ................................ 19

*Verizon Cal., Inc. v. OnlineNIC, Inc.,*

    No. C08-2832-JF, 2009 WL 2706393 (N.D. Cal. Aug. 25, 2009) .................................. 16

*Villegas v. J.P. Morgan Chase & Co.,*

    No. C09-00261, 2009 WL 605833 (N.D. Cal., Mar. 9, 2009) ........................................ 21

**State Court Cases**

*Harjoe v. Herz Fin.*, 108 S.W.3d 653 (Mo. 2003) ......................................................... 4

*Hooters of Augusta, Inc. v. Nicholson*, 537 S.E.2d 468 (Ga. Ct. App. 2000) .............................. 24

*Joffe v. Acacia Mortg. Corp.*, 121 P.3d 831 (Ariz. App. 2006) ............................. 8, 10, 11, 12, 15

*Kaufman v. ACS Sys., Inc.*, 110 Cal. App. 4th 886 (2003) ................................................ 4

*Lary v. VSB Financial Consulting, Inc.*, 910 So.2d 1280 (Ala. Ct. App. 2005) .......................... 24

*Levitt v. Fax.com, Inc.*, 383 Md. 141 (Md. Ct. App. 2004) ................................................ 4

*Rudgayzer & Gratt v. Enine, Inc.,* 193 Misc. 2d 449 (N.Y. Civ. Ct. 2002) .................................. 4

*The Chair King, Inc. v. GTE Mobilnet of Houston*, 135 S.W.3d 365 (Tex. App. Ct. 2004) .......... 4

*Travel Travel, Kirkwood v. Jen N.Y., Inc.*, 206 S.W.3d 387 (Mo. Ct. App. 2006) ...................... 32

*Worsham v. Nationwide Ins. Co.*, 772 A.2d 868 (Md. Ct. Spec. App. 2001) .............................. 24

**Miscellaneous:**

47 U.S.C. § 227, *et seq.* ...................................................................................... *passim*

28 U.S.C. § 2342 ................................................................................................ 30

47 C.F.R. § 64.1200 ...................................................................................... 11, 14

Fed. R. Civ. P. 8 ................................................................................................ 20

9th Cir. Rule 36-3(b) ................................................................................................ 22

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 F.C.C.R. 8752 (Sept. 17, 1992) ............................................................. 28, 31

*In re Rules and Regulations Implementing the TCPA of 1991*, Memorandum Opinion & Order, 10 F.C.C.R. 12391, 1407 (1995) ............................................................................... 25

*In the Matter of Rules and Regulations Implementing The Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014 (July 3, 2003) ...................................................... 3, 11

*Notice of Proposed Rule Making in re Regulations Implementing the TCPA*, 17 FFC Red. 17474, ¶ 24, 2002 WL 31084939 (2002) ............................................................................... 10

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Final Rule*, 68 FR 44144-01, ¶ 95, 2003 WL 21713245 (July 25, 2003) ............................. 9, 10, 11

H.R. Rep. 101-633 ........................................................................................... 2, 9, 10

H.R. Rep. 102-317 ................................................................................................... 9

S. Rep. No. 102-178 .................................................................................... 8, 9, 15, 25

137 Cong. Rec. S16200-04 ....................................................................................... 9

137 Cong. Rec. H11307-1 ........................................................................................ 9

137 Cong. Rec. S18784 .......................................................................................... 10

Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1357(2d ed. 1990) ................... 21

*Miriam-Webster Dictionary Online* (2011) ................................................................. 23

*Chavrvat v. Echostar Satellite, LLC*, No. 09-4525 *Brief for the Federal Communications Commission and the United States as Amici Curiae*, 2010 WL 7325986 (Oct. 15, 2010) ........... 25

*Rulemaking Process at the FCC*, available at http://www.fcc.gov/encyclopedia/rulemaking-process-fcc#q2 ....................................................................................................... 31

*National Do Not Call Registry Tops 200 Million Phone Numbers* available at http://www.ftc.gov /opa/2010/07/dnc.shtm .............................................................................................. 3

Amanda Lenhart, *Cell Phones and American Adults: They Make Just as Many Calls, but Text Less than Teens*, Pew Research Center (2010) ........................................................................ 1

1  **I.      INTRODUCTION**

2          On April 22, 2011, Defendant Heartland Automotive Services, Inc. ("Heartland" or

3  "Defendant") sent thousands of consumers unauthorized text message spam with the hope of

4  generating revenue by offering discounted oil changes at any of its 435 Jiffy Lube locations.  Text

5  message spam has become an increasingly prevalent form of telemarketing, with a recent Pew

6  Research Center Report finding that 57% of adults with cell phones have received unwanted or

7  spam text messages on their phone.[1]  Having become understandably frustrated after having

8  received Heartland spam text messages, Plaintiffs Heuscher, Crowl, Cushnie, Duong, Souder, and

9  Koeller each independently brought suit under the Telephone Consumer Protection Act, 47 U.S.C.

10  § 227, *et seq*. ("TCPA"), intending to stop Heartland's wrongful conduct and to recover statutory

11  damages established by Congress.  Displaying a total disregard for both controlling and pertinent

12  case law, agency guidance, and the plain import of the TCPA, Heartland has filed a Rule 12(b)(6)

13  motion to dismiss Plaintiffs' single count Master Consolidated Complaint ("Complaint").

14  Heartland's arguments are not novel—rather, its Motion is premised primarily on arguments that

15  have been made and uniformly rejected by federal and state courts throughout the country.

16  Heartland repeatedly ignores these on-point authorities that conflict with its arguments in a

17  desperate attempt to invite this Court to overturn what is essentially established law.  The Court

18  should decline such an invitation.  Plaintiffs have additionally exceeded the necessary federal

19  pleading requirements to state a claim under the TCPA.  Accordingly, Plaintiffs respectfully

20  request that the Court deny Heartland's Motion in its entirety.

21  **II.     THE RELEVANT FACTS AND HISTORY OF THE TCPA**

22          **A.     *Plaintiffs' Allegations Against Defendant Heartland***

23          Like the majority of cases arising under the TCPA, the relevant facts at the pleadings stage

24  of this litigation are not particularly complex.  Heartland—the self-described largest Jiffy Lube

---

[1] Amanda Lenhart, *Cell Phones and American Adults: They Make Just as Many Calls, but Text Less than Teens*, Pew Research Center (2010).

Franchisee in America—sought to increase revenue by making unsolicited text message[2] calls to consumers promoting its "signature oil change" through a "one time offer" to join its "EClub." (Dkt. 7, ¶¶ 1, 22.)  To effectuate the transmission of these calls, Heartland engaged co-defendant and mobile technology company TextMarks, and together the Defendants utilized SMS short code "72345" to send the following text messages to each of the Plaintiffs and the putative class members on April 22, 2011:

> JIFFY LUBE CUSTOMERS 1 TIME OFFER:
> REPLY Y TO JOIN OUR ECLUB FOR 45% OFF A
> SIGNATURE SERVICE OIL CHANGE! STOP TO UNSUB
> MSG&DATA RATES MAY APPLY T&C: JIFFYTOS.COM

(Dkt. 7, ¶¶ 1, 20-23, 31-32.)  By using an SMS shortcode and associated systems, Heartland was able to transmit thousands of these text messages to a list of cell phone numbers without human intervention.  (Dkt. 7, ¶ 24, 35.)  The equipment required to make *en masse* text message calls through an SMS shortcode has the capacity to store, or produce telephone numbers to be called, using a random or sequential number generator, and such equipment was used to make those calls. (Dkt. 7, ¶ 35-36.)  None of the Plaintiffs consented to receive the above text message or any other text message from Heartland.  (Dkt. 7, ¶ 25.)

### B.    *The Telephone Consumer Protection Act*

Heartland's characterization that, through the TCPA, Congress sought to remedy only automated telemarketing calls to randomly or sequentially dialed numbers that could reach hospitals or other emergency services is grossly misplaced and warrants correction.  As detailed in greater depth below, Congress enacted the TCPA in 1991 amidst an unprecedented increase in the volume of telemarketing calls to consumers in America.  H.R. 101-633, dkt. 16-17.  The "TCPA was enacted in response to an increasing number of consumer complaints arising from the

---

[2] Text messaging, also called "short message service" or "SMS," is a messaging system that allows cell phone subscribers to send and receive short text message on their wireless devices, usually limited to 160 characters.  (Dkt. 7, ¶ 17.)  Text messages are directed to wireless devices through the telephone number assigned to each device and when successfully made cause the phone to ring alerting the recipient that a text call has been received.  (*Id.* ¶ 18.)  The receipt of text messages, including text message spam, results in actual costs to consumers who frequently have to pay their cell phone service providers for receipt of such wireless spam.  (*Id.* ¶ 2.)

1   increased number of telemarketing calls," and that "consumers complained that such calls are a

2   'nuisance and an invasion of privacy.'"  *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 954

3   (9th Cir. 2009).

4   The Federal Communications Commission ("FCC")—the agency delegated by Congress to issue

5   rules under the TCPA—confirmed in 2003 that "telemarketing calls are even more of an invasion

6   of privacy than they were in 1991," and "we believe that the record demonstrates that

7   telemarketing calls are a substantial invasion of residential privacy, and regulations that address

8   this problem serve a substantial government interest."[3]  *In the Matter of Rules and Regulations*

9   *Implementing The Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014 (July 3, 2003)

10  ("2003 FCC Order").

11       The TCPA combats the growing threat to privacy being caused by the automated

12  telemarketing practices at issue in this case by declaring that:

13           It shall be unlawful for *any person* within the United States . . . (A)
             to make any call (other than a call made for emergency purposes or
14           *made with the prior express consent of the called party*) using any
             automatic telephone dialing system or an artificial or prerecorded
15           voice . . . to any telephone number assigned to a paging service,
             cellular telephone service, specialized mobile radio service, or other
16           radio common carrier service, or any service for which the called
             party is charged for the call.
17

18  47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added); *see also Kramer v. Autobytel, Inc*, 759 F. Supp.

19  2d. 1165, 1169-1171 (N.D. Cal. 2010).

20       The TCPA applies with equal force to the making of text message calls as it does to the

21  making of voice calls to cellular phones.  *Satterfield*, 569 F.3d at 954.  The TCPA's prohibitions at

22  issue require the calls to be made with certain equipment termed an "automatic telephone dialing

23  system" ("ATDS"), which Congress defines as "equipment which *has the capacity* (A) to store or

24  _____

25       [3] Notably, the "National Do-Not-Call Registry" reached 200 million phone numbers in late

26  July 2010.  With only 114 million households in the United States, 200 million phone numbers
    represents the American public's continued, if not growing, distaste for telemarketing.  *National*
27  *Do Not Call Registry Tops 200 Million Phone Numbers* available at http://www.ftc.gov
    /opa/2010/07/dnc.shtm.
28

1    produce telephone numbers to be called, using a random or sequential number generator; and (B)

2    to dial such numbers."  47 U.S.C. § 227(a)(1) (emphasis added).

3         The TCPA sets statutory damages in the amount of $500 per violation and provides for

4    injunctive relief prohibiting the further transmission of such messages.  *See* 47 U.S.C. §

5    227(b)(3)(A-B).  Finally, the TCPA provides that the court may, in its discretion, treble the

6    amount of damages if a defendant's conduct is found to be willful, or if defendant knowingly

7    violated the TCPA.  47 U.S.C. § 227(b)(3)(C).

8         In its twenty-year history, the TCPA has survived numerous constitutional challenges, and

9    the cases supporting the constitutionality of the TCPA are wide-ranging.[4]  In fact, despite the

10   existence of scores of cases deciding TCPA constitutionality issues over the past several years,

11   Plaintiffs have located only three courts that have found a provision of the TCPA unconstitutional,

12   and all three were reversed on appeal.[5]  With this history and the true relevant facts in mind,

13   Plaintiffs address below the substance of Defendant's motion, starting with its unfounded claims

14   of unconstitutionality.

---

18   [4] *See, e.g., Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 57 (9th Cir. 1995); *Moser v. FCC*,

19   46 F.3d 970 (9th Cir. 1995); *Lozano v. Twentieth Century Fox Film Corp.*, No. 09-CV-6344, 2010
     WL 1197884 (N.D. Ill. Mar. 23, 2010); *Abbas v. Selling Source, LLC*, No. 09-CV-3413, 2009 WL

20   4884471 (N.D. Ill. Dec. 14, 2009); *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, No. 07-
     C1611, 2008 WL 597604, at *2 (N.D. Ill. Mar. 3, 2008); *Italia Foods, Inc v. Marinov Enters.,*

21   *Inc.*, No. 07-C2494, 2007 WL 4117626, at *2 (N.D. Ill. Nov. 16, 2007); *Phillips Randolph*

22   *Enters., LLC v. Rice Fields*, No. 05-17114, 2007 WL 129052, at *3 (N.D. Ill. Jan. 11, 2007);
     *Accounting Outsourcing, LLC. v. Verizon Wireless Personal Commc'ns, L.P.*, 329 F. Supp. 2d 789

23   (M.D. La. 2004); *Harjoe v. Herz Fin.*, 108 S.W.3d 653, 655 (Mo. 2003); *Kaufman v. ACS Sys.,*
     *Inc.*, 110 Cal. App. 4th 886, 921 (2003); *Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162 (S.D.

24   Ind. 1997); *Levitt v. Fax.com, Inc.*, 383 Md. 141 (Md. Ct. App. 2004); *Minnesota v. Sunbelt*

25   *Commc'ns. & Mktg.*, 282 F. Supp. 2d 976 (D. Minn. 2002).
          [5] *See Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 196 F. Supp. 2d 920, 934 (E.D. Mo. 2002)

26   *rev'd*, 323 F.3d 649 (8th Cir. 2003); *Rudgayzer & Gratt v. Enine, Inc.*, 193 Misc. 2d 449, 451

27   (N.Y. Civ. Ct. 2002) *rev'd and remanded*, 4 Misc. 3d 4 (N.Y. App. Term. 2004); *The Chair King,*
     *Inc. v. GTE Mobilnet of Houston*, 135 S.W.3d 365 (Tex. App. Ct. 2004), *rev'd*, 184 S.W.3d 707

28   (Tex. 2006).

### III.   THE PLAIN LANGUAGE OF THE TCPA, AS WELL AS THE NINTH CIRCUIT'S AND THE FCC'S INTERPRETATIONS OF THE DEFINITION OF "ATDS," ARE CONSTITUTIONAL.

Heartland mounts its first constitutional attack on the TCPA by claiming that the Ninth Circuit's plain language interpretation of the definition of "automatic telephone dialing system" to require only "capacity," and not actual calling of randomly or sequentially dialed numbers, is impermissibly overbroad in violation of the First Amendment.  (Dkt. 16-1, pg. 21.)  Heartland posits that Congress's sole purpose in restricting the use of an ATDS was to prevent telemarketing calls to blocks of randomly or sequentially generated numbers and, based on this false premise, concludes that any reading of the TCPA prohibiting more than calls to randomly or sequentially generated numbers restricts more speech than is allowed by the First Amendment.  (*Id.* at pgs. 21-28.)  Heartland's argument was rejected by Congress when debating the TCPA, was rejected by the FCC when interpreting the TCPA, and has been ultimately rejected by nearly every state and federal court to be presented with such First Amendment challenges.[6]  Heartland's motion adds nothing that compels a different result.

### A.   *Content-Neutral Speech Restrictions & First Amendment Overbreadth*

Plaintiffs do not dispute that Section 227(b)(1)(A)(iii) of the TCPA is a content-neutral time, place, and manner restriction on speech, as it regulates "any call" made to a cellular phone without prior express consent using an ATDS.  *See Moser*, 46 F.3d at 973-74 (construing TCPA Section 227(b)(1) prohibiting "any telephone call to any residential line using an artificial or prerecorded voice" as content-neutral in rejecting First Amendment challenge); *Abbas*, 2009 WL 4884471, at *7 (rejecting First Amendment challenge to TCPA Section 227(b)(1)(A)(iii) applying content-neutral time, place, and manner analysis).  Such a content-neutral restriction will survive a First Amendment challenge if it: (i) serves "a significant governmental interest," (ii) is "narrowly

---

[6] Heartland's Motion purposefully avoids any citation to or discussion of Congress's consideration of the First Amendment concerns associated with the TCPA or decisional authority directly contradicting the position taken by is brief.

1  tailored" to serve that interest, and (iii) leaves "open ample alternative channels for

2  communication of the information." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989).[7]

3        Although a content-neutral regulation, Heartland does not argue that the TCPA is

4  unconstitutional as applied to the commercial Jiffy Lube text message ads at issue here, but

5  instead makes a facial challenge that the use of the word "capacity" in the definition of ATDS

6  renders the entire statute overbroad as applied to a few factually suspect hypotheticals.  *See Fox,*

7  492 U.S. at 483 (noting that a typical First Amendment overbreadth challenge argues "that even if

8  the commercial application of the [law] are valid, its non-commercial applications are not, and this

9  invalidates the commercial applications as well.").  "In a facial challenge to a law's validity under

10  the First Amendment, the law may be invalidated as overbroad if a substantial number of its

11  applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

12  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, --- F.3d ---, 2011WL

13  4336667, at *4 (9th Cir. Sept. 16, 2011) (internal quotation omitted).  Although admissible

14  evidence of overbreadth is not required, *id.* at *4, "it is not enough for [Heartland] to show 'some'

15  overbreadth . . . [as] the overbreadth of a statute must not only be real, but substantial as well."

16  *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 584 (2002); *see also City Council of Los*

17  *Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984) (holding that an overbreadth

18  challenge requires "a realistic danger that the statute itself will significantly compromise

19  recognized First Amendment protections of parties not before the Court . . . ."); *Turney v. Pugh*,

20  400 F.3d 1197, 1200-01 (9th Cir. 2005) ("The overbreadth must be substantial in order for the

21

22      [7] Regulations on commercial speech, such as the text message calls at issue here, are typically analyzed under the test set forth in *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of*

23  *New York,* 447 U.S. 557 (1980).  However, "the test for time, place and manner restrictions for content-neutral speech and regulations for commercial speech regulations [under *Central Hudson*]

24  are essentially identical."  *Moser*, 46 F.3d at 973 (citing *Board of Trustees v. Fox*, 492 U.S. 469, 477 (1989).  Given that commercial speech and content-neutral restrictions are subject to

25  "essentially identical" scrutiny, it is significant that numerous courts facing similar First Amendment challenges have recognized that "the constitutionality of the TCPA as applied to

26  facsimile transmissions has been challenged repeatedly and upheld consistently [under *Central Hudson*].  *Lozano*, 702 F. Supp. 2d at 1012 n. 2 (N.D. Ill. 2010) (quoting *Abbas*, 2009 WL

27  4884471, at *7 (collecting cases)); *Italia Foods, Inc.*, 2007 WL 4117626, at *2 (collecting cases).

28

1  statute to be invalidated on its face; the fact that a court may conceive of a single impermissible

2  application is insufficient to justify striking down the law."). "The requirement that the

3  overbreadth be substantial arose from [the Supreme Court's] recognition that application of the

4  overbreadth doctrine is, manifestly, strong medicine and that there must be a realistic danger that

5  the statute itself will significantly compromise recognized First Amendment protections of parties

6  not before the Court for it to be facially challenged on overbreadth grounds." *Bd. of Airport*

7  *Com'rs of City of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 574 (1987) (internal quotation

8  and citation omitted). When determining the constitutionality of a statute, the Court's analysis

9  should be guided by the rule that "acts of Congress enjoy a strong presumption of constitutionality

10 . . . ." *Schwenk v. Hartford*, 204 F.3d 1187, 1204 (9th Cir. 2000) (citing *United States v. X-*

11 *Citement Video, Inc*., 513 U.S. 64, 73 (1994)) ("[W]e do not impute to Congress an intent to pass

12 legislation that is inconsistent with the Constitution as construed by this Court."). As detailed

13 below, Defendant falls well short of overcoming this presumption and meeting the applicable test.

14    **B.    *Defendant Misreads the Construction and Scope of the TCPA's ATDS Prohibition.***

15        Heartland directs its cries of unconstitutionality on what it implies is a misguided reading

16 of the TCPA by the Ninth Circuit in *Satterfield v. Simon & Schuster, Inc.* (Dkt. 16-1, pg. 14.) The

17 starting point in an overbreadth analysis is to actually interpret the statute at issue because "it is

18 impossible to determine whether a statute reaches too far without first knowing what the statute

19 covers." *Redondo Beach*, 2011WL 4336667, at *6 (quoting *United States v. Williams*, 553 U.S.

20 285, 293 (2008)). "When analyzing a facial challenge, [a court] must consider the [FCC]'s

21 authoritative constructions of the ordinance, including its own implementation and interpretation

22 of it." *Id.* (internal quotation omitted). In considering either the Ninth Circuit's or the FCC's

23 construction of the TCPA, a court cannot adopt a construction precluded by the TCPA's plain

24 language. *See id; see also Arrington v. Wong*, 237 F.3d 1066, 1071 (9th Cir. 2001) (requiring

25 review of administrative agency interpretations of a rule to clarify its scope).

26        At issue here is the TCPA's prohibition that: "It shall be unlawful for any person . . . to

27 make any call (other than a call made for emergency purposes or made with the prior express

28

consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call."  47 U.S.C. § 227(b)(1)(A)(iii).  The TCPA defines an ATDS as "equipment which has the *capacity*- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1) (emphasis added).

In *Satterfield,* the Ninth Circuit began—and ultimately concluded—its statutory interpretation of ATDS by construing the plain language Congress used.  569 F.3d at 951.  The Court held that:

> [T]he statute's clear language mandates that the focus be on whether the equipment has the *capacity* 'to store or produce numbers to be called, using a random or sequential number generator.'  Accordingly, a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it.

*Id.*; *Lozano*, 702 F. Supp. 2d at 1010 (finding plain language to require equipment to "only have *the capacity* to store or produce numbers" and that requiring "use" of a random or sequential number generator would relegate the phrase "which has the capacity" to mere surplusage).  This plain language reading accurately captures why Congress chose to use the words it did in defining ATDS.

While the *Satterfield* court rightly focused on the plain language of the statute, the legislative history and subsequent FCC and judicial interpretations corroborate this interpretation and further define the scope of prohibition.  The reason Congress defined ATDS with the functional term "capacity" is apparent when viewed in light of the ultimate problem Congress sought to remedy and the privacy and cost-shifting interests it sought to protect in enacting the TCPA.  The TCPA was crafted through a bipartisan Congressional effort "to deal with various telemarketing practices arising out of the telemarketing industry's use of sophisticated equipment, generally known as autodialers, to generate *millions* of automated telephone calls to residential and business numbers."  *Joffe v. Acacia Mortg. Corp.*, 121 P.3d 831, 834 (Ariz. App. 2006) (citing S. Rep. No. 102-178, at 2-3, dkt. 16-19) (emphasis added).  Indeed, the legislative history is replete with statements that Congressional action was required to halt the exponential increase in

1    unsolicited telemarketing practices that it determined were being driven by the use of equipment

2    capable of automatically dialing thousands of telephone numbers each day.  H.R. Rep. 101-633,

3    dkt. 16-17, pg. 3 (stating need for Congressional action because "the number of unsolicited

4    telemarketing practices has increased overwhelmingly" by equipment that "has the capacity to

5    automatically dialing as many as 1,000 numbers per day."); S. Rep. No. 102-178, dkt. 16-19, pg.

6    3) (finding consumer complaints stemmed from an increase in the number of telemarketers using

7    autodialing technology resulting in millions of calls to consumer each day); H.R. Rep. 102-317,

8    dkt. 16-20, pgs. 3, 8-10 (reporting Congressional findings of how expanded use of low cost

9    automatic dialing systems are used by solicitors to increase their "customer" contacts has resulted

10   in millions of calls each day); 137 Cong. Rec. S16200-04, dkt. 16-22, pg. 2 (same).  As such,

11   Congress's findings in the final bill spoke of the privacy and cost to consumers resulting from the

12   ever-increasing volume of calls being placed.  137 Cong. Rec. H11307-1, dkt. 16-23, pg. 2.

13   Subsequent FCC Rules have confirmed this reading of the TCPA and its legislative history.  2003

14   FCC Order, 68 FR 44144-01, ¶ 96 ("The legislative history also suggests that through the TCPA,

15   Congress was attempting to alleviate a particular problem—an increasing number of automated. . .

16   calls to certain categories of numbers" including cell phones.)

17          Heartland argues that this Court should ignore the language Congress specifically chose

18   and instead interpret the TCPA to prohibit only the "use" of equipment that dials randomly or

19   sequentially generated numbers.  First, this argument is merely an invitation to re-write the TCPA

20   by reading the word "capacity" out of the definition of ATDS, and the Court should decline this

21   invitation.  Heartland attempts to support its contention by cherry-picking out of context snippets

22   from the legislative history and various FCC reports.  There is no doubt that one problem

23   Congress sought to address by enacting the TCPA was calling blocks of random and sequential

24   numbers that could simultaneously tie up several business or hospital telephone lines.  (Dkt. 16-1,

25   pg. 5.)  As noted above, however, the concern about dialing blocks of sequential number was but a

26   facet of a larger issue: the increasing *volume* of solicitations to consumers from autodialing

27   equipment that it deemed both an invasion of privacy and as imposing unwarranted costs on

28   consumers.  As such, Congress noted repeatedly in its debates and findings that ATDS's "*often* are

programed to dial sequential blocks of numbers, including those of emergency organizations and unlisted subscribers." *See e.g.* H.R. Rep. 101-633, dkt. 16-17, pg. 3 (emphasis added).

Congress's explicit prohibition of the dialing of random or sequential numbers merely demonstrates its awareness of the state of autodialing technology circa 1991. However, by making "capacity" the relevant standard, "the wording of the statute is not limited to 1991 technology . . . and demonstrates Congress anticipated that the TCPA would be applied to advances in automatic telephone dialing technology." *Joffe*, 121 P.3d at 839; *see also* 137 Cong. Rec. S18784 (1991), dkt. 16-21 (statement of Sen. Hollins) ("[T]he FCC is not limited to considering existing technologies. The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies.")

In the exercise of its TCPA rulemaking authority under 47 U.S.C. § 227(b)(2), the FCC sought comment on the types of equipment Congress sought to cover in defining ATDS. The 2002 Notice of Proposed Rulemaking issued by the FCC seeking comment recognized "that in the last decade new technologies have emerged to assist telemarketers in dialing the telephone numbers of potential customers. More sophisticated dialing systems, such as predictive dialers and other electronic hardware and software containing databases of telephone numbers, are now widely used by telemarketers to increase productivity and lower costs." *Notice of Proposed Rule Making in re Regulations Implementing the TCPA*, 17 FFC Red. 17474, ¶ 24, 2002 WL 31084939 (2002). In the Final Rule that followed, the FCC concluded from the statutory definition that "the equipment need only have the 'capacity to store or produce telephone numbers' . . . [as] it is clear from the statutory language and the legislative history that Congress anticipated that the FCC . . . might need to consider changes in technology." *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Final Rule*, 68 FR 44144-01, ¶ 95, 2003 WL 21713245 (July 25, 2003). The FCC went on to note "the evolution of the teleservices industry has progressed to the point when using lists of numbers is far more cost effective. The basic function of the equipment, however, has not changed—the capacity to dial numbers without human intervention." *Id.* The FCC concluded that "[w]e believe that the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called'

1   is to ensure that the prohibition on autodialed calls not be circumvented." *Id.* at ¶ 96; *Joffe*, 121

2   P.3d at 836-37.  Accordingly, the FCC has interpreted ATDS to apply to equipment to which lists

3   of cellular phone numbers can be uploaded to and then dialed without human intervention.

4          The FCC has also issued regulations concerning calls made with an ATDS that are

5   exempted from the TCPA limiting the scope of its application.  The TCPA has an exception for

6   calls made to family, friends and acquaintances that would apply to calls that would otherwise

7   violate the TCPA's prohibition on the use of an ATDS.  The TCPA directs the FCC to "prescribe

8   regulations to implement the requirements" of the TCPA.  *See* 47 U.S.C. § 227(b)(2).  The FCC's

9   regulations, codified at 47 C.F.R. § 64.1200, contain an exception to the general restrictions on

10  telemarketing when "the telemarketer making the call has a personal relationship with the

11  recipient of the call."  47 C.F.R. § 64.1200(c)(E)(ii).  A "personal relationship" is defined as "any

12  family member, friend, or acquaintance of the telemarketer making the call."  47 C.F.R. §

13  64.1200(f)(14).  Importantly, this exemption applies to calls made to wireless telephone numbers.

14  *See* 47 C.F.R. § 64.1200(e); 2003 FCC Order, 2003 WL 21517853, at *14 ("Moreover, we believe

15  it is more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit

16  from the full range of TCPA protections.")  Thus, Defendant's creative hypotheticals

17  notwithstanding, calls made and text messages sent using "smartphones" to friends, family, and

18  acquaintances do not violate the TCPA.

19         **C.**     ***The TCPA Serves the Substantial Governmental Interest in Minimizing the
20                Invasion of Privacy and Cost to Consumers Caused by Mass Unsolicited Text
                Message Calls.***

21         Heartland urges the Court to find that the sole governmental interest served by the ATDS

22  provision of the TCPA is "reducing the volume of calls to randomly or sequentially generated

23  numbers."  (Dkt. 16-1, pg. 23.)  Heartland's argument ignores the express findings of Congress, as

24  well as the FCC rulings and numerous court decisions, that have all found the TCPA's prohibition

25  on using an ATDS to call cellular phones justified by the significant governmental interest in

26  privacy and reducing costs to consumers resulting from the increase in autodialed calls to cell

27  phones.

28

1    In enacting the TCPA in 1991, Congress held extensive hearings on telemarketing, was

2  presented with "significant evidence" regarding "consumer concerns about telephone solicitation

3  in general and about automated calls in particular," and made "extensive findings."  *Moser*, 46

4  F.3d at 973.  "[W]hen Congress makes findings on essentially fact issues . . . those findings are of

5  course entitled to a great deal of deference, inasmuch as Congress is an institution better equipped

6  to amass and evaluate the vast amounts of data bearing on such an issue."  *Id*. at 974.  Congress,

7  enacting the TCPA, found that it had "a substantial interest in protecting the privacy of consumers

8  and in preventing the [ ] nuisances" of "rampant telemarketing and the consequent costs of money,

9  time, and the invasion of privacy to consumers."  *Abbas,* 2009 WL 4884471, at *7 (citing S. Rep.

10  102-178, at 1 & 4, *reprinted in* 1991 U.S.C.C.A.N. at 1969, 1971-72 (noting, *inter alia*, that

11  "unsolicited calls placed to . . . cellular telephone numbers often impose a cost on the called party

12  [as] cellular users must pay for each incoming call")); *Moser*, 46 F.3d at 974 ("We conclude that

13  Congress accurately identified automated telemarketing calls as a threat to privacy"); *Lozano*, 702

14  F. Supp. 2d at 1011 ("[T]he TCPA serves a significant governmental interest of minimizing the

15  invasion of privacy caused by unsolicited telephone communications to consumers"); *see also*

16  *Bland v. Fessler,* 88 F.3d 729, 734-35 (9th Cir. 1996) (finding California's interest in personal

17  privacy and the avoidance of unwanted calls and faxes is substantial); *Satterfield*, 569 F.3d at 954

18  (noting "that the purpose of the TCPA is [is] to protect the privacy interests of subscribers" and

19  that a "voice message or a text message are not distinguishable in terms of being an invasion of

20  privacy"); *Destination Ventures, Ltd. v. F.C.C.*, 844 F. Supp. 632, 637 (D. Or. 1994) (finding

21  "Congress' interest in protecting consumers from economic harm resulting from the unfair shifting

22  of the cost of advertising to the unwitting consumer" associated with fax spam is a substantial

23  interest which is identified in the TCPA's legislative history"); *Joffe*, 121 P.3d at 842 (finding

24  Congress concluded that "consumers and businesses were especially frustrated by [autodialed]

25  calls, viewing them as a nuisance, and invasion of privacy and a threat to interstate commerce.").

26    As such, the TCPA serves a substantial government interest in privacy and reducing costs

27  to consumers.

28

**D.**      ***The TCPA is Narrowly Tailored to Protect Privacy and Costs to Consumers.***

Proceeding on the false premise that the government interest at issue is "preventing the random or sequential sending of text messages," Heartland argues that any reading of the TCPA that considers "capacity" in not narrowly tailored.  Heartland's argument and examples of supposed overbreadth are without merit.  Although content-neutral time, place, and manner restrictions must be "narrowly tailored" to the government's legitimate interest, the regulations "need not be the least restrictive or least intrusive means of doing so."  *Ward*, 491 U.S. at 798-99. Here, Congress's inclusion and definition of ATDS in the conduct prohibited by the TCPA is narrowly tailored to the compelling and well-documented Congressional interest in protecting consumer privacy and cost-shifting.

In *Lozano*, the court was presented with the identical argument about "capacity" being raised by the Defendant here.  702 F. Supp. 2d at 1010-12.  Rejecting the argument, the court found that "[r]educing the number of unsolicited calls results in less invasion of privacy . . . [and] [t]he TCPA directly advances this interest by limiting unsolicited calls to consumers.  *Id.* at 1011. The court went on to hold that "the fact that the TCPA only prohibits the use of equipment with the capacity to randomly dial numbers does not  [make it] overbroad [as] . . . the limitations on the prohibition of the use of equipment with certain capacities reflects the restriction is not excessive in proportion to the interest it serves."  *Id.* at 1011-12.

The Ninth Circuit is in accord.  In *Moser v. FCC*, the Ninth Circuit rejected a First Amendment challenge to an analogous section of the TCPA and found that restricting automated calls was narrowly tailored to Congress's interest in lessening the threat such calls pose to residential privacy.  46 F.3d at 975.  While the Ninth Circuit was not construing the same ATDS provision at issue here, it nevertheless determined that restrictions reducing consumer privacy violations are narrowly tailored to serve that interest.

In addition to narrowly tailoring the TCPA to protect the privacy of consumers, Congress's content-neutral application of this section of the TCPA is narrowly tailored to its interest in reducing the shifting of costs to consumers implicated by Heartland's sending of text messages. In *Destination Ventures*, the court found that Congress's prohibition of any unsolicited fax

1  advertisements was narrowly tailored to the analogous interest in reducing the shifting of

2  advertising costs to unwilling consumers in the fax spam context.  844 F. Supp. at 638-39.  Here,

3  Congress's prohibition of the use of an ATDS to reduce the volume of text message calls made by

4  advertisers and other solicitors is clearly sufficiently tailored to Congress's interest in reducing the

5  consumer costs associated with receiving such text messages (in addition to consumer privacy

6  interests).

7        Although most of Defendant's hypothetical examples of overbreadth can be summarily

8  disregarded as being applied to the wrong Congressional "interest," Heartland nevertheless

9  identifies a handful of hypothetical instances, which on the surface, could give the Court pause.

10  For instance, Heartland implies that the TCPA could be applied to a person-to-person text message

11  sent from an iPhone inviting a friend of a friend to dinner or that Wells Fargo or other businesses

12  may inadvertently violate the TCPA through various "calling campaigns."  First, Defendant has

13  not pointed to a single actual instance of overbreadth: not one case and not one FCC decision.  In

14  addition, its attempt to claim potential overbreadth as it relates to the commercial calling

15  campaigns is similarly of no moment as "it is irrelevant whether the ordinance has an overbroad

16  scope encompassing protected commercial speech of other persons, because the doctrine does not

17  apply to commercial speech." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455

18  U.S. 489, 496-97 (1982).  Finally, Heartland is mistaken that the TCPA would apply to a text sent

19  to a "friend of a friend" because, as noted above, the FCC has provided for a specific exemption

20  for all texts from "smartphones" to friends, family, and acquaintances.  *See* 47 C.F.R. §

21  64.1200(e).  Accordingly, Congress has prohibited no more speech than necessary to protect

22  consumer's interest in privacy and increased costs from *en masse* autodialed calls.

23        **E.      *Numerous Alternative Channels of Communication Remain Open.***

24        Perhaps recognizing that the TCPA leaves open many alternative channels for

25  communication, Heartland fails to put forth any argument that Section 227(b)(1)(A)(iii) prohibits

26  any form of communication other than the sending of text messages without consent.  In fact, a

27  finding of overbreadth in a content-neutral regulation is typically limited to instances where the

28  limitation on speech operates as a complete ban on a medium of expression.  *See Maldonado v.*

1    *Morales*, 556 F.3d 1037, 1046 (9th Cir. 2009) *cert. denied* 130 S. Ct. 1139 (2010).  No such

2    "complete ban" is at issue here.

3        Several courts have concluded that, in enacting the TCPA, "Congress left open ample

4    alternative channels through which telemarketers and other would-be automated callers can

5    communicate." *Abbas*, 2009 WL 4884471, at *8; *Joffe,* 121 P.2d at 842.  In *Bland v. Fessler*, the

6    Ninth Circuit found California's statute regulating autodialing equipment was not overbroad, as

7    communications could still be disseminated via handbills, billboards, magazines, newspapers,

8    television, and radio.  88 F.3d at 736.  Importantly, the TCPA does not prevent Defendant or

9    anyone else from using an ATDS to call cellular phones for which it has "prior express consent"

10    or for an emergency purpose.  The TCPA also does not prohibit using an ATDS to make calls to

11    landline phones or other phones outside the specified categories of wireless, emergency numbers,

12    paging services, or any other service where the party is charged for the call.  Further, the TCPA

13    does not prevent Defendant from calling cellular numbers by hand, or making live solicitations

14    without the use of an ATDS.  *Lozano*, 702 F. Supp. 2d at 1012; *Abbas,* 2009 WL 4884471, at *8;

15    *Joffe,* 121 P.3d at 842.

16        In conclusion, this Court should reach the same conclusion as Congress when it considered

17    the implications posed by the TCPA on speech restrictions: it is a valid time, place, and manner

18    restriction that properly balances consumer privacy and cost-shifting with the First Amendment.

19    *See* S. Rep. No. 102-178, dkt. 16-19, pgs. 4-5.

20    **IV.**      **THE TCPA'S STATUTORY DAMAGES COMPORT WITH DUE PROCESS**

21        Heartland's second claimed affront to the Constitution is that, according to the factors set

22    out by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 408 (2003), and its

23    progeny, the TCPA's statutory damage provision violates its Fifth Amendment Due Process

24    rights.  Much like its First Amendment challenge, Heartland inexplicably ignores the numerous

25    federal decisions rejecting this identical argument and instead advocates a position that is not even

26    supported by the case law upon which it relies.  Defendant does, however, correctly note that 47

27    U.S.C. § 227(b)(3)(B) & (C) provides for the recovery of actual damages or $500 per violation,

28

1    which can be trebled upon a finding of willfulness.  For the reasons that follow, this Court should

2    reject Defendant's contention that the damages Congress provided are violative of Due Process.

3           **A.     *BMW and its Progeny are Inapplicable to Claims for Statutory Damages.***

4           The crux of Heartland's argument is that this Court must dismiss Plaintiffs' TCPA claim

5    because an award of statutory damages is akin to an award of punitive damages, which would be a

6    "grossly excessive or arbitrary punishment[]" contrary to the Due Process standards set forth by

7    the Supreme Court in *BMW v. Gore* and its progeny.  "Those cases are clearly distinguishable,

8    however, because they involve the constitutionality of excessive punitive damage awards by

9    juries, and not statutorily-prescribed damage awards."  *Sadowski v. Med1 Online LLC*, No. 07 C

10   2973, 2008 WL 489360, at *5 (N.D. Ill. Feb. 20, 2008) (citing *Arrez v. Kelly Servs., Inc.*, 522 F.

11   Supp. 2d 997, 1008 (N.D. Ill. 2007)); *Accounting Outsourcing LLC*, 329 F. Supp. 2d at 808-09

12   (finding *BMW* and *Campbell* inapplicable to Fifth Amendment challenge to TCPA because they

13   dealt with fair notice of the severity of damage awards by juries, not statutory damages).  Indeed,

14   Heartland's proclamation that the statutory damages afforded by the TCPA are indistinguishable

15   from punitive damages is simply false—"statutorily prescribed damage awards are distinct from

16   punitive damage awards."  *Moeller v. Taco Bell Corp.*, No. C 02-5849-MJJ, 2004 WL 5669683, at

17   *3 (N.D. Cal. Dec. 7, 2004).  In fact, the primary authority Heartland relies on for the application

18   of *BMW* to this case actually concluded that "it is highly doubtful whether [*BMW*] and *Campbell*

19   apply to statutory damages at all" because the "ratios between actual and or potential damages and

20   punitive damage that are at the heart of [those cases] simply do not apply in the context of

21   statutory damages."  *Verizon Cal., Inc. v. OnlineNIC, Inc.*, No. C08-2832-JF, 2009 WL 2706393,

22   at *6-7 (N.D. Cal. Aug. 25, 2009).

23          Heartland's final push for the application of *BMW* is that Due Process requires that it have

24   notice that its conduct is subject to punishment.  (Dkt 16-1, pg. 29.)  Heartland argues that it had

25   no such notice because it claims Plaintiffs fail to allege that it knew that the company it hired to

26   send its text message spam (co-defendant Textmarks) was going to use an ATDS.  Heartland

27

28

completely misunderstands the "notice" at issue in *BMW*.[8]  "[T]he due process concerns enunciated in [*BMW*] and its progeny related to a defendant's lack of notice regarding the potential magnitude of the verdict and a lack of any limits on the jury's discretion in awarding excessive verdicts . . ." *Ashby v. Farmers Ins. Co. of Oregon*, 592 F. Supp. 2d 1307, 1316 (D. Or. 2008).  As the TCPA provides for statutory damages of a set amount, Heartland can hardly complain that it did not have notice of the severity of the potential punishment resulting from engaging Textmarks to transmit the offending text messages promoting its services.  *See Accounting Outsourcing, LLC*, 329 F. Supp. at 809.  And since Heartland knew the phone numbers to which the offending text messages were sent, the full extent of the potential damages at issue in this case could even have been specifically calculated without so much as the need for a calculator prior to the transmission of the messages.

### B. *The TCPA's Statutory Damages are Not Constitutionally Excessive*

Although Heartland's primary argument seeks to apply the incorrect test to the TCPA's statutory damage provision, it concludes its Motion with a half-hearted attempt to argue that the statutory damage award here nevertheless violates Due Process under the applicable standard.  Under the test set out by the Ninth Circuit in *United States v. Citrin*, "[a] statutorily prescribed penalty violates due process rights 'only where the penalty prescribed is so severe and oppressive as to be wholly disproportional to the offense and obviously unreasonable." 972 F.2d 1044, 1051 (9th Cir. 1992) (quoting *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66-67 (1919)).[9]  In

---

[8] To the extent Heartland is attempting to argue that the TCPA is in fact "void for vagueness" under the Fifth Amendment due to lack of notice of what conduct that statute prohibits, it has failed to properly raise such a claim and, besides, such a claim would be futile, as Heartland has admitted it had notice of how the Ninth Circuit interprets ATDS.  This is especially true in light of the fact that, back in 2003, the FCC expressly ruled that the TCPA applies to text message calls, *see* 2003 FCC Order, 2003 WL 21517853 at *58, and also in light of the fact that lawsuits alleging TCPA violations are not novel—such claims have been filed in literally hundreds of cases throughout the nation for several years preceding the transmission of the messages at issue here.

[9] Heartland's claim that the standard applicable to Due Process challenges has somehow changed post-*BMW* ignores both the general inapplicability of those cases and the fact that courts still view *U.S. v. Citrin* as the standard when evaluating statutory damages.  *See, e.g., Facebook, Inc. v. Fisher*, C 09-05842 JF PSG, 2011 WL 250395 (N.D. Cal. Jan. 26, 2011); *Moeller*, 2004 WL 5669683, at *3.

1    *Williams*, the Court went beyond considering the amount of the statutory fine as it related to the

2    actual damages, and specifically also took into account "due regard for the interests of the public,

3    the numberless opportunities for committing the offense, and the need for securing public

4    adherence" to the statute.  251 U.S. at 67.  Although statutory damages may not be oppressive and

5    wholly disproportional, "[t]he Due Process clause does not require Congress to make illegal

6    behavior affordable, particularly for multiple violations." *Centerline Equipment Corp.*, 545 F.

7    Supp. 2d at 778.  Turning to the several recent decisions that have confronted this argument—

8    which Defendant again chooses to wholly ignore—it is apparent that "Courts have routinely

9    upheld the constitutionality of the TCPA's statutory damage provision." *Sadowski*, 2008 WL

10   489360, at *5.

11           Heartland's argument claims that because Plaintiffs have not alleged any specific monetary

12   losses, that the TCPA's statutory penalty of $500 is "disproportionate" to the offense of having

13   receiving unwanted text messages.  (Dkt. 16-1, pgs. 24-25.)  First, "[t]here is no requirement that

14   the statutory remedy be proportional to the Plaintiff's own injury." *Centerline Equipment Corp.,*

15   545 F. Supp. 2d at 777.  The Ninth Circuit rejected the argument that statutory damages need to be

16   proportional to the alleged harm in the context of the certification of a class action under FACTA:

17           Congress expressly created a statutory damages scheme that intended to compensate
             individuals for actual or potential damages resulting from FACTA violations,
18           without requiring individuals to prove actual harm. . . .  But the plain text of the
             statute makes absolutely clear that, in Congress' judgment, the $100 to $1000 range
19           *is* proportionate and appropriately compensates the consumer.  That proportionality
             does not change as more plaintiffs seek relief; indeed, the size of [the defendant's]
20           potential liability expands at exactly the same rate as the class size.

21   *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 719 (9th Cir. 2010).

22           Heartland attempts to bolter its disproportional damage argument by discussing *Capital*

23   *Records, Inc. v. Thomas-Rasset*, --- F. Supp. 2d ---, No. 06-1497, 2011 WL 3211362 (D. Minn.

24   July 22, 2011).  *Capital Records* is not only wholly dissimilar to the Plaintiffs' claims here, it

25   actually defeats the argument that Defendant claims it supports.  In *Capital Records*, the plaintiff

26   recording companies sued an individual consumer (of limited means) who had illegally shared 24

27   songs on the peer-to-peer file-sharing network Kazaa.  *Id.* at *1.  It was the first case to go to trial

28

1   over a consumer illegally sharing copyrighted songs, and the jury returned a verdict of $1,500,000,

2   or $62,500 per song.  *Id.*  The court considered such an award against an individual to be

3   "appalling" for misappropriating 24 songs for personal use and, pursuant to *Williams*, reduced the

4   award to $54,000, or $2,250 per violation—which was three times the statutory minimum

5   penalty—which it found served the public goals and provided sufficient deterrent to the consumer.

6   *Id.* at *12-14.  In the instant case, Defendant is not an individual of limited means who violated the

7   law by downloading a few songs for her personal enjoyment, but a corporation who spammed the

8   public for its own financial gain.  Importantly, the *Capital Records* court did <u>not</u> throw out the

9   case—as Heartland urges here—but rather reduced the damage award to an amount that was three

10  times the minimum statutory penalty at issue in that case—an amount even *greater* than Plaintiffs

11  could obtain in this case should Defendants' violation be proven willful.

12          In fact, Heartland acknowledges that more than a fine-to-actual-damage ratio is considered

13  in a Due Process analysis, but its argument ends with its claim of an improper ratio here, while

14  overlooking the fact that "the TCPA damages provision was not designed solely to compensate

15  each private injury caused by unsolicited [text message] advertisements, but also to address and

16  deter the overall public harm caused by such conduct."  *Texas v. American Blastfax, Inc.*, 121 F.

17  Supp. 2d 1085, 1090 (W.D. Tex. 2000).  In setting the TCPA's damage provision, Congress

18  selected "a benchmark that [was] appropriate to many different situations, as well as taking into

19  account considerations such as the public interest."  *Holtzman v. Caplice*, No. 07 C 7279, 2008

20  WL 2168762, at *6 (N.D. Ill. May 23, 2008).  As noted above, Congress identified two harms

21  caused by the increase in autodialed calls to consumers cell phones: an invasion of privacy and the

22  shifting of costs to consumers who have to pay for incoming calls (and text messages) to their cell

23  phones.  *Supra*, at § III.B; *see also e.g. Accounting Outsourcing, LLC*, 329 F. Supp. at 809.  In

24  setting the statutory damage amount, Congress also considered the difficultly of quantifying

25  business interruption costs caused by the receipt of unsolicited ads, the need to "deter the

26  unscrupulous practice of shifting these costs to unwitting recipients," and to encourage

27  prosecution of these claims.  *American Blastfax*, 121 F. Supp. 2d at 1090 (citing *Kenro, Inc.*, 962

28  F. Supp. at 1166).  Accordingly, the TCPA's $500 damage provision is not "so severe and

1  oppressive as to be wholly disproportionate to the offense or obviously unreasonable," and

2  Heartland's Due Process argument necessarily fails.

3          **C.**       ***Heartland's Due Process Challenge is Premature.***

4       Should the Court find either that *BMW* and its progeny apply or that it disagrees with the

5  numerous courts holding that the TCPA's damage provision is consistent with Due Process under

6  *Williams*, Heartland's Motion still fails as being premature.  As noted above, while the majority of

7  courts confronted with Fifth Amendment excessive damage arguments have dismissed them

8  outright, others have concluded that such arguments are premature and that the constitutionality of

9  damages should be considered only after an excessive verdict is actually returned by a jury.

10  *Ashby*, 592 F. Supp. 2d at 1316; *In re Napster Inc. Copyright Litig.*, MDL 00-1369 MHP, 2005

11  WL 1287611, at *11 (N.D. Cal. June 1, 2005) ("At this stage of the proceedings, there is simply

12  nothing in the record that would permit the court to apply these '[*BMW*] factors' in an informed

13  manner.").  This is especially true in a class action that has yet to be certified, as prior to

14  certification only the level of damages available to the named Plaintiffs is at issue.  *Holtzman*,

15  2008 WL 2168762, at *7.  Finally, Heartland's argument for dismissal based on oppressively large

16  potential statutory damages is premature because the Court can simply reduce the aggregate award

17  *after* it is rendered.  *Centerline Equip. Corp.*, 545 F. Supp. 2d at 778.  Accordingly, the Court

18  should deny Heartland's Fifth Amendment challenge.

19  **V.**     **PLAINTIFFS' COMPLAINT ALLEGES SUFFICIENT FACTS TO MEET**

20          **FEDERAL PLEADING REQUIREMENTS**

21       In addition to its constitutional challenges, Defendant also asserts that Plaintiffs'

22  Complaint fails to meet the current federal pleading standards.  (Dkt. 16-1, pgs. 6-13.)  Under Rule

23  8(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs' Complaint need only contain a "short

24  and plain statement of the claim showing that [he] is entitled to relief."  Here, Heartland claims

25  that *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), as further modified by *Ashcroft v. Iqbal*,

26  129 S. Ct. 1937 (2009), has somehow radically altered Rule 8(a)(2) and created a fact-pleading

27

28

standard that Plaintiffs have failed to meet.[10]  Defendant's arguments are both without merit and redundant of arguments previously rejected by federal courts nationwide.  *See, e.g., Kazemi v. Payless Shoesource Inc.*, No. 09-cv-5142, 2010 WL 963225 (N.D. Cal. Mar. 16, 2010).  Under *Twombly*, a plaintiff's allegations will not be dismissed under Rule 12(b)(6) if two minimum hurdles are cleared: (1) the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests; and (2) the complaint's allegations must plausibly suggest that the plaintiff has a right to relief, raising the possibility above a level of speculation.  *Twombly*, 550 U.S. at 544-55.  A complaint must "provide a 'short and plain statement of the claim showing that [he] is entitled to relief.'  This is not an onerous burden. 'Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what  . . . the claim is and the grounds upon which it rests.'"  *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89 (2007)); *see also Coupons, Inc. v. Stottlemire*, 588 F. Supp. 2d 1069, 1073 (N.D. Cal. 2008) (citing *Twombly*, 550 U.S. 544) ("'heightened fact pleading of specifics' is not required to survive a motion to dismiss.").  Finally, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

For a complaint to be dismissed because the allegations give rise to an affirmative defense, "the defense clearly must appear on the face of the pleading." *McCalden v. California Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir. 1990) (citing 5A C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1357, 1348-49 (2d ed. 1990)).  Immunities and other affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of the complaint. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999); *Jablon v. Dean Witter & Co.*, 614 F.2d

---

[10] Courts nationwide have noted that "In *Erickson v. Pardus*, …decided two weeks after *Twombly*, the Court clarified that *Twombly* did not signal a switch to fact-pleading in the federal courts. *Erickson* reaffirms that under Rule 8 "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Villegas v. J.P. Morgan Chase & Co.*, No. C09-00261, 2009 WL 605833 (N.D. Cal., Mar. 9, 2009) (citing *Airborne Beepers & Video, Inc. v. AT&T Mobility* LLC, 499 F.3d 663, 667-668 (7th Cir. 2007)).

677, 682 (9th Cir. 1980).

In order to plead a violation of the TCPA, Plaintiffs must plead facts that Defendant (1) made a call without the prior express consent of the called party; (2) using an automatic dialing system; (3) to any telephone number assigned to a cellular telephone service.  *See Satterfield*, 569 F.3d at 950 (citing 47 U.S.C. § 227(b)(1)(A)(iii)); *see also Kazemi*, 2010 WL 963225, at *2. Moreover, whether Plaintiffs and the members of the proposed class provided their prior express consent to receive these messages is an affirmative defense to—not an element of—a TCPA violation.  *Grant v. Capital Management Services, L.P.*, 2011 WL 3874877, at *1 n.1.  (9th Cir. Sept. 2, 2011)[11]  ("express consent is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof"); *Adams v. AllianceOne, Inc.*, No. 08-cv-248, 2011 WL 2066617, at *1-2 (S.D. Cal. May 25, 2011) (stating that "prior express consent" is an affirmative defense).

Plaintiffs' Complaint not only alleges facts as to each required element of a TCPA violation, it provides ample factual context to give Defendant fair notice of the basis of Plaintiffs' claim, including that they each received an identical unauthorized text message, the time the message was received, from what short code the message was sent, and the content of the message.

**A.**     ***Plaintiffs Have Adequately Alleged that Heartland Violated the TCPA by Effectuating the Transmission of Spam Text Messages.***

Heartland's first "pleadings" argument is that an advertiser can skirt liability under the TCPA simply by hiring a third-party to transmit the offending text messages.  (Dkt. 16-1, pg. 13.) Specifically, Heartland argues that it cannot be held liable under the TCPA because:  (1) Plaintiffs fail to plead that Heartland itself "made or initiated any calls" with an ATDS; and (2) it cannot be liable for the actions of its co-defendant TextMarks under an agency theory because no facts are pleaded showing Heartland knew messages would be transmitted with equipment that sent messages to randomly or sequentially generated numbers.  (*Id.* at 13-15.)  Unfortunately for

---

[11] Although this case is unpublished and the holding (involving removal under CAFA) does not carry precedential weight, citation to it is appropriate under 9th Cir. Rule 36-3(b).

Heartland, liability under the TCPA is not so limited.  By focusing its arguments on not only an improper construction of ATDS, but on the TCPA's "make any call" language, Heartland overlooks that Congress explicitly extended liability to "any person" involved in "making" the call.  Holding "any person" involved in the transmission to be liable follows the plain language of the TCPA, the intent of the drafters of the statute, FCC pronouncements, prevailing case law on the point, and the well-pleaded allegations of the Complaint—all of which Heartland again fails to address in its Motion.

> **1.     The TCPA makes it unlawful for "any person" to engage in prohibited conduct, not just the "maker" of text message spam.**

Heartland begins its argument by claiming that, unless it physically transmitted the unauthorized text messages itself, it cannot be held liable under the TCPA.  This argument, made with flimsy legal support, is baseless.  The overwhelming weight of authority holds that beneficiaries of spam text messages are liable for violating the TCPA even though they did not actually "pull the trigger" and transmit the messages themselves.  Heartland's narrow view of TCPA liability is unsupported by the language of the TCPA, which reads as follows:

> It shall be unlawful *for any person* within the United States, or any person outside the United States if the recipient is within the United States - - (A) to make any call . . . using any automatic telephone dialing system . . . (iii) to any telephone number assigned to a . . . cellular telephone service . . . .

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).  Thus, the relevant portion of the statute identifies the parties who may be found to be in violation of the TCPA; it is not just transmitters, but *any person* who violates the statute, which means any and all persons involved in the violation.  The use of the word "any" is not accidental—Congress could have used the words "a person," or even "any telemarketer."  Congress instead chose to use the phrase "any person," which is broadly defined as "one, some, or all indiscriminately of whatever quality."  *Miriam-Webster Dictionary Online* (2011); *see also Account Outsourcing, LLC*, 329 F. Supp. 2d at 805 (finding that the "any person" language broadly defines the scope of whose conduct is prohibited under the TCPA).  Even the term "make" implies a process and not merely a physical act, in the same way that a

person who specifically directs his or her assistant to dial a phone number is as involved in making the call as the assistant who physically dialed the numbers.[12]

Not surprisingly, courts have uniformly rejected the narrow interpretation suggested by Defendant here, imposing liability on the advertisers on whose behalf the messages were sent, based on both the language of the statute as well its purpose. *See, e.g., American Blastfax, Inc.*, 121 F. Supp. 2d at 1089 (analyzing the "any person" phrase and holding that the TCPA's plain language places no restrictions on who can be liable under the statute); *Lary v. VSB Financial Consulting, Inc.*, 910 So.2d 1280, 1283 (Ala. Ct. App. 2005) (holding that liability under the TCPA is "affixed on 'any person'" who violates the Statute, and finding that the trial court erred in granting summary judgment on behalf of advertiser who hired an individual to transmit unauthorized facsimiles.)[13] "It would circumvent the purpose of the TCPA to exempt [Heartland] from potential liability on the theory that it plays no role [in transmitting the text message calls] at issue." *Kramer*, 759 F. Supp. 2d at 1170.

The cramped reading of the TCPA urged by Heartland would "effectively allow advertisers to make an end-run around the TCPA's prohibitions" by contracting out the task of actual transmission to third-parties—a result Congress did not intend. *Account Outsourcing, LLC*, 329 F. Supp. 2d at 806. That Congress intended "any person" to be liable pursuant to 47 U.S.C. §

---

[12] Of course, Heartland remains free to put on evidence later in the litigation saying that it somehow did not know about the text messages or that it did not contract with Textmarks to transmit the messages. But assuming that Heartland cannot put on such evidence, it cannot escape from the fact that it contracted with Textmarks to transmit messages on its behalf and paid Textmarks to do so. Thus, in the same way that parties acting in concert may both be held liable for tortious conduct, so too must Heartland be held liable for its conduct here.

[13] *See also Charvat v. Echostar Satellite, LLC*, 676 F. Supp. 2d 668, 673 (S.D. Ohio 2009) ("Liability under the TCPA may exist not only for the person making the call, but for the entity on whose behalf the call is made."); *Worsham v. Nationwide Ins. Co.*, 772 A.2d 868, 871 (Md. Ct. Spec. App. 2001); *Hooters of Augusta, Inc. v. Nicholson*, 537 S.E.2d 468, 472 (Ga. Ct. App. 2000); *Spillman v. Dominos Pizza, LLC*, No. 10-cv-349, 2011 WL 721498, at *3-4 (M.D. La. Feb. 22, 2011) (finding defendant potentially liable under TCPA for calls "placed by [defendant] or by a mandatory of [defendant]); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 (D. Md. 2011)( holding non-transmitters of unauthorized calls liable under the TCPA furthers Congress's purposes of enacting the TCPA); *Kopff v. Battaglia*, 425 F. Supp. 2d 76, 92-93 (D.D.C. 2006).

227(b)(1)(A)(iii) for placing calls to cell phones is further evidenced by the fact that under the TCPA's prohibition of fax spam, there is an express exemption for "fax broadcasters" who lack a high degree of involvement or knowledge of the illegal use of their equipment.  *See In re Rules and Regulations Implementing the TCPA of 1991*, Memorandum Opinion & Order, 10 F.C.C.R. 12391, 1407 (1995).  In fact, the FCC has supported this interpretation as its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations."  *Id.* at 12397 ¶ 13 (1995).[14]

In addition, the legislative history of the TCPA also supports this interpretation.  In the "Section by Section Analysis" of the TCPA, the Senate Report said that although the TCPA's prohibitions do not apply to "common carriers," they do apply to the "originator or controller of the content of the call or message."  S. Rep. No. 102-178, at 9 (1991) *reprinted in* 1991 U.S.C.C.A.N. 1968, 1977.  Thus, Congress has stated what it believes to be the scope of liability under the TCPA.  It excludes "common carriers" (*i.e.* telephone carriers such as AT&T and Verizon) but, by the TCPA's plain terms, includes "any other person" who participates in the violation of the TCPA in placing unsolicited calls to cell phones.

Defendant states that "the act of contracting with someone to send text messages is not a violation of law."  (Dkt. 16-1, pg. 8.)  This is true, but misses the point: the act of contracting with someone to send text messages *en masse* using an ATDS to individuals without their prior express consent most surely <u>is</u> a violation of the TCPA.  Accordingly, Plaintiffs need not allege Heartland physically sent the text messages or resort to common law agency theories[15] in order for liability to attach under the TCPA.  As shown below, the well-pleaded allegations of the Complaint more than establish Heartland's liability here.

---

[14] The FCC recently reiterated this view in a Request for Clarification and Declaratory Ruling, and has stated it again in court filings.  *See Chavrvat v. Echostar Satellite, LLC*, No. 09-4525 *Brief for the Federal Communications Commission and the United States as Amici Curiae*, 2010 WL 7325986, at *11 (Oct. 15, 2010).

[15] To the extent that the Court finds that liability for "making" a call in this case requires allegations of vicarious liability, the Complaint still includes more than sufficient allegations giving rise to such vicarious liability.  (*See, e.g.,* Dkt. 7, ¶¶ 20-23.)

2. **Plaintiffs have adequately pleaded facts establishing Heartland's liability.**

Defendant disingenuously states that Plaintiffs, in their Complaint, only allege that "Heartland engaged Textmarks" to send the unauthorized text messages, and nothing more. (Dkt. 16-1, pg. 7.) Heartland further argues dismissal is warranted under vicarious liability principles because there are no allegations that Heartland directed the messages be sent with an ATDS. (*Id.* at 7-8.) The allegations in Plaintiffs' Complaint more than adequately set forth facts making it sufficiently plausible that Heartland, under the proper standard, is legally responsible for the transmission of unauthorized text messages.

Numerous Courts have found that allegations similar to the ones made by Plaintiffs here are sufficient to withstand a motion to dismiss brought by the beneficiary of advertisements sent in violation of the TCPA. For example, in *Kramer v. Autobytel, Inc.*, the court denied a motion to dismiss brought by both an advertiser and a transmitter of unauthorized text messages. 759 F. Supp. 2d at 1172. The court found that the plaintiff sufficiently alleged defendants' joint involvement in the transmission of unauthorized text messages so as to both be liable under 47 U.S.C. § 227(b)(1)(A)(iii), even though the advertiser-defendant "engaged" a separate entity to actually transmit the message. *Id.* at 1169, 1172. In other similar cases involving text message spam under the TCPA, the respective beneficiaries of the messages have never been dismissed simply because they hired a third-party to physically transmit the messages. *See, e.g., Satterfield*, 569 F.3d at 946 (9th Cir. 2009); *Kazemi*, 2010 WL 963225, at *2-3; *Abbas,* 2009 WL 4884471; *Lozano*, 702 F. Supp. 2d at 999.

The allegations in this case set out more than enough facts regarding Heartland's role in the TCPA violation to satisfy the pleading requirements of Rule 8. In addition to alleging that Heartland "engaged" Textmarks to transmit unauthorized text messages (Dkt. 7, ¶ 1), Plaintiffs also allege that:

- Heartland[16] effectuated unauthorized text message calls and caused consumers actual harm. (Dkt. 7, ¶ 2);

---

[16] In Plaintiffs' Complaint, the word "Defendants" is used to refer to both Heartland and Textmarks. This is sufficient under federal pleading standards to put both Defendants on notice of
(footnote continued)

- Heartland and their agents directed the mass transmission of wireless spam to cell phones nationwide of what they hoped were potential customers of Heartland's "signature oil change" service.  (*Id.* ¶ 20);

- Heartland's use of an SMS short code enabled Defendants' mass transmission of wireless spam to a list of cellular telephone numbers.  (*Id.* ¶ 24);

- Heartland made unsolicited commercial text calls to the wireless telephone numbers of the Plaintiffs and the Class.  (*Id.* ¶ 35);[17]

- The text calls were made *en masse* using an SMS short code and an ATDS, and transmitted an identical text message to thousands of individuals in order to promote Heartland's products and services.  (*Id.* ¶¶ 22-24 28, 35-36); and

- That Heartland participated in the transmission of such unauthorized text message calls to Plaintiffs and the class on or about April 22, 2011.  (*Id.* ¶¶ 20-23.)

Thus, Plaintiffs allege that Heartland did much more than "engage" Textmarks to transmit unauthorized text messages.  Plaintiffs sufficiently allege that Heartland (1) effectuated the sending of text message calls to Plaintiffs' cell phones; (2) that Plaintiffs did not give their consent to Heartland to receive any text messages; (3) that the text messages sent specifically promoted Heartland's products and services; (4) that Heartland participated in the transmission of the calls; and (4) that the messages were sent with equipment that is plausibly an ATDS.  Plaintiffs' allegations in the instant Complaint clearly exceed the minimum hurdles established by *Twombly*, providing more than adequate detail to put Heartland on fair notice of the bases for the claim alleged and plausibly suggesting that Plaintiffs have a right to relief as it pertains to Heartland.  As such, its Motion to Dismiss on this point should be denied.

**B.**     ***Heartland Did Not Have Prior Express Consent to Send Text Message Ads.***

Defendant's second "pleadings" argument is that the Complaint must be dismissed because, as set forth in the self-serving declaration submitted with its Motion, four of the

_____

their statutory violations.  *See Peter Strojnik, P.C. v. Singalife, Inc.,* No. CV-08-1116-PHX-FJM, 2009 WL 605411, at *4 (D. Ariz. Mar. 9, 2009); *Kazemi*, 2010 WL 963225, at *3.

[17] Even under Heartland's proposed reading of the TCPA that holds only the "maker" of the unauthorized call subject to liability, the allegations in ¶¶ 20-25, 31, and 35 specifically allege that "Defendants" made the text messages calls at issue.

Plaintiffs' cell phone numbers appear on invoices from previous oil changes, which it claims constitutes "prior express consent" based on two FCC "rulings."  In addition to Defendant's reliance on such evidence outside the pleadings not being proper for judicial notice here,[18] Heartland's reliance on its out of context selective citation to the FCC is misplaced and flatly contradicts the language Congress used in the TCPA.

Heartland's central argument is based on what it claims to be two binding FCC "rulings" that Heartland asserts show that the mere provision of one's cellular phone number to a business in connection with a particular service somehow equates to *carte blanche* "prior express consent" for that business to later send spam text messages relating to another service (here the joining of Heartland's "EClub" and other promotions).  Heartland is mistaken both as to the application of the FCC's statement to its conduct here as well as its assertion that these "rulings" are binding on this Court.

First, Heartland takes the sections from the September 17, 1992 FCC Report and Order upon which it relies completely out of context.  There, the FCC was discussing an issue raised by a few businesses about inadvertently incurring liability when responding to a consumer inquiry, where unbeknownst to the business, the number provided by the consumer fell into a prohibited category, such as a cell phone or hospital phone.  (Dkt. 16-24, pgs. 107-08.)  Under these circumstances, the FCC included in its report, but did not order, that a consumer who reaches out to a business and provides a phone number does so "with the expectation that the party to whom the number was given will return the call" and therefore "have in effect given their invitation or permission to be called at the number which they have given."  (*Id.*, pg. 108.)  That is simply not the situation in this case.  Here, Defendant's "evidence" is that Plaintiffs provided their cell phone numbers to Heartland customer service agents or technicians in order to open accounts to have service performed on their vehicles.  The only call they arguably could have consented to receive is one relating to the specific service for which they gave their phone number: *e.g.,* a call

---

[18] *See* Plaintiffs' Motion to Strike Defendant's Request for Judicial Notice, filed concurrently herewith.

1  informing them that the service was complete and the car was ready for pickup, that there was a

2  problem with the car, or perhaps that there was a problem processing the payment for that

3  particular service.  Had the text messages at issue applied to the service being performed on the

4  car when the cell phone number was given and said, "your car is ready for pick up" or "the bank

5  rejected your check," the FCC report may provide support to Heartland's argument.  However, as

6  it is undisputed that the text messages at issue are ads promoting Heartland's EClub and

7  advertising *future* oil changes, this was undoubtedly not the reason Plaintiffs provided their

8  numbers,[19] nor could Plaintiffs have anticipated a call back about their service that had been

9  concluded months before, and the warranty for which had expired.[20]

10         Heartland also claims support from a 2007 FCC Declaratory Ruling.  However, that ruling

11  resulted from a narrowly defined Petition for Expedited Clarification and Ruling brought by a

12  group of creditors/debt collectors seeking clarification "that the prohibition against autodialed or

13  prerecorded calls to wireless telephone numbers in [the TCPA] does not apply to creditors and

14  collectors when calling wireless telephone numbers to recover payments for goods and services

15  received by consumers."  (Dkt. 16-25, pg 136.)   The ruling from the FCC was limited to the

16  narrow question posed in the debt collector's petition.  The FCC took care to "emphasize that prior

17  express consent is deemed to be granted only if the wireless number was provided by the

18  consumer to the creditor, and that *such number was provided during the transaction that resulted*

---

[19] Importantly, Defendant does not suggest that Plaintiffs provided the numbers specifically with the intent of receiving such future advertisements, or that any document provided to the Plaintiffs even suggested that such future advertisements were the purpose of providing their phone numbers.  This fact, alone, clearly flies in the face of any argument that Plaintiffs knowingly provided their "prior express consent."

[20] *Greene v. DirecTV*, No. 10-C-117, 2010 WL 4628734 (N.D. Ill. Nov. 8, 2010), relied on by Defendant, is consistent with Plaintiffs' analysis here.  In *Greene*, the court found that the plaintiff's provision of her cell phone number to a credit reporting agency constituted consent to be called on that number.  *Id*. at *3.  However, the call in that case related to plaintiff' request to receive fraud alerts, which was the precise reason why plaintiff provided her phone number.  Consequently, the consent was specifically within the scope of the service requested and received by plaintiff.  In this case, as discussed above, there is no basis for concluding that Plaintiffs' provision of their phone numbers constituted consent to receive *future* advertisements unrelated to the *specific* service they had already received.

*in the debt owed.*"  *Id.* at 137-38 (emphasis added).  In addition, the FCC determined that scope of the "consent" given was limited to "be[ing] called at that number *regarding the debt.*" *Id.* at 137 (emphasis added).[21]  Because Heartland is not a creditor trying to collect payment through the text messages at issue from consumers who received car service on credit, its reliance on this FCC Ruling is misplaced.[22]  Again, the text message at issue did not relate to the service that Plaintiffs had already received and for which they had provided their respective phone numbers.  Rather, the text message they received was an advertisement for a new/future service, thus rendering the FCC citations inapposite here.[23]

Not only does Heartland misapply these FCC statements to the facts of this case, it claims that this Court is "bound by the FCC's interpretation of the term 'prior express consent.'"  (Dkt. 16-1, pg 17.)  Pursuant to the Hobbs Act, 28 U.S.C. § 2342, federal appellate courts have exclusive jurisdiction over "all final orders" of the FCC, including those final orders issued under the Communications Act of 1934 of which the TCPA is part.  *See Leckler v. CashCall, Inc.*, No. 07-4002-SI, 2008 WL 5000528, at *2 (N.D. Cal. Nov. 21, 2008) (citing *Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 396-97 (9th Cir. 1996)).  As noted above, the 2007 Declaratory Ruling is expressly limited to debt collection calls made to numbers provided in connection with a debt.  So while the FCC's interpretation of "prior express consent" as applied to the debt collectors there

---

[21] Although the ruling as a whole is inapplicable to this case, it bears mentioning that in granting the debt collectors' petition, the FCC required that the debt collectors are responsible for demonstrating they in fact had "prior express consent" in relation to the debt by including "language on the credit application or other documents informing the consumer that, by providing a wireless telephone number, the consumer consents to receiving autodialed . . . calls from the creditor . . . at that number."  *Id*. at 138 n. 37.  Such language is notably absent from the invoices here.

[22] The implication of such consent in the debtor/creditor context is arguably appropriate because the creation of a debt, by its nature, also creates a continuing relationship between the debtor and the creditor.  In the instant case, however, no such continuing relationship is created by purchasing an oil change.

[23] What Heartland is really arguing, is that this Court should find that "prior express consent" exists because it had an "established business relationship" with some of the Plaintiffs.  Although the TCPA prohibition of fax spam contains an explicit exemption for solicitations to consumers where a prior business relationship exits, *see* 47 U.S.C. § 227(b)(1)(C)(i), neither Congress nor the FCC has created such an exemption for calls to cell phones.

1    may be a final order, the validity of that order is irrelevant to this case.  *Wilson*, 87 F.3d at 397

2    (finding the district court only lacks jurisdiction over FCC orders where the court's decision

3    would "enjoin, set aside, suspend, or determine the validity of the Declaratory Ruling.").  In

4    regards to the September 17, 1992 FCC Report and Order, Paragraphs 30 and 31 on which

5    Heartland relies are included in the FCC's "Report."  However, the "Order" section of that

6    document—the part subject to the Hobbs Act—does not begin until the "Ordering Clauses," which

7    start at Paragraph 62.  (Dkt. 16-24, pg. 117); *see also Rulemaking Process at the FCC*, available at

8    http://www.fcc.gov/encyclopedia/rulemaking-process-fcc#q2 (stating "[a]ny final rule must

9    include an explanatory preamble and the rule text.  The preamble includes a response to the

10   significant, relevant, issues raised in public comments and a statement explaining the basis and the

11   purpose (i.e., an explanation) of the rule.")  Significantly, the FCC excluded from the final rule

12   any of the comments made in its "explanatory preamble" concerning consumers giving "their

13   invitation or permission" to be called at their cell phone when providing it to a business with the

14   expectation of a return call.  *Id.*  Accordingly, even if they were relevant here (which they are not),

15   this Court is not beholden to either of the FCC "rulings" relied upon by Heartland.

16        Whether the Court looks to the plain language of the TCPA, or whether the Court is

17   inclined to examine the level of deference to be provided to the inapposite 2007 FCC Declaratory

18   Ruling and/or the comments made in the explanatory preamble in the 1992 Report under *Chevron*

19   *U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984),[24] the result is the

20   same: the mere provision of one's cell phone number to a merchant in connection with the

21

22   _____

23   [24] Under *Chevron*, agency interpretations of federal law are given deference under a two-step
     test: (1) "if the intent of Congress in clear, that is the end of the matter; for the court, as well as the
24   agency, must give effect to the unambiguously expressed intent of Congress;" and (2) "if a statute
     is silent or ambiguous with respect to the issue at hand, [the court] defer[s] to the agency so long
25   as 'the agency's answer is based on a permissible construction of the statute."  *Satterfield*, 569
     F.3d at 952 (quoting *Chevron*, 467 U.S. 842-43).  Agency interpretations that are "arbitrary,
26   capricious, or manifestly contrary to the statute" are to be disregarded.  *Id.*  Moreover, agency
     interpretations outside of formal rules are entitled to limited deference or respect "only to the
27   extent it has the power to persuade."  *See Lozano*, 702 F. Supp. 2d at 1004.
28

1  performance of a particular service is not "prior express consent" to receive future text message

2  advertisements related to other services.

3    The provisions of the TCPA are construed by looking "first to the language of the statute

4  to determine if it has a plain meaning." *Satterfield*, 569 F.3d at 951 (citing *McDonald v. Sun Oil*

5  *Co.*, 548 F.3d 774, 780 (9th Cir. 2008)).  The Ninth Circuit directly addressed the plain meaning

6  of "prior express consent" in an identical setting and found "express consent" to be "[c]onsent that

7  is clearly and unmistakably stated." *Satterfield*, 569 F.3d at 955.  Similarly, the court in *Leckler*

8  interpreted the phrase "prior express consent" and found Congress' intent and word choice to be

9  so clear that it refused to give *Chevron* deference to the 2007 FCC Declaratory Ruling.  *Leckler*,

10  554 F. Supp. 2d at 1029-30 *vacated on other grounds*, No. C07-04002, 2008 WL 5000528 (N.D.

11  Cal. Nov. 21, 2008).[25]  There the court found that "the phrase 'prior express consent' is

12  unambiguous and consists of three words with discernable, ordinary meanings," making the

13  FCC's construction of "prior express consent" in the declaratory ruling to be "manifestly contrary

14  to the statute and unreasonable" as it provided an exception for "implied consent" that was plainly

15  contrary to Congress's intent as evidenced by the words used.  *Id.*; *see also Travel Travel,*

16  *Kirkwood v. Jen N.Y., Inc.*, 206 S.W.3d 387, 392 (Mo. Ct. App. 2006) (employing identical

17  analysis of "express consent" to conclude that "[i]f the consent is not manifested by explicit and

18  direct words, but rather is gathered only by implication or necessary deduction from the

19  circumstances, the general language, or the conduct of the parties, it is not express consent"); *Edeh*

20  *v. Midland Credit. Mgt., Inc.*, 748 F. Supp. 2d 1030, 1038 (D. Minn. 2010) (finding that "[e]xpress

21  means 'explicit,' not as [defendant] seems to think, 'implicit.' [Defendant] was not permitted to

22  make an automated call to [plaintiff's] cell phone unless [plaintiff] had previously said to

23

24

_____

25  [25] The *Leckler* decision was later vacated on grounds that the court did not have subject matter
26  jurisdiction under the Hobbs Act; however, that ruling is not relevant to the case at hand because
   in *Leckler* the court was dealing with debt-collecting calls to cell phone numbers provided on
27  credit applications. *See* 2008 WL 5000528 (N.D. Cal. 2008).  Here, that FCC ruling in not
   precisely on point making the Hobbs Act inapplicable.
28

1  [defendant] (or at least [defendant's] predecessor in interest) something like this: 'I give you

2  permission to use an [ATDS] to call my cellular phone.").

3       In this case, Heartland's sole basis for claiming prior express consent is that the cellular

4  phone numbers of four of the six plaintiffs appear on service invoices prepared after the

5  completion of service.[26]  Plaintiffs clearly allege they did not consent to receive these text

6  messages ads (Dkt. 7 ¶¶ 25, 36), under the plain language of the TCPA, this is sufficient as a

7  matter of law.  Heartland's Motion should be denied.

8       **C.**    *All Plaintiffs Have Sufficiently Pleaded Use of an ATDS.*

9       Heartland's final Rule 8 arguments in support of dismissal of the Complaint are that

10  Plaintiffs fail to present allegations that create the "inference" that Defendants utilized an ATDS.

11  In making its argument, Heartland attempts to convince this Court that *Twombly* and *Ashcroft*

12  have somehow abolished pleadings based upon information and belief.  Heartland is wrong about

13  its claimed pleading standard.  "*Twombly* does not prevent a plaintiff from pleading facts on

14  information and belief when the information is either 'peculiarly' within a defendant's control or

15  where a belief is based on facts that make an inference of liability plausible.  *Mills v. Bristol-*

16  *Myers Squibb Co.*, No. CV 11-00968-PHX-FJM, 2011 WL 4708850, at *2 (D. Ariz. Oct. 7, 2011)

17  (citing *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010)); *see also Hutchens v.*

18  *Alameda County Soc. Services Agency*, No. C-06-06870 SBA, 2008 WL 4193046, at *5 (N.D.

19  Cal. Sept. 10, 2008).

20       **1.**    **Plaintiffs' allegations about the text message and short code use are**
             **sufficient at the pleading stage.**

21       Putting aside the pleading standard, Heartland's initial substantive argument assumes the

22  success of its First Amendment attack on the meaning of "capacity" and also claims that the

23  allegations made "on information and belief" demonstrate the equipment could not have randomly

24

25

26      [26] Not only has Heartland introduced evidence unquestionably outside of the pleadings in a

27  motion to dismiss, it does not even have invoices for all six of the Plaintiffs and has not even
provided evidence that the invoices contain the cell phone numbers that were called.

28

1  or sequentially dialed numbers.  This precise argument has been repeatedly rejected by federal

2  courts and similarly does not support dismissal here.

3         As discussed at length in Section III.B, *supra*, the plain language of the TCPA does not

4  require use of the system's capacity to actually send the unlawful text messages to random or

5  sequentially generated numbers.  *Satterfield*, 569 F.3d at 950 ("a system need not actually store,

6  produce or call randomly or sequentially generated telephone numbers, it need only have the

7  capacity to do it."); *Lozano*, 702 F. Supp. 2d at 1011.  Heartland's *ad nauseam* trumpeting of this

8  false standard does not change the governing case law.  Time and again, allegations that a

9  defendant used a dedicated SMS short code to transmit generic, impersonal messages *"en masse"*

10  to consumers have been deemed sufficient to allege the use of an ATDS in satisfaction of federal

11  pleading requirements.  *See Kramer*, 759 F. Supp. 2d at 1172; *Kazemi*, 2010 WL 963225, at *2;

12  *Abbas,* 2009 WL 4884471, at *3; *Lozano*, 702 F. Supp. 2d at 1010-11; *see also* 2003 FCC Order

13  2003 WL 21517853 at *46 (confirming that the ATDS requirement was to be interpreted broadly

14  to apply to a wide spectrum of evolving technologies, including technology that is used to dial

15  "lists" or "databases" of numbers, since such technology has the basic functional "capacity to dial

16  numbers without human intervention.").[27]

17         Precisely like the plaintiffs in *Kramer, Kazemi, Abbas*, and *Lozano,* Plaintiffs support their

18  allegations that Defendants used an ATDS with all known specific facts regarding the message

19  and the equipment used to transmit it.  Here, Plaintiffs pleaded that they received the message on

20  April 22, 2011, that the "from" field of the text message indicated that it was transmitted from an

21  SMS short code, and the body of the text message was provided demonstrating its generic

22

23     [27] Defendant misguidedly relies on *Knutson v. Reply!, Inc.* to support its argument.  No. 10-cv-
   1267, 2011 WL 291076 (S.D. Cal. Jan. 27, 2011).  In the first instance, Knutson actually misstates
24  the entire pleading requirement for a TCPA claim in the Ninth Circuit.  *Id.* at *1 (including that
   the plaintiff must plead he "was charged for the call.")  However, more relevant to this case, the
25  court here found that the plaintiff's allegations were insufficient because they did not make
   additional allegations like those in *Kramer*, and specifically used *Kramer* as the example of what
26  would suffice to infer the existence of an ATDS.  *Id.* at *2.  Plaintiffs' allegations here are
   substantially similar to those pleaded in *Kramer*, and therefore, meet the minimum pleading
27  requirements.

28

impersonal nature.  (Dkt. 7, ¶¶ 21-22.)  Further, Plaintiffs alleged that the use of a short code

paired with the use of certain equipment allowed Heartland "to effectively send thousands of text

messages simultaneously to lists of thousands of wireless phone numbers of consumers without

human intervention."  (*Id.* at ¶¶ 24, 35.)  These allegations are sufficient to make it more

plausible that the text messages at issue were sent using an ATDS, particularly when, as discussed

above, the technical facts supporting such an allegation are currently within the excusive

knowledge of the Defendants.

**2.      Each Plaintiff sufficiently alleged use of an ATDS.**

Heartland's final pleadings argument is that only Plaintiff Heuscher has pleaded use of an

ATDS to send the messages and therefore the Complaint must be dismissed.  This argument is

nonsense.  Although the Complaint alleges facts about the text message sent specifically to

Plaintiff Heuscher, (Dkt. 7, ¶¶ 21-22), the Complaint goes on to specifically allege that on the

same date Heuscher received the offending text message from Heartland, "Plaintiffs Crowl,

Cushnie, Doung, Souder, and Koeller also each received a text message advertisement from

Defendants substantially identical to the [message Heuscher received.]"  (Dkt. 7, ¶ 23.)  Later in

the Complaint, Plaintiffs further allege that "Defendants made the unsolicited commercial text

calls, including the messages referenced in paragraphs 22-23, to the wireless numbers of the

Plaintiffs and the Class."  (*Id.* at 35.)  Such allegations and reasonable inferences drawn therefrom

are more than sufficient for the Court to conclude that all of the text messages at issue were sent

on the same date, from short code 72345, and said the exact same thing.[28]  As such, Heartland's

final pleadings argument fails like the rest and its Motion should be denied in its entirety.

**VI.    CONCLUSION**

For the reasons stated herein, Plaintiffs respectfully requests that this Court enter an Order

denying Heartland's Motion to Dismiss in its entirety and for such other relief as the Court deems

---

[28] Heartland's argument on this point is particularly in bad faith as each of the individual complaints filed before the case was consolidated by the JPML contained the very accusations Heartland now claims are missing from the Master Complaint.

1  reasonable and just.  In the event the Court finds that Plaintiffs' claims are insufficiently pleaded

2  under Federal Rule of Civil Procedure 8, Plaintiffs respectfully request leave to file an amended

3  master complaint.

4

5  Dated: November 22, 2011                    Respectfully Submitted,

6                                              **RENE HUESCHER, LAWRENCE CUSHNIE,**
                                               **JOSEPH CROWL, DAWN SOUDER, TRAMY**
7                                              **DUONG & ED KOELLER,** individually and
                                               on behalf of a class of similarly situated individuals

8

9                                              By:   /s/ Michael J. McMorrow
                                                         Michael J. McMorrow
10

11  Jay Edelson (*pro hac vice*)
    jedelson@edelson.com
12  Michael J. McMorrow
    mmcmorrow@edelson.com
13  EDELSON MCGUIRE, LLC
    350 North LaSalle, Suite 1300
14  Chicago, IL 60654
    Telephone: (312) 589-6370
15  Facsimile: (312) 589-6378

16  *Interim Class Counsel for Plaintiffs*

17  Douglas J. Campion
    LAW OFFICES OF DOUGLAS J. CAMPION
18  409 Camino Del Rio South
    Suite 303
19  San Diego, CA 92108
    Telephone: (619) 299-2091
20  Facsimile: (619) 858-0034

21  *Liaison Class Counsel*

22  Jordan L. Lurie
    WEISS & LURIE
23  10940 Wilshire Blvd.
    Los Angeles, CA 90024
24  (310) 208-2800 (phone)
    (310) 209-2348 (fax)
25

26  *Attorney for Edward Koeller*

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Richard E. Grey
GREY LAW GROUP
409 Camino Del Rio South
Suite 303
San Diego, CA 92108
(619) 543-9300 (phone)
(619) 543-9307 (fax)

*Attorney for Dawn Souder*

Joshua B. Swigart
Robert L. Hyde
HYDE & SWIGART
411 Camino Del Rio South
Suite 301
San Diego, CA 92108
(619) 233-7770 (phone)
(619) 297-1022 (fax)

*Attorneys for Joseph Crowl*

Daniel R. Forde
HOFFMAN & FORDE, ATTYS AT LAW
3033 Fifth Ave.
Suite 225
San Diego, CA 92103
(619) 546-7880 (phone)
(619) 546-7881 (fax)

*Attorney for Tramy Duong*

Clifford A. Cantor
LAW OFFICES OF CLIFFORD A. CANTOR, P.C.
627 208th Ave., SE
Sammamish, WA 98074
(425) 868-7813 (phone)
(425) 868-7870 (fax)

*Attorney for Lawrence Cushnie*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I, Michael J. McMorrow, an attorney, certify that on November 22, 2011, I served the above and foregoing ***Plaintiffs' Opposition to Defendant Heartland Automotive Services, Inc.'s Motion to Dismiss Master Consolidated Complaint*** by causing true and accurate copies of such paper to be filed and transmitted to the persons registered to receive such notice via the Court's CM/ECF electronic filing system.

      /s/  Michael J. McMorrow