# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: JIFFY LUBE INTERNATIONAL, INC., TEXT SPAM LITIGATION | Case No. 11-md-2261-JM-JMA<br><br>**ORDER DENYING MOTION TO DISMISS AND MOTION TO COMPEL ARBITRATION**<br><br>Docket Nos. 14, 16 |

Plaintiffs filed a Master Consolidated Class Action Complaint ("complaint") on September 23, 2011, claiming that Defendants Heartland Automotive Services, Inc. ("Heartland") and TextMarks, Inc. ("TextMarks") sent them text messages in violation of the Telephone Consumer Protection Act ("TCPA").  Shortly thereafter, Heartland filed (1) a motion to compel arbitration of one Plaintiff's claims and stay the litigation and (2) a motion to dismiss the complaint.  For the reasons stated below, both motions are DENIED.

## I. BACKGROUND

Heartland is a franchisee of Jiffy Lube and operates hundreds of service stations under the Jiffy Lube name.  The six named Plaintiffs (residents of Washington, California, and

1

Missouri) all claim to have received an unauthorized text message offering a discount on Jiffy Lube services.[1]  According to the complaint, Heartland hired TextMarks to run the marketing campaign responsible for the text messages.  Plaintiffs allege that in order to send the text messages, TextMarks illegally used equipment that "had the capacity to store or produce telephone numbers to be called, using a random or sequential number generator."  Compl. ¶ 35. Further, the "text calls were made en masse through the use of a short code and without prior express consent of the Plaintiffs."  ¶ 36.

The complaint alleges "that the Class members number in the thousands," that class counsel has extensive experience in this area, and that class members would not be able to proceed individually because of prohibitive cost.  ¶¶ 28-30.

Based on these factual allegations, Plaintiffs state only one cause of action:  violation of 47 U.S.C. § 227, the TCPA.  That statute prohibits the use of an automated telephone dialing system ("ATDS") "to make any call[2] [without prior express consent] . . . to any telephone number assigned to a . . . cellular telephone service." § 227(b).  An ATDS is defined as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." § 227(a)(1).  The law provides for statutory damages in the amount of $500 per violation, which may be trebled if the defendant has acted willfully or knowingly.  § 227 (b)(3).

On October 26, Heartland filed a motion to dismiss the complaint and a motion to compel arbitration of the claims of Lawrence Cushnie.  Because the motion to dismiss challenges the

---

[1]     The messages allegedly contained the following text:
    JIFFY LUBE CUSTOMERS 1 TIME OFFER:
    REPLY Y TO JOIN OUR ECLUB FOR 45% OFF A SIGNATURE SERVICE OIL
    CHANGE! STOP TO UNSUB MSG&DATA RATES MAY APPLY T&C:
    JIFFYTOS.COM
[2]     For purposes of the law, sending a text message is often referred to as "making a call."  The Ninth Circuit has held that a text message qualifies as a "call" under the TCPA.  Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 952 (9th Cir. 2009).

1   constitutionality of the TCPA, the United States has intervened to support the law's

2   constitutionality.

3   **II. MOTION TO DISMISS**

4       A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of the

5   pleadings.  De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir. 1978).  In evaluating the motion, the

6   court must construe the pleadings in the light most favorable to the non-moving party, accepting

7   as true all material allegations in the complaint and any reasonable inferences drawn therefrom.

8   See, e.g., Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003).  The Supreme Court has held

9   that in order to survive a 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to

10  relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The

11  court should grant 12(b)(6) relief only if the complaint lacks either a "cognizable legal theory" or

12  facts sufficient to support a cognizable legal theory.  Balistreri v. Pacifica Police Dep't, 901 F.2d

13  696, 699 (9th Cir. 1990).

14  **A. Heartland's Liability for TextMarks' Actions**

15  1. Liability Under the TCPA

16      Heartland argues that it cannot be held liable because Plaintiffs have not alleged that

17  Heartland sent the text messages at issue, but only "engaged" TextMarks to send the messages.

18  Plaintiffs respond by asserting that the law recognizes liability for any party responsible for the

19  text messages, regardless of which entity physically sends the messages.

20      It does not appear that the Ninth Circuit has explicitly decided this issue, but case law and

21  a reasonable reading of the statute indicate that Heartland should not be allowed to avoid TCPA

22  liability merely because it hired a different firm to send advertisements to its customers.

23      First, at least one previous Ninth Circuit case implicitly accepted that an entity can be

24  held liable under the TCPA even if it hired another entity to send the messages.  In Satterfield v.

25  Simon & Schuster, Inc., 569 F.3d 946, 955 (9th Cir. 2009), discussed by the parties with regard

to other issues, the Ninth Circuit reversed a district court's grant of summary judgment that held there was no issue of material fact as to whether the equipment used by the defendants fit the description contained in the TCPA.  The defendants in that case were Simon & Schuster and ipsh!net, a marketing company hired by Simon & Schuster to promote a new book released by Stephen King.  Ipsh!net later engaged another firm to physically send the text messages.  Despite the fact that Simon & Schuster seemed to play no role in physically sending the messages, the Ninth Circuit did not question whether it could be held liable.[3]

In Account Outsourcing, LLC v. Verizon Wireless, 329 F. Supp.2d 789, 805-806 (M.D. La. 2004), the Middle District of Louisiana heard a void-for-vagueness challenge to § 227(b)(1)(C), which is similar to the provision examined here, but applies to facsimile transmission.  The court, accepting the United States' argument, cited the "rule of statutory construction that makes explicit vicarious liability unnecessary," and held that "congressional tort actions implicitly include the doctrine of vicarious liability."  Id. (citing Meyer v. Holley, 537 U.S. 280, 285 (2003) (in Fair Housing Act case, explaining that the Supreme Court "has assumed that, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules")).[4]  The court also decided that "[i]nterpreting the TCPA to exempt either fax broadcasters or advertisers would effectively allow advertisers to make an end-run around the TCPA's prohibitions."  Id. at 806.  The Northern District of California has recognized that in fax cases like Account Outsourcing, "courts have held both advertisers and advertisement

---

[3]     Though the court stated that Simon & Schuster hired ipsh!net to run its promotional campaign and that ipsh!net hired another company to "handle[] the actual transmission of the text messages to the wireless carriers," it described the text message in question as being "from Simon & Schuster."  Id. at 949.  It also stated that "Simon & Schuster sent the text message as part of its promotional campaign."  Id.
[4]     Heartland cites Meyer v. Holley for the same proposition, but argues that TextMarks was an independent contractor and that under general tort rules, the employer of an independent contractor is not liable to third parties for negligence.

broadcasters subject to liability under the TCPA." Kramer v. Autobytel, Inc., 759 F.Supp.2d 1165, 1170 (N.D. Cal. 2010).[5]

Heartland's attempts to factually distinguish these and other cases fail, in part because the relationship between Heartland and TextMarks is not currently clear. Similarly, its citation to Knutson v. Reply!, Inc., 2011 WL 291076 (S.D. Cal. 2011), which lists one of the elements of § 227(b)(1) as "that Defendant made the call" is unpersuasive. First, that quotation merely restates the language of the statute, and does not provide additional meaning as to the breadth of the phrase "to make any call." Second, the complaint at issue in Knutson alleged that the defendant there had actually made the call, and there was no discussion of whether the statute would apply more broadly.[6]

Thus, given persuasive authority and Heartland's failure to sufficiently distinguish this case, the court finds that Heartland can be held liable even if it did not physically send the messages at issue.

2. Whether Vicarious Liability Has Been Sufficiently Pleaded

Likewise, Plaintiffs have provided sufficient detail and plausible factual allegations regarding Heartland's ultimate control to meet the federal pleading standard. Plaintiffs have alleged that "Defendants and their agents directed the mass transmission of wireless spam to the cell phones nationwide." Compl. ¶ 20. In the introduction, the complaint states that Heartland "engaged TextMarks" to conduct the campaign. Id. at ¶ 2. While the complaint does not provide specifics about how much control Heartland possessed or how much information Heartland had

---

[5]    Plaintiffs cite numerous similar cases from state courts and federal district courts around the country.

[6]    Heartland also makes a minimally persuasive statutory construction argument that points to another part of § 227 that uses the term "by or on behalf of" an entity. However, without more support, it does not outweigh persuasive case law and the fact that preventing liability for Heartland would fail to serve the statute's purposes.

as to TextMarks' use of an autodialer, Heartland has not provided a convincing reason as to why such specifics are necessary for Plaintiffs to survive a motion to dismiss.

Moreover, courts in this circuit have generally upheld complaints similar to this one in the face of 12(b)(6) motions.  E.g. Kramer v. Autobytel, 759 F.Supp.2d 1165 (N.D. Cal. 2010) (upholding complaint that alleged that defendant "contracted with LeadClick, who thereafter contracted with B2Mobile, for the purpose of advertising Autobytel's products and services through spam text messages") (First Amended Complaint, ¶ 39, Doc. No. 20)); Kazemi v. Payless Shoe Source, 2010 WL 963225 (N.D. Cal. 2010).

**B. Plaintiffs' Prior Consent**

While 47 U.S.C. § 227 generally prohibits using an auto-dialer for telemarketing, it excepts those calls "made with the prior express consent of the called party." § 227(b)(1)(A). Heartland argues that at least four of the six named Plaintiffs provided Heartland with prior express consent to the text messages by providing their telephone numbers to Heartland on invoices when they received oil changes.  Heartland provides copies of these invoices along with a request for judicial notice, which is opposed by Plaintiffs.

The court denies Heartland's request for judicial notice of exhibits B-F, which Heartland claims are the invoices on which Plaintiffs provided their telephone numbers.[7]  Under Parrino v. FHP, Inc., 146 F.3d 699, 705 (9th Cir. 1998), "a district court ruling on a motion to dismiss may consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" (citation omitted). Heartland argues that an element of Plaintiffs' claim is lack of prior express consent, and therefore that the invoices are integral to the complaint because they contradict Plaintiffs'

---

[7]     The court notes that even if it were to take judicial notice of the invoices, it is not persuaded that a customer's provision of a telephone number on the invoice in question would constitute prior express consent.  Heartland's citations to FCC documents are not particularly convincing, and it is doubtful that Plaintiffs' alleged consent was "clearly and unmistakably stated."  Satterfield, 569 F.3d at 955.

allegations.  However, the contents of the invoices are by no means alleged in the complaint, and under Heartland's view the very existence of the invoices only harms Plaintiffs' case.  Parrino's decision was partly based on the argument that if the document in question is "integral to the plaintiff's claim . . . the plaintiff 'obviously is on notice of the contents of the document and the need for a chance to refute evidence is greatly diminished.'"  Id. at 706 n.4 (citation omitted).  Here, Plaintiffs are not obviously on notice of the contents of the invoices.  The complaint does not, and need not, reference the invoices, and it is certainly conceivable that even if the invoices are accurate, some or all of Plaintiffs were unaware that they had provided their telephone numbers to Heartland in connection with an oil change they received.  Further, the facts of Parrino are distinguishable here.  In that case, the plaintiff disputed his insurance company's denial of a claim.  He argued that the district court erred by considering the "Master Group Application" even though it was not attached to the complaint.  However, Parrino referred to the FHP "group plan" and its "cost containment program" in the complaint, and because his "claims rest[ed] on his membership in FHP's plan and on the terms of the plan, documents governing plan membership, coverage, and administration [were] essential to his complaint."  Id. at 706.  Conversely, none of Plaintiffs' claims here rest on the invoices—indeed, the two named Plaintiffs who apparently have not provided their telephone numbers on invoices have claims that are as strong as or stronger than those who did sign.

This result aligns with Kenneally v. Bank of Nova Scotia, 711 F.Supp.2d 1174 (S.D. Cal. 2010).  In that case, the plaintiff sued a developer and several lenders based on a misrepresentation of the size of a condominium he purchased.  The defendants asked Judge Hayes to take judicial notice of several documents, including a "Receipt for Public Report" concerning the property.  The court did not take judicial notice because the complaint did not refer to the report or rely on it, and in fact "expressly allege[d] that 'Plaintiff did not receive a federal property report before signing the purchase contract.'"  Id. at 1183.  Here, as in

1  Kenneally, Defendant seeks to introduce a document that it hopes will support its theory of

2  defense, claiming that the complaint relies on the document.  In fact, the complaint alleges the

3  opposite of what Heartland claims the document represents.

**C.  Whether the Complaint Adequately Pleads an Auto-Dialer Was Used**

5       Heartland argues that the complaint does not contain sufficient factual allegations

6  regarding the use of an auto-dialer.

7  1. Failure to Allege Specific SMS Short Code

8       Heartland asserts that Plaintiffs can only plead use of an auto-dialer on information and

9  belief if the complaint alleges (1) the text message was sent by a specific SMS short code; and

10 (2) the content of the message was impersonal, citing Knutson v. Reply!, Inc., 2011 WL 291076

11 (S.D. Cal. 2011).  According to Heartland, only one Plaintiff provided this information, so the

12 other five Plaintiffs must be dismissed.  First, Knutson is not binding, and it did not specifically

13 hold that these two pieces of information were necessary, but only approvingly cited Kramer v.

14 Autobytel, Inc., 2010 LEXIS 137257 (N.D. Cal. 2010), which allowed a complaint to proceed

15 because it had provided those details.

16      More importantly, Heartland's argument rests solely on the fact that the complaint

17 provides a specific short code for one Plaintiff, but then alleges that the other five Plaintiffs

18 received "a text message advertisement from Defendants substantially identical to the

19 aforementioned."  Heartland essentially states that the court cannot be certain from this language

20 that the alleged short code is the same.  However, the court finds greater detail unnecessary;

21 rejecting the complaint on such a technicality would serve no other purpose than to delay the

22 progress of this case.

23 2. Failure to Plead That Messages Came from an ATDS

24      Plaintiffs have also sufficiently alleged that the messages came from an ATDS.  It is true

25 that in many TCPA cases cited by Heartland there seems to have been no pre-existing

relationship between the parties, indicating some probability that messages were sent randomly.[8]
However, that does not establish that the absence of a relationship is necessary for Plaintiffs to
successfully allege that an ATDS was used.  Plaintiffs have stated that they received a text
message from an SMS short code and that the message was sent by a machine with the capacity
to store or produce random telephone numbers.  While additional factual details about the
machines might be helpful, further facts are not required to move beyond the pleading stage.  It
is possible that further litigation will determine that no ATDS was used, but the complaint has
pleaded enough facts "to raise a right to relief above the speculative level."  Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 555 (2007).

**D. First Amendment Challenge**

Heartland challenges the TCPA on First Amendment grounds, asserting that it is
unconstitutional to prohibit calls from machines that have the capacity for random or sequential
number generation but do not utilize that capacity.  Plaintiffs oppose this challenge, and the
United States also filed a brief supporting the statute's constitutionality.[9]

Heartland's overbreadth challenge focuses on its contention that the statute allows speech
restrictions that would not serve the law's purpose.  For example, Heartland posits that a person
could be held liable under the TCPA if she were to send a dinner invitation to a friend of a friend

---

[8]     First, as Plaintiffs point out, the machine only needs to have the capacity to store or produce
numbers using a random or sequential number generator, so creating a pleading standard that requires an
inference that such a capacity was actually used would create an unwarranted burden.
        Heartland has also failed to show that a machine which is fed a large list of telephone numbers
and then dials them sequentially or randomly (see Satterfield, 569 F.3d at 949), should not be considered
an ATDS.  It is true that some (and maybe all) recipients in this case were Jiffy Lube customers, and thus
may have been contacted from a list of telephone numbers.  But Heartland has not adequately
demonstrated that this would absolve them of liability under the statute, given that such a machine could
arguably be said to "store . . . telephone numbers to be called, using a random or sequential number
generator." 47 U.S.C. § 227(a)(1).
[9]     The parties have cited one case that directly considered the First Amendment challenge.  Lozano
v. Twentieth Century Fox Film Corp., 702 F.Supp. 2d 999 (N.D. Ill. 2010).  While the court upheld the
statute, its analysis was limited and its existence does not obviate the need for this court to perform its
own review of the issue.

using a machine that has the capacity to randomly or sequentially generate telephone numbers. Heartland maintains that such a situation is entirely possible because "[e]veryday devices . . . like the iPhone, the BlackBerry, and the personal computer have the 'power, ability, or faculty' to randomly or sequentially generate and dial telephone numbers." MTD at 18.

Under a First Amendment facial challenge, a "law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Comite de Jornaleros v. City of Redondo Beach, 657 F.3d 936, 944 (9th Cir. 2011) (citations and internal quotation marks omitted). First, the court should construe the law in question in order to determine the scope of its coverage. Id. at 945. If the law is content neutral (as the parties agree the TCPA is), the court should then determine whether the restrictions on the time, place, or manner of speech are narrowly tailored to serve a significant government interest, and whether ample alternative channels for communication have been left open. Id.[10]

The Ninth Circuit has confirmed that the statute creates liability based solely on a machine's capacity rather than on whether the capacity is utilized. Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 951 (9th Cir. 2009) (explaining that "a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it").

With the scope of the law established, the parties' principal disagreement is about the governmental interest at issue. Heartland points to the specific TCPA subsection governing this case, arguing that the government interest is "to prevent the random or sequential generation and dialing of cellular telephone numbers." MTD at 16. See 47 U.S.C. §§ 227(a)(1), (b)(1)(A). In

---

[10]     Lozano, 702 F.Supp. 2d 999, applied the commercial speech standard in this situation. However, the Ninth Circuit has explained that "the tests for time, place, and manner restrictions for content-neutral speech and regulations for commercial speech regulations are essentially identical." Moser v. FCC, 46 F.3d 970, 973 (9th Cir. 1995).

support, Heartland cites     § 227(b)(1)(C), which (unlike § (b)(1)(A)) prohibits certain messages

from facsimile machines but does not limit the prohibitions to those machines with any certain

autodialing capacity.  Plaintiffs and the United States disagree with Heartland's framing of the

issue, arguing based on legislative history and FCC documents that the governmental interest is

in reducing the volume of solicitations to consumers from autodialing equipment and protecting

consumers from cost and invasions of privacy.

Both parties cite to legislative history to support their respective interpretations of the

law.  But while Heartland may be correct that preventing the random or sequential generation

and dialing of cellular telephone numbers is one goal of the statute, it certainly is not limited to

such a purpose.  One indication of this is the very phrase that Heartland thinks is

unconstitutional—"has the capacity".  If Congress' goal was as narrow as Heartland posits, the

phrase "has the capacity" would have been superfluous.  Rather, Plaintiffs and the United States

have shown that the government sought to generally protect consumers' privacy and reduce the

volume of telephone solicitations.

In meeting this goal, the regulation in question "need not be the least restrictive or least

intrusive means" of meeting Congress' goal, but may not "burden substantially more speech than

necessary."  U.S. Br. at 8; Ward v. Rock Against Racism, 491 U.S. 781, 798-99 (1989).   As the

government argues, "Congress anticipated that advancements in technology would allow

telemarketers to employ new and more sophisticated ways of auto-dialing large lists of

numbers." U.S. Br. at 10.  Regulating machines that have the capacity to do so serves the overall

goal of protecting privacy and reducing call volume.  Heartland has not successfully shown that

the statute fails to serve that interest, and it has also failed to demonstrate that the statute will

burden substantially more speech than necessary.  Its argument is principally based on the

potential that individuals will be held liable for use of a smartphone or personal computer.

However, it provides essentially no support for its assertion that use of an iPhone or BlackBerry

could fall under the statute's purview.[11]  While Heartland cites to <u>Comite de Jornaleros</u> to demonstrate that the court should consider examples of improperly-restricted speech, the examples in that case, unlike here, "f[e]ll squarely within the plain language of th[e] facially overbroad law."  657 F.3d at 948 n.7.

Without further support for Defendant's argument, the court cannot conclude that use of personal electronic devices in the situations posed by Heartland would be restricted by the TCPA.  Even assuming that Heartland did make such a showing, it clearly has not demonstrated that the threatened overinclusiveness would be substantial.  Finally, Heartland has not shown that any speaker would lack ample alternative channels for communication.  For these reasons, Heartland's First Amendment challenge fails.

\* \* \*

For the reasons stated above, the motion to dismiss is DENIED.[12]

## II. MOTION TO COMPEL ARBITRATION OF PLAINTIFF CUSHNIE'S CLAIMS[13]

The arbitration agreement at issue was allegedly signed by Plaintiff Cushnie when he visited a Heartland location in December of 2010 in Seattle.  In relevant part, the document at issue, "THE JIFFY LUBE PLEDGE OF SATISFACTION," states that:

> Jiffy Lube® and you agree that any and all disputes, controversies or claims between Jiffy Lube® and you (including breach of warranty, contract, tort or any other claim) will be resolved by mandatory arbitration according to the terms of this Mandatory Arbitration Agreement ("Agreement"), except that any such dispute can be resolved by a small claims court if and for so long as the dispute is within its jurisdiction.  By this Agreement, Jiffy

---

[11]    In support of its claim that a smartphone would qualify as an ATDS, Heartland cites to a comment made by Wells Fargo & Co. in a Notice of Proposed Rulemaking by the FCC.  25 FCC Rcd. 1501, 1510 (Jan. 20, 2010).

[12]    Heartland has also challenged the potential damage award on due process grounds.  The court declines to rule on the due process challenge at this early stage—though the statute does provide specific damage amounts, many questions remain unanswered concerning Heartland's culpability and the size and nature of the putative class.

[13]    Heartland's motion to compel arbitration only applies to the complaint of Lawrence Cushnie, though Heartland states that "the same arbitration provisions applicable to Plaintiff here are likely contained in invoices signed by other putative class members."  Mtn. to Compel Arb. at 4, n. 1.

Lube® and you also agree to only bring disputes against each other in an individual capacity and not as a class representative or class member and waive the right to a jury trial.

Under the Federal Arbitration Act, arbitration provisions are generally "valid, irrevocable, and enforceable." 9 U.S.C. § 2. However, the Act "permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.'" AT&T Mobility LLC v. Concepcion, 131 S.Ct. 1740, 1746 (2011) (quoting 9 U.S.C. § 2). Further, "[t]he general rule in interpreting arbitration agreements is that courts 'should apply ordinary state-law principles that govern the formation of contracts." Cape Flattery Ltd. v. Titan Maritime, LLC, 647 F.3d 914, 920 (9th Cir. 2011).

The language of the arbitration agreement is incredibly broad. It purports to apply to "any and all disputes" between Jiffy Lube® and Cushnie, and is not limited to disputes arising from or related to the transaction or contract at issue. Heartland has not identified a case involving an arbitration agreement that is so unlimited, and indeed does not attempt to argue that the agreement can truly encompass "any and all disputes" between the parties. As Heartland must admit, a suit by Cushnie against Heartland regarding a tort action arising from a completely separate incident could not be forced into arbitration—such a clause would clearly be unconscionable. For example, in Smith v. Steinkamp, 318 F.3d 775, 777 (7th Cir. 2003), Judge Posner noted that if there were no limiting clause in the arbitration agreement at issue in that case, "absurd results [would] ensue," such that if a defendant murdered the plaintiff in order to discourage default on a loan, the wrongful death claim would have to be arbitrated.

Implicitly, Heartland seems to urge the court to construe this agreement narrowly enough to avoid invalidation, but broadly enough to encompass the claims at issue in this case. The court declines to rewrite the agreement in such a fashion. Heartland has not pointed to any authority that would give the court permission to do so.

Even if the court were willing to read the agreement so as to contain a typical limitation, such as that the dispute at issue must "arise out of or relate to" the contract, it is doubtful whether that language would encompass the claims here. Though it seems likely that Cushnie provided his telephone number when signing the contract, it is unclear that later use of that number to commit a tort can be said to relate to the contract—contrary to Heartland's repeated urging, the fact that the text message offered membership in a club that would provide discounts on an oil change does not establish that the text message was related to the contract governing Cushnie's oil change. The existence of the original contract may have been the "but for" cause of the alleged TCPA violation, but this alone is not necessarily enough to establish that the claim arises out of or relates to the contract.

## IV. CONCLUSION

The allegations in the complaint meet the federal pleading standard, and Heartland has not demonstrated that the TCPA is unconstitutionally overbroad. Further the court declines to salvage the arbitration agreement by writing in terms that would encompass the alleged TCPA violations at issue. For these reasons, both of Heartland's motions are DENIED.

**IT IS SO ORDERED.**

DATED: March 8, 2012

**Jeffrey T. Miller**
**United States District Judge**